IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| | Case No.: 00-3837 (JKF) |
| OWENS CORNING, et al., | |
| | (Jointly Administered) |
| Debtors | |
| | Related to Docket Nos. 13509, 13511, 13512, |
| | 13513, 13514, 13515, 13516, 13517, 13518, |
| | 13519, 13520, 13521, 13522, 13523, 13524, |
| | 13525, 13526, 13527 |

## SPEIGHTS & RUNYAN'S CONSOLIDATED RESPONSE TO DEBTORS' OBJECTIONS TO CERTAIN ASBESTOS PROPERTY DAMAGE CLAIMS

Speights & Runyan ("S&R"), on behalf of certain asbestos property damage claimants,

hereby responds, on a consolidated basis, to Debtors' objections to certain asbestos property

damage claims, namely: Garrison Public School District #51 (Claim Nos. 8783, 8926); One

Liberty Plaza Building (Claim Nos. 8299, 8576); Presbyterian Church of Jamesburg (Claim Nos.

8271, 8573); Fair Lawn Professional Center (Claim Nos. 8441, 8628); Saint Peter and Paul

Congregation (Claim Nos. 8633, 8683); The State of North Dakota (Claim Nos. 8744, 8922);

Wauwatosa School District (Claim No. 8678, 9556); Winneconne School District (Claim Nos.

8677, 9555); Wood River Rural Jr./Sr. High School (Claim Nos. 8771, 9573); Kindred Public

School District #2 (Claim No. 8886); Anderson Memorial Hospital (Claim Nos. 8822, 8795);

Jacksonville City Hall (Claim Nos. 8357, 8608); Altoona School District (Claim Nos. 8752,

9557); Green Bay Area Public Schools (Claim Nos. 8709, 8871); City of Rock Hall (Claim Nos.

8735, 8959); 880 Third Avenue Building (Claim Nos. 8362, 8609); Clara Maass Medical Center

(Claim Nos. 8500, 8648); Langley Professional Office Building (Claim Nos. 8596, 8323);

A-50

(collectively hereinafter "Claim Objections") and in support thereof, represents as follows:

## I. THE CLAIM OBJECTIONS ARE PROCEDURALLY IMPROPER[1]

1.    During the hearing on October, 25, 2004, this Court ruled that an initial case management order would be put in place regarding the remaining asbestos property damage claims to set: (1) objection deadlines for objections to asbestos property damage claims; (2) response deadlines for responses to the asbestos property damage claim objections; (3) a discovery schedule; and (4) a status conference. (See October 25, 2004 hearing transcript attached hereto as Exhibit A at page 54, lines 24-25 and page 55, lines 1-19).

2.    Additionally, the Court also ruled that the Speights & Runyan claimants, the State of Delaware and the Debtors would participate in mediation to attempt to resolve their subject claims before costly and protracted litigation ensued. In fact, the parties were directed by the Court to submit the names of four (4) potential mediators if they could not agree on a particular mediator (See attached October 25, 2004 hearing transcript at page 53, lines 13-23).

3.    On November 11, 2004, the parties submitted the names of four (4) potential mediators with their CV's but the Court has not yet appointed a mediator and, therefore, the parties have not started the mediation process (See November 11, 2004 letter to Court with CV's attached hereto as Exhibit B).

4.    The protocol that was established by the Court to resolve the remaining asbestos property damage claims clearly contemplated that mediation (for the parties that desired mediation) would occur prior to the start of actual litigation. The Debtors apparently agree with

---

[1] Under the circumstances, S&R pointed out the procedural infirmities with the Claim Objections and requested that the Debtors agree to extend the time for responses to the Claim Objections and continue the scheduled hearing for the reasons set forth in this response, but the Debtors refused to extend the time for responses and continue the scheduled hearing.

A-51

this proposition because in their Motion For Entry of Case Management Order Relating To Asbestos Property Damage Claims [Docket No. 13533] at ¶12, they state "After the Court selects a mediator, the parties will work with the mediator to determine which claims can be consensually resolved."

5.      Nevertheless, in direct contradiction of their purported desire to resolve the subject claims consensually, the Debtors filed the Claim Objections and wrongfully assert that the claims subject to the Claim Objections should be resolved "as a matter of law without the need for any discovery" (See Claim Objections at ¶ 25 and ¶ 26 in the Wauwatosa School District and the Altoona School District claim objections).[2]

## II.   RESERVATION OF RIGHTS

6.      Finally, due to the unique circumstances surrounding the Claim Objections vis-a-vis mediation and the proposed case management order, S&R on behalf of the claimants subject to the Claim Objections, hereby reserves the right to amend this Response on a substantive basis, file additional papers in support of this Response or take other appropriate actions to: (a) respond to any allegation, objection or claim that may be raised by or on behalf of the Debtors or other interested parties, (b) further respond to any objection for which the Debtors provide (or attempt to provide) additional documentation or substantiation, or (c) further respond to any objection based on additional information that may be discovered by S&R pursuant to the applicable provisions of Part VII of the Federal Rules of Bankruptcy Procedure.

---

[2]  The Debtors are wrong in at least two (2) aspects: (a) the Claim Objections cannot simply be resolved as a matter of law, since there are factual issues that must be vetted through the discovery process and then adjudicated by the Court after an evidentiary hearing and; (b) the Debtors are not correct on the state law to be applied by the Court when making a determination whether the various state statutes of limitations will preclude the assertion of the claims at issue.

## III. CONCLUSION

7.    For the foregoing reasons, the Debtors' Claim Objections should be overruled or,

alternatively, continued to a later date with a new objection deadline to allow for mediation.


FERRY, JOSEPH & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
(302) 575-1555
Local Counsel for the Speights & Runyan
Claimants

-and-

Daniel A. Speights, Esq. (SC Bar No. 4252)
SPEIGHTS & RUNYAN
200 Jackson Avenue East
P.O. Box 685
Hampton, South Carolina 29924
(803) 943-4444
(803) 943-4599 (fax)
Counsel for the Speights & Runyan Claimants

Dated: January 7, 2005

EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .          Chapter 11

Owens Corning, et al.,              .

          Debtor(s).                .          Bankruptcy #00-3837 (JKF)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
October 25, 2004
10:00 a.m.


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              Norman Pernick, Esq.
                                Saul, Ewing, LLP
                                222 Delaware Ave.
                                Wilmington, DE 19899

                                Mary Beth Hogan, Esq.
                                Debevoise & Plimpton, LLP
                                919 Third Ave.
                                New York, NY 10022

For Creditor's Committee:       William Sudell, Esq.
                                Morris, Nichols, Arsht
                                & Tunnell
                                1201 North Market Street
                                Wilmington, DE 19899

                                James McClammy, Esq.
                                Davis, Polk & Wardwell
                                450 Lexington Ave.
                                New York, NY 10017

A-55




2

```
 1                                  Howard Kessler, Esq.
                                    Anderson, Kill & Olick
 2                                  1251 Ave. of the Americas
                                    New York, NY 10020

 3
     For Asbestos Claimants:        Mark T. Hurford, Esq.
 4                                  Campbell & Levine, LLC
                                    1201 North Market St.-Ste. 1501
 5                                  Wilmington, DE 19801

 6                                  Peter Lockwood, Esq.
                                    Caplin & Drysdale
 7                                  One Thomas Circle, N.W.
                                    Washington, DC 20005

 8
     For Futures Representative:    Sharon Zieg, Esq.
 9                                  Young, Conaway, Stargatt
                                    & Taylor, LLP
10                                  The Brandywine Bldg.
                                    1000 West St.-17th Fl.
11                                  Wilmington, DE 19801

12                                  Edmund M. Emrich, Esq.
                                    Kaye, Scholer, LLP
13                                  425 Park Ave.
                                    New York, NY 10022

14
     For Travelers:                 Linda M. Carmichael, Esq.
15                                  White & Williams, LLP
                                    824 North Market St.-Ste. 902
16                                  Wilmington, DE 19801

17   For King Street, et. al.:      Kenneth Pasquale, Esq.
                                    Stroock Stroock & Lavan, LLP
18                                  180 Maiden Lane
                                    New York, NY 10038

19
     For Bank of America:           Eric Sutty, Esq.
20                                  The Bayard Firm
                                    222 Delaware Ave.-Ste. 900
21                                  Wilmington, DE 19899

22                                  Josef Athanas, Esq.
                                    Latham & Watkins
23                                  Sears Tower
                                    233 South Wacker Dr.-Ste. 5800
24                                  Chicago, IL 60606

                       A-56
25
```

Writer's Cramp, Inc.

3

| | |
|---|---|
| 1 | For CSFB: | Richard Cobb, Esq. |
| 2 | | Landis Rath & Cobb, LLP<br>919 Market Street-Ste. 600<br>Wilmington, DE 19801 |
| 3 | | |
| 4 | | Timothy E. Graulich, Esq.<br>Weil Gotshal & Manges<br>767 Fifth Ave. |
| 5 | | New York, NY 10153 |
| 6 | | Gary M. Becker, Esq. |
| 7 | | Kramer Levins Naftalis<br>& Frankel, LLP<br>919 Third Ave. |
| 8 | | New York, NY 10022 |
| 9 | For Kensington International:<br>Springfield Assoc., | David J. Baldwin, Esq. |
| 10 | | Potter Anderson & Corroon, LLP<br>Hercules Plaza<br>1313 N. Market St. |
| 11 | | Wilmington, DE 19801 |
| 12 | For | James J. Lotz, Esq. |
| 13 | | Foley & Mansfield, PLLP<br>545 Madison Ave.-15th Fl.<br>New York, NY 10022 |
| 14 | | |
| 15 | | Carl N. Kunz, III, Esq.<br>Morris James Hitchens |
| 16 | | & Williams, LLP<br>PNC Bank Center<br>222 Delaware Ave.-10th Fl. |
| 17 | | Wilmington, DE 19899 |
| 18 | For Speights & Runyan:<br>Claimants | Theodore J. Tacconelli, Esq. |
| 19 | | Ferry Joseph & Pearce, PA<br>824 Market Street-Ste. 904<br>Wilmington, DE 19800 |
| 20 | | |
| 21 | | Daniel A. Speights, Esq.<br>Speights & Runyan |
| 22 | | 200 Jackson Ave. East<br>Hampton, SC 29924 |
| 23 | | |
| 24 | | |
| 25 | A-57 | |

4

| | |
|---|---|
| 1 | For Roberta A. DeAngelis: | Frank J. Perch, Esq. |
| | (Acting US Trustee-Reg.3) | USTP |
| 2 | | Department of Justice |
| | | 844 King Street-Ste. 2313 |
| 3 | | Lock Box 35 |
| | | Wilmington, DE 19801 |
| 4 | | |
| | Audio Operator: | Todd Kirk |
| 5 | | |
| | Transcribing Firm: | Writer's Cramp, Inc. |
| 6 | | 6 Norton Rd. |
| | | Monmouth Jct., NJ 08852 |
| 7 | | 732-329-0191 |

8  Proceedings recorded by electronic sound recording, transcript produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-58

5

1       THE COURT:  Good morning.

2       MR. PERNICK:  Good morning, Your Honor.

3       THE COURT:  Please be seated.  I don't know what it

4  is about this case.  I keep getting this blue screen of death

5  every time I start working on this computer.

6       (Laughter)

7       THE COURT:  Did something happen --

8       MR. PERNICK:  Well, at least it's not the black

9  screen.

10      THE COURT:  -- in this 2 minutes while I was gone?

11      (Laughter)

12      THE COURT:  Nope?  You'll have to wait a minute.

13      MR. PERNICK:  That's fine, Your Honor.

14      THE COURT:  I'm sorry.

15      (Pause in proceedings)

16      THE COURT:  Oh, this is bad news.

17      (The Court and the Clerk confer)

18      MR. PERNICK:  Your Honor, I didn't know -- also, we

19  have -- I think some people that are supposed to be on the

20  phone.

21      THE COURT:  All right.

22      MR. PERNICK:  So, I think we probably should dial

23  them in at some point.

24      (Telephone connection attempted)

25      THE COURT:  Apparently I don't have the right phone



6

1    number.

2            MR. PERNICK:  I'm gonna try to get it.

3        (Telephone connection attempted)

4            THE COURT:  Mr. Pernick, I don't think we're going to

5    get anybody by phone.

6            MR. PERNICK:  Okay.  We're gonna try to get that

7    number now.

8            THE COURT:  Okay.  I'm sorry for the delay folks.

9    This is the matter of <u>Owens Corning Bankruptcy</u>, #00-3837.  I

10   have a list of parties who are appearing by phone.  When we

11   find out whether we can connect them, I'll read the list off.

12   But for now, is there anything we can do without the parties by

13   phone?

14           MR. PERNICK:  Yeah, I think we can go through some of

15   the preliminary matters, Your Honor.

16           THE COURT:  All right.

17           MR. PERNICK:  The first one is -- that I have is

18   continued to November 15th is the CSFB Motion to Compel

19   compliance with the stand-still agreement.  And I thought I

20   would just explain very quickly what's going on with that so

21   the Court knows there's been progress in that matter and we're

22   actually hopeful that we'll get a resolution.  As to the bank's

23   -- as the Court is aware -- oh, excuse me -- I have 888-311-

24   9053.

A-60

25           THE COURT:  Well, the last -- I had 8053 -- but,

1    okay.  I'll try 9053.

2            MR. PERNICK:  9053 and then the code 435091.

3            THE COURT:  That's what the code was --

4            MR. PERNICK:  Okay.

5            THE COURT:  435091, but I never got that far.

6        (Telephone connection established)

7            MR. PERNICK:  I never liked that voice until now,

8    Your Honor.

9            THE COURT:  Are we connected?

10            MR. PERNICK:  It's gotta bounce.

11            THE COURT:  Hello?  Anybody on the phone?

12            UNIDENTIFIED SPEAKER:  Yes, Your Honor, there's a

13    bunch of people.  We've got our mute buttons on.

14            THE COURT:  All right.  Thanks.  I'll read the list

15    of participants by phone.  I'm sorry for the delay.  We were

16    having some technical difficulties here.  By phone I have Adam

17    Eisenberg, Gordon Harris, Isaac Puchulski, John Shaffer, John

18    Gibbons, Robert Milner, Andrew --

19            MR. LEIBERMAN:  Leiberman.

20            THE COURT:  -- Leiberman, Patrick Knapp -- I'm sorry,

21    Maxi -- Joe Caplin, Sandy Esserman or David Parsons -- but I

22    recognize Mr. Esserman's voice -- Natalie Ramsey, Elizabeth

23    Magner, Monty Travis, John Gregory, Crystal Howard, Bruce

24    White, Sara Ni-Campbell, Gerald Stein, Raymond Callery and

A-61

25    Jeffrey Carbino.  Okay.  Mr. Pernick was about to explain that

8

1    item #1 has been continued to November 15th.  Mr. Pernick?

2          MR. PERNICK:  There are two -- the are actual --

3    there are two parts.  One is this Motion and one's related, so

4    I'm going to go over both those at once.  And they relate to

5    the banks and then the bond holders in trade.  As to the banks,

6    as the Court is aware, Weil, Gotshal has taken over the

7    estimation process on behalf of the banks and litigating that.

8    And it's been represented to the Debtors that Davis, Polk and

9    Kramer, Levins are not billing the estate for estimated --

10   estimation related fees or expenses as of approximately July 1.

11   That leaves what we're calling a stub period of Kramer, Levins'

12   fees and expenses for the period of October of '03 through June

13   of '04.  The parties are negotiating to see if there's an

14   acceptable compromise amount that the estate would agree to

15   pay.  And just to give the Court an idea of what we're talking

16   about, the total amount that they claim for that period is in

17   the $350,000 range.  So we're gonna talk and continue talking,

18   we have been, to see if there's an acceptable amount that we

19   believe is a compromise the estate would be willing to pay so

20   that we don't bring that dispute further to the Court.

21          THE COURT:  All right.

22          MR. PERNICK:  As to the bond holders and the trade,

23   the ACC and the Futures Rep. and the Debtors have agreed that

24   Anderson, Kill can receive a maximum of $50,000 per month for

25   the months of October 2004 through January of 2005 to monitor

A62

*Writer's Cramp, Inc.*

1    the estimation process.  And the reason for that is in the

2    event that there is a deal between all of the parties and the

3    banks, but not the bonds, and the estimation trial needs to go

4    forward, the bonds are gonna need to pick that up.  And they

5    feel that the need to stay at least in a monitoring role so

6    that they would be in a position to pick that up in the event.

7    And we thought, considering the limited amount of time and the

8    relatively limited amount of fees, and in addition, the amount

9    of fees that Anderson, Kill has billed up until now, which we

10   view as a very reasonable number, we thought that that was a

11   fair compromise of that part of it, even though it's not part

12   of the bank stand-still agreement and the Motion to Compel

13   compliance with it, it's very related to it.  So we actually

14   tried to resolve both of those at once.

15           THE COURT:  All right.  Just a second.

16        (The Court and the Clerk confer)

17           THE COURT:  Okay, Mr. Pernick, thanks.

18           MR. PERNICK:  So that's the reason for #1's

19   continuous to -- continuance to 11/15.

20           THE COURT:  All right.

21           MR. PERNICK:  Continuance to December 20th of '04 is

22   #10, which is the AT Plastics adversary.  And #11 which is the

23   Nexterone adversary.  And we are trying to resolve both of

24   those, but in the event we can't, those status conferences are

25   continued to 12/20 with the Court's permission.

A-63

1      THE COURT:  All right.

2      MR. PERNICK:  Number 7, which relates to the

3  amendment of the Lexington lease, there was a Certification of

4  Counsel submitted on that one.  I just want to check a note

5  here, Your Honor.  Okay, and then #8, which is the Motion to

6  Extend and Modify the D-I-P financing, again, there was a

7  Certification of Counsel submitted on that one also, Your

8  Honor.

9      THE COURT:  When were they submitted?

10     MR. PERNICK:  Give me one moment.

11     THE COURT:  I -- I've got an amended CNO with respect

12  to item 8 on the Motion to Modify the D-I-P financing?

13     MR. PERNICK:  Yes.  That was #12927.  And that was

14  October 12th, on number --

15     THE COURT:  The amended CNO, not a Certification of

16  Counsel.

17     MR. PERNICK:  Sorry, it was an amended CNO.  And the

18  same thing for #7 was actually a Certification of No Objection.

19  That was Docket #12901 filed on October 11th.  We can send

20  additional copies over later in the day if you'd like.

21     THE COURT:  I think I instructed my staff with

22  respect to those, 7 and 8, to have those orders entered on the

23  CNO's.  I was just confused because when you said there was a

24  COC, I thought maybe something else had changed on the

25  financing.

A-64


Writer's Cramp, Inc.

1        MR. PERNICK:  No.  I apologize.  I was inexact on

2    that.  My notes are actually COC/CNO submitted and I -- it --

3    they were both CNO's.

4        THE COURT:  All right.  I'll -- if those orders have

5    not been entered, they should be entered hopefully today.

6        MR. PERNICK:  Thank you, Your Honor.  You did enter

7    an order, just for record, on #5, which was the Highway 290

8    administrative expense claim.  And the matters that are not

9    going forward are #2, which is the B & W settlement, and that's

10   only because it's resolved and we will be submitting an order -

11   - there actually is an agreed Form of Order between the

12   parties, the Debtors and the objector of the banks.  And we'll

13   be submitting that order probably later today or early

14   tomorrow.  We just have to get final approval of that from the

15   banks, but we've agreed on the language.

16       THE COURT:  All right.

17       MR. PERNICK:  And #6, which is the Baron & Budd 2019

18   Motion, which Your Honor dealt with at a hearing earlier this

19   month in Pittsburgh and it encompassed that Motion.  The other

20   matter that's not going forward which is going to be withdrawn

21   --

22       THE COURT:  I'm sorry.  Has an order been submitted

23   with respect to item 6?

24       MR. PERNICK:  No, because you entered an order in the

                        A-65

25   Owens Corning case with respect to 2019.  It was actually, I

12

1   think --

2           THE COURT:  No --

3           MR. PERNICK:  -- in the last week.

4           THE COURT:  Pittsburgh Corning case.

5           MR. PERNICK:  I think you entered it in the Owens

6   Corning case first.

7           THE COURT:  The Owens too, okay.

8           MR. PERNICK:  And I -- I know there was one in Owens

9   Corning.  I'm not sure about Pittsburgh.

10          MR. LOCKWOOD:  Your Honor, you did.  I mean it was --

11  I got a copy of it.

12          THE COURT:  Okay.  After -- before the Pittsburgh

13  Corning one?

14          MR. LOCKWOOD:  No, after it.

15          THE COURT:  Okay.

16          MR. LOCKWOOD:  You issued orders at PC Git, Narco and

17  Owens Corning.

18          THE COURT:  That's right, I did.  Okay.  And what I

19  was trying to do was make sure -- because the -- that I was

20  getting them in all the cases, and I was aware that I had some

21  of them in the Delaware, but not all the Delaware cases, and I

22  didn't know which.  But I knew the one I had worked on was

23  Pittsburgh Corning --

24          MR. PERNICK:  Right.

25          THE COURT:  A-66 -- not Owens.  Okay.  So this one's

13

1   entered then?

2       MR. PERNICK:  Correct.

3       THE COURT:  All right.  Thank you.

4       MR. PERNICK:  And as to #4 which was the Dehay &

5   Ellison retention -- excuse me, one moment -- our understanding

6   is that the Movant is -- which is the Committee -- is going to

7   withdrawal that Motion without prejudice.  I want to just put

8   one quick note on the record.  It's withdrawn specifically

9   without prejudice to the rates of the bonds and the trade to

10  later request Dehay & Ellison's retention, and that's for the

11  same reason.  In the event that there is a deal with the banks

12  and the Debtors and the ACC and the Future's Rep., but not the

13  bonds, and the bonds and trade want to retain Dehay & Ellison

14  the assist in trying the estimation case, then we've agreed

15  that this is a withdrawal without prejudice, even though it's

16  on behalf of the Committee.  And we've also agreed that if

17  circumstances warrant it and they need an expert at a hearing

18  that we would agree to that expert at a hearing on the

19  retention.  And this has been on the Court's calendar for

20  probably 7 or 8 months at this point.  So --

21      THE COURT:  All right --

22      MR. PERNICK:  -- people are pretty aware of what it

23  says.

24      THE COURT:  Is a formal notice of withdrawal without

25  prejudice going to be filed then?

A-67

14

1    MR. PERNICK: Yes. I believe that there's actually a

2  -- either a stipulation or a Form of Order that I just received

3  today. We just need to look at it and then we'll agree on it

4  and it'll be submitted to the Court.

5    THE COURT: All right.

6    MR. PERNICK: That leaves three items, Your Honor.

7  One is #3, which is exclusivity. And the Court may recall that

8  the reason that that is on the calendar for today is that at

9  the July 19th hearing on the last Motion for an Extension of

10  the solicitation period, the Court extended exclusivity on

11  solicitation through 12/31/04, but you directed that in the

12  event that Judge Fullam ruled on substantive consolidation,

13  that we put it on the next Omnibus Hearing, after that ruling

14  came out. Judge Fullam ruled on October 5th, so we added it to

15  the agenda for this hearing. I think the Court is aware that

16  an appeal -- or if not, I'll tell the Court -- that an appeal

17  was filed to that sub-con ruling on October 13th. Judge Fullam

18  in that ruling ordered the parties to try to reach a consensual

19  resolution. And there are meetings scheduled for this week on

20  October 28th and for next week on 11 -- on November 2 to try to

21  get that accomplished. Obviously, I can't say whether it's

22  gonna happen or not. We're hopeful that it will resolve. But

23  the parties are scheduled for full day meetings each of those

24  two days to try to resolve things.

A-68

25    The estimation hearing is currently scheduled for January

1   13th of 2005.  Although, just for full disclosure, I will tell

2   the banks -- tell the Court that the banks have asked Judge

3   Fullam to continue that hearing for up to a year.  And we don't

4   know how that's gonna come out.  It's been -- there's been an

5   opening motion filed.  There was a response by the Debtors and

6   the ACC and the Future's Rep.  And I believe that the banks

7   will be filing a response, and then we don't know whether Judge

8   Fullam will schedule argument or just rule.

9           THE COURT:  Well, obviously it's not before me.  But

10  just for the sake of curiosity, why -- what's the basis --

11          MR. PERNICK:  Um --

12          THE COURT:  -- to ask --

13          MR. PERNICK:  I'll try to give it to you as well as I

14  can -- or maybe if Tim wants to.  Judge Fullam originally ruled

15  that there would be an initial estimation hearing just on

16  expert reports.

17          THE COURT:  Right.

18          MR. PERNICK:  And I think implicit or explicit in

19  that ruling was that he would then determine whether anything

20  further needed to happen for him to estimate.  The banks

21  believe that they need to look at individual files of claimants

22  and conduct a trial that's based, in some part at least, on --

23  those individual files arguing that the Debtor's settlement

24  history is not appropriate and that these files will show, when

25  they're reviewed and tried, that the numbers should be a lot

A-69

16

1   lower than the experts say that it is, or at least the other

2   experts --

3                   THE COURT:  Okay.

4                   MR. PERNICK:  -- besides theirs.

5                   THE COURT:  Okay.

6                   MR. PERNICK:  I think that's generally the dispute.

7                   THE COURT:  All right.

8                   MR. PERNICK:  So I'm not quite sure -- and would

9   never presume to know what was in the Court's mind.  I mean,

10  we're back here on a status on exclusivity.  Actually, I looked

11  back at the transcript and my recollection was that the Court

12  asked for a status report.  But there's nothing in the

13  transcript that says that the Court actually -- you could read

14  the transcript to say that the Court wanted to hear argument

15  again after sub-con had come out.

16                  THE COURT:  Oh, I wanted a status report because in

17  the event that the -- a ruling was against substantive

18  consolidation, I wanted to get the Debtor's opinion about how

19  long it was going to take to amend the Disclosure Statement and

20  get a new plan on file.

21                  MR. PERNICK:  Right.

22                  THE COURT:  Since it's in favor of substantive

23  consolidation, I'm still not sure the Debtor can do much until

24  the estimation is resolved, unless you can leave a big blank

A-70

25  space, with respect to, you know, the amount of the claims that



1   are going to be -- be -- have to be reconciled through the

2   trust distribution procedures. And I'm not sure that makes a

3   great deal of sense. But that's what I wanted to discuss.

4          MR. PERNICK: Right.

5          THE COURT: So --

6          MR. PERNICK: Well, I can tell you what the Debtor's

7   been doing. I mean, we -- Your Honor may recall that at the

8   2019 hearing in Pittsburgh earlier in the month, you instructed

9   us to get moving on the Plan and Disclosure Statement, which we

10   actually are doing. It, I think by necessity, really can't be

11   finalized until -- well, it could be finalized, and we could do

12   a chart which would show a range of recoveries. And I'm not

13   sure which position we're gonna take right now; whether we're

14   gonna wait for estimation or whether we're going to put a range

15   of recoveries -- put a Plan and Disclosure Statement out there

16   and try to move on that. I think it depends a little bit on

17   whether the estimation hearing's really gonna happen, whether

18   we think Judge Fullam's gonna rule on it, and then we would

19   decide. But we're gonna do most of the revisions that we can

20   do and get it ready to go, both Plan and Disclosure Statement.

21   And then I guess it'll be up to the Debtors, and probably more

22   importantly the Court, on whether you would like us to proceed

23   or wait until the estimation number comes out.

24          THE COURT: Well, if a range of recoveries is

25   possible, I'm not sure that -- at least for an amended

A-71

*Writer's Cramp, Inc.*

1  Disclosure Statement purpose, that's not appropriate.  And I

2  don't know -- I don't know enough about your range to know what

3  kind of information it's going to get.  But in theory, I don't

4  see why that's a problem.

6       MR. PERNICK:  Well, we did it before in the last

6  version and I think, you know, we probably know more about what

7  the range is likely to be than less.  And so that's certainly a

8  possibility.

9       THE COURT:  I would just think that most of the

10 parties by now would like to out of this bankruptcy.  And to

11 the extent that moving this Plan forward gets you out of

12 bankruptcy, it --

13      MR. PERNICK:  I think you're correct that most of the

14 parties would like to be out of bankruptcy.

15      THE COURT:  Nice to be -- so, you know, maybe some

16 marching along that line wouldn't hurt.

17      MR. PERNICK:  Right.  Would you like to keep the

18 current solicitation period at 12/31, or does it makes sense to

19 have that be a different later date or not?

20      THE COURT:  Well, I guess it depends on when you're

21 going to file and what you're going to file.

22      MR. PERNICK:  Um --

23      THE COURT:  You know -- as I understand it -- let me

24 back up.  As I understand it from prior discussions and prior

A-72
25 hearings, the Debtor has to amend the Disclosure Statement

1  based on the settlement with the bonds and maybe some other

2  matters --

3         MR. PERNICK:  Correct.

4         THE COURT:  -- anyway.

5         MR. PERNICK:  That's correct.

6         THE COURT:  Correct?  So, I think we ought to at

7  least get the documents in place and now that you've got a

8  ruling of substantive consolidation, even though it's on

9  appeal, hopefully your settlement negotiations will then, in

10 fact, lead to a settlement.

11        MR. PERNICK:  Right.

12        THE COURT:  But even if they don't, I think at least

13 at this point, you've got to final ruling from the District

14 Court that you can say, you know, this is what our Plan is if

15 it's affirmed on appeal.  The question is, what if it isn't?

16        MR. PERNICK:  Right.  Right.

17        THE COURT:  So, what's the Debtor going to do about

18 the what if it isn't part?

19        MR. PERNICK:  Can I have one moment to consult, Your

20 Honor?

21        THE COURT:  Yes.

22     (Counsel confer)

23        THE COURT:  For those of you on the phone, there's a

24 conference going on in Court at the moment.  So, we're waiting.

   A-73
25     (Counsel confer)

20

1    MR. PERNICK: Your Honor, we have a hearing now

2  scheduled in Pittsburgh on December 20. I think our suggestion

3  is that we do as much work as we think we can do internally to

4  get the revisions that we know that have to be made done, and

5  that we maybe come back for a status conference on December

6  20th. Or it may actually be -- maybe we'll have to file

7  another motion since exclusivity will be expiring without a

8  further extension on 12/31. Maybe we come back on December

9  20th and we tee the motion up for that date. And I think we'll

10  know a lot more about whether the estimation trial's really

11  gonna happen, what the parameters of it are gonna be, whether

12  we're likely to get a number, sometime soon or not. Because I

13  think if we're likely to get a number soon, after the trial we

14  might want to pursue -- you know, we might want to wait. If

15  we're not likely to get that, we may want to go out and

16  actually spend the money and solicit and put a chart in there

17  and see what happens.

18    THE COURT: All right. So you just want a status

19  conference on the Disclosure Statement, but you're going to do

20  the revisions that you know have to be done, regardless of what

21  the outcome of estimation or --

22    MR. PERNICK: Absolutely.

23    THE COURT: -- the substantive consolidation. And if

24  -- if you're able to settle with the banks, is that going to be

25  sufficient time for you at least to put, you know, some sort of

A-74



1  a term sheet in there, even if not all the details?

2      MR. PERNICK:  I mean, certainly, you know, we would

3  do our best.  It's hard to know without knowing when that deal

4  would be reached whether we'd have time.  But, we'll certainly

5  -- if we have a deal with the banks, we're gonna all be trying

6  to move as quickly as possible to get that documented and

7  implemented.  The only thing I would change and what the Court

8  said is I think while I would love to have just a status

9  conference on 12/20, since it expires 12/31, I'll probably have

10  to file another Motion to Extend.  And we'll probably actually

11  have a hearing on that Motion.

12      THE COURT:  Oh, that's fine.  I just meant with

13  respect to the Disclosure Statement itself --

14      MR. PERNICK:  Right.

15      THE COURT:  -- 'cause right now, you've got one

16  that's, I guess, approved.  Since it was --

17      MR. PERNICK:  Right, we have a conditional approval

18  right now by Your Honor, and it's only subject to Judge Fullam

19  ruling preliminarily on voting procedures and then also on the

20  Disclosure Statement.

21      THE COURT:  Right.  Okay, so that's fine.  I think

22  with respect to item 3, I'm just going to do what I did before,

23  which is direct the Debtor to put it back on the list for a

24  status report once -- I guess I'll use a pretty general term --

A-75

25  it's appropriate; i.e., you get a settlement with the bank or

1  Judge Fullam has issued further findings.  However, with

2  respect to your Motion to Further Extend Exclusivity, I think

3  we can use that as a status report on December 20 because you

4  will have to get that teed up for hearing --

5              MR. PERNICK:  Correct.

6              THE COURT:  -- that day.  Okay.

7              MR. PERNICK:  And we'll do the same thing -- which --

8  I would suggest with #12, which was the status report and the

9  Plan and Disclosure Statement.  I kind of put those two

10  together in my discussion today, but I think we'll -- if it's

11  okay with the Court -- we'll come back for a status report on

12  that when it's appropriate.  I think that's what the Court just

13  ruled.

14              THE COURT:  All right.  So both of those matters are

15  continued to a date determined by the parties.  I think what

16  I'm going to do, though, is say but if the parties haven't

17  determined it's appropriate by the February status -- Omnibus

18  date -- I want a status report in February.

19              MR. PERNICK:  Okay.

20              THE COURT:  Have you gotten the list for the year of

21  the dates?

22              MR. PERNICK:  Only -- we only got the January dates

23  so far.

24              THE COURT:  I have the dates.  Shall I give those to

25  you now?
                                    A-76

*Writer's Cramp, Inc.*

1       MR. PERNICK:  Sure,

2           THE COURT:  Okay.  January 24th, February 28th, March

3   21st, April 25th, May 16th.  That's awfully close.  I'm not

4   sure that that's going to work for this case.  But for now,

5   that's when I had to do May.  So, if that doesn't work, you can

6   let me know and we'll figure out something different.

7           MR. PERNICK:  Okay.

8           THE COURT:  June 27th, July 18th, August 22nd,

9   September 26th, October 24, November 14.  This is another one

10  of those times where I wasn't able to coordinate something that

11  was a month apart.  And then December 19th.  In all

12  probability, the December 19th is going to be in Pittsburgh.

13          MR. PERNICK:  And they're all at 10 A.M.?

14          THE COURT:  Yes.

15          MR. PERNICK:  Okay.  Great.  We will do an order.

16  But at least everybody now that's here has this on the record

17  also.  That leaves us, Your Honor, with #9, which is the claims

18  objections with respect to asbestos property damage claims.

19  And Mary Beth Hogan is going to handle that, Your Honor.

20          MS. HOGAN:  Good morning.

21          THE COURT:  Good morning.

22          MS. HOGAN:  Mary Beth Hogan, Debevoise & Plimpton,

23  for the Debtors.  Your Honor, we have gone from over 700 -- or

24  just about 700 property damage claims that were filed at the

                        A-77
25  end -- at the bar date, in this case, to about 100 claims.

24

1  That was through the first CMO that the Court entered in March
2  of '03.   There are about 103 remaining claims; 38 against Owens
3  Corning and the balance against Fiber Board.   We entered into a
4  process where we tried to mediate the remaining claims so that
5  neither side would have to expend a lot of resources and time
6  on discovery, and unfortunately was unsuccessful.   And so now
7  we're back before the Court with a new CMO, which will attempt
8  to move these cases toward resolution.   It calls for discovery
9  over the next several months, depositions by February,
10  dispositive motions by April.   And we -- we received just one
11  objection this morning from the State of Louisiana, who I
12  believe might be on the phone.   Their objection, so far as I
13  understand it -- it was read to me -- is that I think that the
14  CMO is not tough enough, that it gives people who did not fully
15  comply with the CMO the first time around a second bite at the
16  apple on product ID proof.   And the Debtor's position is that
17  while it's true that there are a number of claimants that did
18  not come forth with product ID evidence, the terms of the first
19  CMO were quite lenient when it came to product ID.   All that
20  was required was that counsel for the claimant come forward and
21  say there was a belief that there was product ID and that was
22  argued for strenuously by one of the objectors to the first
23  CMO.   Debtors -- well, the Court entered that CMO and even with
24  that lenient standard, the vast majority of claims were
A-78
25  dismissed.   And the Debtors did not feel practically we could



1  move to disallow these claims because of the lenient language

2  in the CMO. And now we seek to move forward so that we can get

3  adequate discovery and can make dispositive motions on many of

4  these claims.

5        THE COURT: Okay. Is someone present for the State

6  of Louisiana?

7        ALL: (No verbal response).

8        THE COURT: Anyone present by phone for the State of

9  Louisiana? If so, make sure you take your mute button off.

10 There's no response. I have not seen an objection.

11       MS. HOGAN: Just on my Blackberry this morning on the

12 train down, I heard there was a letter from Louisiana that came

13 this morning.

14       THE COURT: Well, they go out on notice with

15 objection dates. I don't know what else I can say.

16       MS. HOGAN: Yeah.

17       THE COURT: If they want them considered, they have

18 to get something to me so I can consider it. With respect to

19 the leniency in the first CMO, it seems to me that this one

20 goes significantly farther, requiring the parties --

21       MS. HOGAN: It does.

22       THE COURT: -- to set forth the product

23 identification and the nature of the building -- in the

24 building itself, which is identified, and whether or not there

A-79

25 is evidence that someone else has product that may have caused



26

1   the problem.  And it seems at this point that that's

2   appropriate because if at some point, that information has to

3   be produced, it seems as though it should be produced now.

4           MS. HOGAN:  Right.  And there's really no other way

5   that we can resolve these claims at this point.  So, we're

6   prepared to move forward on the claims and would ask that the

7   order be entered.

8           THE COURT:  All right.  Good morning.

9           MR. TACCONELLI:  Good morning, Your Honor.  Theodore

10  Tacconelli, local counsel for the Speights & Runyan claimants,

11  Your Honor.  Your Honor, there are people that want to address

12  this.  This was sent out under Certification of Counsel.  There

13  was no objection deadline --

14          THE COURT:  Oh.

15          MR. TACCONELLI:  -- set, so that's why there was no

16  objections --

17          THE COURT:  Oh.

18          MR. TACCONELLI:  -- that were filed.  People are here

19  in person to address that -- the order.

20          THE COURT:  Okay.  Thank you.  In that case, I guess

21  I'll hear objections.  Good morning.

22          MR. SPEIGHTS:  Good morning, Your Honor.  Dan

23  Speights on behalf of a number of claimants.  There are nine

24  reasons that Speights & Runyan claimants suggest for this Court

25  to deny the CMO at this time.  And I will try to be very

A-80

1  efficient in going over them, and I go over them in no

2  particular order of strength, but in the logical way that it

3  would seem to address them.  First of all, Your Honor, I do not

4  believe that the mediation is properly over.

5          THE COURT:  Is not properly?

6          MR. SPEIGHTS:  Over.

7          THE COURT:  Over.

8          MR. SPEIGHTS:  Finished.  Let me back up.  After we

9  went through the process the first time -- and Your Honor may

10 recall, I came to Pittsburgh in the snow and ice one time and

11 we had a lengthy argument.  I said there should be no CMO.

12 Counsel said there should be a -- what I would call a draconian

13 CMO and Your Honor split the baby and we had the CMO and a

14 number of claims were eliminated on basically administrative-

15 type of information, such as building locations, et cetera, et

16 cetera.  We then suggested in mediation before the Plan

17 Mediator, Francis McGovern -- we participated in the mediation.

18 I went to New York, two times, at least, maybe three.  And Mr.

19 Tacconelli accompanied me and we had a good faith exchange

20 between the parties.  I thought we were making progress.  I

21 can't tell you what was said during the mediation because

22 that's confidential.  But low and behold, through no fault of

23 Your Honor, no fault of the Debtors and no fault of Speights &

24 Runyan, Professor McGovern was no longer a mediator in this

   A-81
25 case.  He resigned, and we all know about those extracurricular

1  activities he went on to that don't have anything to do with

2  this.  Professor McGovern didn't declare an impasse.  I don't

3  think we had reached an impasse.  It's certainly not for me or

4  Miss Hogan to call an impasse.

5       We had suggested to Miss Hogan's partner a couple of

6  months ago that we ought to go before another mediator and even

7  gave a name, (indiscern.), and see if we can't save all of us a

8  whole lot of time and money and expense.  I gather today that

9  there's going to be a little more time involved in this

10 bankruptcy.  We're not trying to slow down the process of

11 getting this resolved.  We want to.  I believe if Professor

12 McGovern had not had to exit, we would have gotten it resolved

13 through mediation.  So, number one point I'd like to make, Your

14 Honor, is I think we should finish the mediation and let the

15 mediator, whoever that might be -- and perhaps we could agree

16 on somebody in 10 minutes outside the door here -- let the

17 mediator declare an impasse, if there is, in fact, an impasse.

18 Secondly, Your Honor --

19           THE COURT:  What about a timeframe?

20           MR. SPEIGHTS:  I'm --

21           THE COURT:  So that in the event that there is no

22 resolution, then I'll automatically put a Case Management Order

23 of some set -- some sort in place?

24           MR. SPEIGHTS:  I had no problem with the timeframe.

25 I do have some other problems with the particular Case



1    Management Order, which I'm prepared to argue now -- or then,

2    but I have no problem with the timeframe.

3            THE COURT:  Well, I'd like to argue them now because

4    my expectation would be fine, I'll send you back to mediation,

5    but I'm going to put a deadline by which it has to be

6    accomplished.  And if it isn't then the Case Management Order,

7    which I will enter however it turns out today, will kick into

8    effect.

9            MR. SPEIGHTS:  I understand that, Your Honor.  And

10   I'll go to point two.

11           THE COURT:  All right.

12           MR. SPEIGHTS:  Point two is that it's unclear to the

13   PD claimants -- and I'm not taking a position on this at this

14   time.  It's not up before you on some sort of motion, but it's

15   a very important issue.  It's unclear that the PD claimants

16   that they can be treated separately from the trust.  Your

17   Honor's, of course, got the Pittsburgh Corning Corporation

18   bankruptcy in which I'm not involved.  I don't even know

19   whether PD claimants were involved in that bankruptcy.  But

20   Your Honor made a statement at a March 16, 2004 hearing which

21   suggests to some in the asbestos world that Your Honor believes

22   that all asbestos claims, the IPD, must be treated in the

23   trust, if, in fact, there is a 524 chief trust.

24           THE COURT:  Well, must be treated in a trust.

25           MR. SPEIGHTS:  A-83 Must be treated in a trust.

1      THE COURT:  A trust.  Not meaning a single trust, but

2  through the trust format.

3      MR. SPEIGHTS:  Well -- and of course, I'm not -- I

4  should have said at the beginning as I always do -- I'm not a

5  bankruptcy lawyer, I'm an asbestos PD lawyer.  But having said

6  that -- and I have the transcript if you -- I assume Your Honor

7  recalls the exchange during that transcript --

8      THE COURT:  Actually I don't, but I -- I'm sure I

9  would have said that I think they should be treated through a

10  trust because I do think they should be treated through a

11  trust.

12     MR. SPEIGHTS:  Well, and of course, 524(g) speaks

13  both in terms of asbestos property damage claims and asbestos

14  bodily injury claims.  So I think a threshold issue is whether

15  it is appropriate to treat property damage outside of the

16  trust, through all of these objection procedures or whatever,

17  or whether, in fact, we have to be in a trust in this

18  bankruptcy.  And I don't know whether Your Honor has resolved

19  that in your mind or not.  But before we go across the rubicon

20  of doing a lot of expensive and lengthy discovery on an

21  objection process, I think that needs to be clarified.

22     THE COURT:  Okay.  I think my ultimate view is that

23  with respect to property damage claims, especially in this case

24  where there simply aren't very many of them -- and frankly, the

A-84

25  amount that they're now of record -- four is significantly

1  less, it's really a drop in the bucket concerned -- as compared

2  to what the Plan proponents are estimating the personal injury

3  liability to be -- that it makes sense to liquidate them now.

4  They can be paid through a trust.  But I think the liquidation

5  process just ought to go forward here.  It's probably less

6  expensive and quicker then it would be through the trust

7  processes.

8          MR. SPEIGHTS:  I respect that, Your Honor, and I'm

9  not taking a position at this time.  I would say that I'm not

10 sure that we can make the legal distinction based upon the size

11 of the claims.  And I must also say that it's not the number of

12 claims.  For instance -- I should have said this at the outset

13 -- I represent the State of North Dakota; one claim which is

14 many buildings in North Dakota.  I know that the Attorney

15 General for Delaware is here and that's one claim and there are

16 many buildings, obviously, in Delaware.  And I'm not sure that

17 the -- I'm quite confident that the claims are worth a lot more

18 than the Debtors say they are and less than I say they are.

19 But they certainly are worth a lot more than they have been

20 portrayed to be because there are only 103.  103 can produce

21 huge numbers.

22          -THE COURT:  Well, I think the amount that was listed -

23 in the Debtor's statement -- and again, I apologize if I'm

24 incorrect -- but was something like 137 million, which was down
                                A-85
25 from almost a billion dollars when the 693 were originally

1  filed.  And compared to the, you know, $16 billion that the
2  asbestos claimants contend the trust is going to have to deal
3  with in terms of Court claims, that's not even a significant
4  fraction.  So the liquidation of those claims, I think given
5  the number, makes more sense to go through this process rather
6  than through the trust distribution procedure in this case.
7  There may be other cases where I don't think that's appropriate
8  because of the huge number of claims.  But in this case, it
9  seems that this process can be quite efficient, especially if
10 mediation will resolve them.

11        MR. SPEIGHTS:  And I hope mediation will.  And I
12 can't -- I don't want Mr. Lockwood to stand up at my back and
13 object when I say this -- but we certainly would not accept
14 service on the magnitude of the DI claims that are portrayed by
15 Mr. Lockwood --

16        THE COURT:  Well, I understand.

17        MR. SPEIGHTS:  -- and others too.  I mean, if we --
18 if they have -- one of my points is if we started carving out
19 the DI, they might be a whole lot less too.  But --

20        THE COURT:  They may.

21        MR. SPEIGHTS:  Number three, quick point, is under
22 the same transcript and same ruling is it certainly would seem
23 that if you have a trust to deal with claims for property
24 damage -- a trust property damage -- then all of the property
25 damage claims should be in that trust, a PD trust.  And under

33

1   the old plan -- I'm not sure what the -- what the current
2   status of it is -- there was a PD trust set up for the Fiber
3   Board claims and not for the OC claims.  Well, if you're going
4   to have a trust, I believe all of the claims should be funneled
5   in that trust and there should be procedures for qualifying for
6   payment.  And I think that's especially true since the Debtors
7   have now won their Substantive Consolidation Motion.

8           THE COURT:  Well, with respect to the Plan issues, I
9   think the Plan proponents get to pick the way that works, and
10  that is a Plan objection if you're unhappy with the mechanism
11  by which it's funneled.  But I'm not at the part of payment of
12  those claims.  I'm only trying to get them liquidated now.

13          MR. SPEIGHTS:  But the trust liquidates claims for
14  BI.  The trust, apparently under the Plan, I don't know, will
15  liquidate claims for Fiber Board.

16          THE COURT:  I think not.  If we're going through a
17  Case Management Order, they're all going to be liquidated here.
18  There are only 103 left.  And it makes no sense to put them
19  into a trust.

20          MR. SPEIGHTS:  I appreciate that, Your Honor.  That
21  was my point three.  Point four, I don't believe there is a
22  case for there to be a Case Management Order.  It seems
23  implicit that if you have a Case Management Order, there needs
24  to be a case.  This is something we discussed a little bit in
25  Pittsburgh and the final order would seem to suggest that I

A-87

34

1  made a little headway on this argument.  Although, I'm the

2  first to admit that Your Honor didn't rule in my favor on this.

3  But the traditional way in which you deal with property damage

4  claims, or any claims in a bankruptcy if you're going to attack

5  'em, is either by an adversary proceeding or an objection

6  process.  And there's been neither here now.  There's nothing

7  but what's called a Case Management Order.

8          THE COURT:  Oh, I'm happy to have the Debtor file the

9  objections to claims, if that's what's necessary.  I thought

10  through the mediation process that it was probably actually

11  better not to.  But, I agree.  If they're going to be

12  liquidated here, somebody should file an objection to claim and

13  -- so that's all right.

14          MR. SPEIGHTS:  Good.  And that was my point.  And I

15  think that in your March 31 order, that's what you would

16  envision, not another Case Management Order, but an objection

17  process.

18          THE COURT:  Well, I expect an objection process, but

19  then I expect a Case Management Order to set out how the

20  liquidation of those claims will go forward.  I don't see them

21  as exclusive, I see them as steps in the same chain.

22          MR. SPEIGHTS:  And -- I don't -- they don't -- well,

23  let me try again.  I understand there might well be a Case

24  Management Order as a part of an objection process --

25          THE COURT:  Right.

A-88



1    MR. SPEIGHTS:  -- but I think the objection process

2    triggers a lot of things that are important to claimants to

3    have all of their {quote} "rights" protected, et cetera, et

4    cetera.  And your March 31 order said if -- this was before the

5    mediation -- the Court shall hold a status conference

6    concerning these claims.  A schedule for filing and serving

7    objections to claims shall be addressed at that time.  So I

8    just think the CMO should be -- and I'm not saying continued

9    forever -- but we should file the objections and then deal with

10    the CMO because the objections are gonna raise some issues,

11    some motions that I'm going to address in a minute, some of

12    them which I think need to be resolved before we go down the

13    road of the CMO.  We're dealing with a lot of different states

14    and a lot of different laws and a lot of different

15    requirements, and to just throw a CMO in the hopper until we

16    have objections, I believe, is putting the cart before the

17    horse.

18    Next point, Your Honor, I believe the -- and this probably

19    doesn't need to be said in light of what the Court just said

20    about requiring them to file the objections -- but just for the

21    record, my sixth point was that to allow them to go a CMO and

22    not objections would be undermining the local rule that says

23    all the substantive objections should be filed at once, rather

24    then this rolling CMO; CMO last year, this year, what happens

25    when we get through with this CMO.  I would request that when

Walter's Cramp, Inc.

1   they file the objections, they comply with the local rule, or

2   if they want to seek an exception to the local rule, as some

3   Debtors have done before Your Honor and Judge Newsome, then

4   fine, let them seek it and we can brief that before Your Honor.

5           THE COURT:   That's fine.

6           MR. SPEIGHTS:   Next point, Your Honor, is that I

7   believe that -- and I'll reiterate what I said in Pittsburgh --

8   that it is putting the cart before the horse to deal with

9   objections before there's a plan, before there's plan

10  procedures.   And we believe the appropriate way to deal with

11  this, Your Honor, is at least have a set of procedures.

12  Whether it's a PD trust or not, at least have a plan there that

13  tells us what's going on with these claims if we prevail.

14          My problem is I don't know what's behind door #3.   Let's

15  assume, Your Honor enters a Case Management Order -- hopefully

16  not this one -- but some Case Management Order that requires me

17  to go through a whole lot of time and expense.   At the end of

18  the day, I need to have, to represent my clients adequately,

19  some idea of how much money there is in this.   Now if there's a

20  plan, a Disclosure Statement, they're going to say it's

21  projected I get 12 cents on the dollar or 100 cents on the

22  dollar or something.   We don't have a plan.   We don't have a --

23  Disclosure Statement, talking about it.   I assume that if we

24  win -- and we will win on some of these claims, we probably

    A-90
25  will lose on some -- if we win, I assume they're not giving us

37

1    100 cents on the dollar. And that places us in a very

2    difficult position because what they want is very, very

3    expensive to claimants. I mean, I have to fly to North Dakota

4    to sit in a document room for weeks and copy matters and

5    providing materials and et cetera, et cetera.

6        So I would suggest, Your Honor, maybe there's something

7    that will happen during the mediation period that will

8    eliminate some of this concern. But I need to have some idea

9    before I advise my clients what is -- what is going to be there

10   at the end of the day. Because it may not be cost effective

11   for us to fight some of these claims, while others, it may be.

12       THE COURT: Well, I think the mediation is a good

13   place to try to figure that dividend to the property damage

14   claims if, in fact, there are property damage claims that will

15   be allowed. I agree. That's a great subject for mediation.

16       MR. LOCKWOOD: Your Honor, just for the record, the

17   bond and trade deal under the OC Plan that was announced in

18   Open Court under the Plan (indiscern.) covers property damage

19   claims --

20       THE COURT: Okay.

21       MR. LOCKWOOD: -- that's roughly 38 cents on the

22   dollars has been announced in Open Court. We don't need

23   mediation --

24       THE COURT: All right.
                                A-91
25       MR. LOCKWOOD: -- to fit that in.

38

1          THE COURT: Okay. I'm sorry. I -- if I knew that,
2    Mr. Lockwood, I'd forgotten. I'm sorry.
3          MR. LOCKWOOD: Well, we -- I don't think anybody's
4    focused specifically on the fact that the property damage
5    claims were a subset of the bond and trade claims as relates to
6    the OC Plan, but that is, in fact, the case.
7          THE COURT: And that's true for fiber board too?
8          MS. HOGAN: No, Fiber Board will be handled through a
9    trust. For Fiber Board there is property damage insurance and
10   that will be handled through a trust. But for the OC property
11   damage claims, they're treated as General Unsecured Creditors.
12         MR. SPEIGHTS: And I appreciate that, Your Honor.
13   That's a little more information then I had before, although
14   I'm not sure where we are in this Plan process. I gather
15   there's kind of a war going on out there among the banks and
16   OC, et cetera, and I don't know what's going up there at the
17   end of the day. But that does clarify that if I could rely on
18   Mr. Lockwood's guarantee that it's 38 cents per claim, then I
19   would move on from that point.
20         THE COURT: Well, that's what the current projection
21   is with the settlement, yes.
22         MR. SPEIGHTS: Lastly, Your Honor -- I actually
23   skipped two points, or combined them. I would say -- and I
24   return to a theme I started back in Pittsburgh -- I think
                                    A-92
25   there's some fundamental unfairness going on here between the

1  BI constituency and the property damage constituency.  And this
2  is through -- I'm certainly not suggesting it's because of this
3  Court -- there has been here a bifurcation of these
4  proceedings.  And I appreciate Your Honor's role with BI has
5  been more limited then with PD.  But there's been no BI bar
6  date.  There has been no opportunity to object to claims and no
7  interest in objection of BI claims.  They're gonna get all of
8  their claims funneled to a trust.  And this is what they tell
9  us when we say there should be no disparity of treatment.  This
10  is a brief filed by both the legal representative and Caplin &
11  Drysdale in response to the earlier argument about these
12  claims:  "There is no reason to impose a CMO with respect to
13  the hundreds of thousands of present BI claims because
14  allowance and treatment of those claims will be governed by
15  formal distribution procedures, which will deal adequately and
16  systematically with all of the document production and proof
17  requirements."  Well, I don't understand -- and I understand
18  they have a bigger pot.  Even when I carve down their pot, it
19  will be bigger then the PD pot, I readily acknowledge that --
20  but I don't see why the same doesn't hold true for property
21  damage; why they shouldn't have a CMO and go through this
22  process or why we can't have a pot of money and then procedures
23  as we do in most other bankruptcies.

24          THE COURT:  Well, with respect to the PI issues,
A-93
25  unfortunately those -- well, maybe fortunately -- they're in

Writer's Cramp, Inc.

1  front of Judge Fullam. I have nothing to say about those. All

2  I'm doing is marching to the drum that I think is appropriate

3  for the property damage. And he'll do the same thing with

4  respect to what he thinks is appropriate for personal injury

5  and maybe you will have that process. I don't know.

6            MR. SPEIGHTS: And I appreciate that. That's what I

7  said in Pittsburgh and that's what you told me in Pittsburgh

8  and I don't want to belabor the point. I feel like there's a

9  train here, but we're about 200 miles ahead of the rest of the

10  train in this process and sort of --

11            THE COURT: Somebody always has to be in the lead car

12  and somebody's in the caboose.

13            MR. SPEIGHTS: Now, Your Honor, to the particular CMO

14  that's attached here, and I'm not sure what details you want --

15  I might mention, Your Honor, that I have spoken with other PD

16  claimants' counsel and they join in my positions in this. I

17  think Delaware may address you as well, but certainly, Phil

18  Goodman who represents significant PD claimants, has advised us

19  that he joins in this and what generally I'm saying today.

20  There's also the Arch Diocese in Virginia, which has indicated

21  a similar concern. And there are probably others. Again,

22  there's no motion there. I'm ready to talk about the nuts and

23  bolts of the CMO if that's what you want to do now. I'm

24  willing to come back if mediation fails and talk about the nuts

25  and bolts.

                        A-94

1    Just two general comments about it, though.  One is, it's
2  addressed to several issues.  First, product identification.
3  Everybody assumes, Your Honor -- there's been no litigation
4  here -- everybody assumes that property damage claimants must
5  identify either Owens' or Fiber Board's product in a building.
6  Your Honor, that simply is not the law in all the states.  It
7  might be the law in a lot of states, maybe even the majority of
8  states.  But I have claimants all over the country.  And for
9  those claimants who can prove a case against one of these
10  Debtors by an alternative theory, such as conspiracy, which has
11  been upheld by the 3rd Circuit in the schools class action --
12  they paid the schools a lot of money without any product ID.
13  Or one of the other alternative theories, these claimants
14  should not be involved in any process that requires them to go
15  through product identification.  Now, if we get over that
16  hurdle, then we have to deal with the specifics.  So somehow,
17  if there's not a plan, if there's not a procedure, somehow
18  through the objection process that you've outlined there needs
19  to be a way to tee up some of those over riding legal issues
20  before we spend all the money on discovery on issues that don't
21  matter at all.

22     Secondly, Your Honor, as I look at the Case Management
23  Order, much of what's said in the Case Management Order also
24  goes to Statute of Limitations issues.  Of course, the Statute
A-95
25  of Limitations does not apply to certain states because of



42

1   nullem tempus.   Statute of Limitations is an affirmative
2   defense, which the Debtor in this case -- or Debtors -- would
3   have to come forward and show it's not for us to prove we're
4   not too late, it's for the Debtors.   Now that we've made a
5   prima facie case, acknowledge -- they gave me a C- in Illinois,
6   but I passed the prima facie test.   They -- there must be some
7   burden on their part.   Then we're dealing with different
8   standards and different states for the Statute of Limitations.
9   I've argued that in several Courts of Appeals or Supreme
10  Courts.   They vary from state to state.   All of these issues --
11  we need to somehow get to the front of the line rather than the
12  back of the line through an objection process, or else we're
13  all gonna get caught up in this CMO that's spending a lot of
14  time and money, when, for some claimants, it has nothing to do
15  with their position.   Now, those are my two general comments.
16  I'm ready to talk about the semicolons, too, if you want me to
17  talk about the semicolons.

18          THE COURT:   Well, let me hear first from the other
19  parties about what you've had to say so far, because I think
20  with respect to the mediation, it's -- if you think there is
21  some benefit to going back, I'm not opposed to having some
22  brief period, but it will be a brief period for mediation.   If
23  you can get this resolved, I think that's in everybody's best
24  interest and certainly saves a lot of litigation.   With respect
            A-96
25  to your general comments, I'll hear what they have to say.   And

Writer's Cramp, Inc.

43

1   if it's appropriate to defer the nuts and bolts until later, I

2   will.  If you want to go into it today, we will.  Frankly, I

3   would prefer it to later with the Debtor filing a motion to do

4   this so that I can get responses.  I really don't see why I'm

5   taking 45 minutes for something the Debtor could do by motion

6   and set a response date.  It may still take 45 minutes, but at

7   least I have a clue in advance what was going to be talked

8   about.  So --

9           MR. SPEIGHTS:  Thank you, Your Honor.

10          THE COURT:  Good morning.

11          MR. DROUSE:  Stuart Drouse.  I'm a Deputy Attorney

12  General for the State of Delaware.  And I just briefly want to

13  make a few comments to the Court.  I echo much of what Mr.

14  Speights has said with regards to what Delaware at least views

15  as the inappropriateness of the CMO -- the proposed CMO as it

16  exists.  And it's based, particularly with regards to the

17  factual situations that have arisen, on behalf of the State and

18  it's proposed claim as to the Debtor that's arisen over the

19  past several years.  Prior to the filing of petition, pre-

20  petition, there had been negotiations entered into between --

21  counsel for the Debtor and the State with regards to it's

22  property damage claim.  And with regards to those negotiations,

23  there were -- based upon market share analysis theory that the

24  State has discussed with counsel, they had sent information

A-97.

25  concerning the claims, support of that claim, to counsel in

1  1999, prior to the petitions filing.  And it was received by
2  counsel at that point in time with the understanding --
3  particularly because of subsequent actions taken by counsel on
4  behalf of the Debtor -- that that was sufficient to at least
5  establish a prima facie case on behalf of the State of Delaware
6  as far as property damage was concerned.  Subsequent to the
7  filing of the petition and then notice that claims had to be
8  filed, the State subsequently filed in timely fashion it's
9  claim, again mirroring and echoing what it has previously
10  submitted to counsel.
11      During this entire timeframe from 1999 through July of
12  2003, negotiations continued.  They were stalled, to some
13  extent, because of the termination of the mediation process,
14  the original mediation process to which Mr. Speights referred
15  to.  And we were advised at that point in time by Debtor's
16  counsel that the matter would be ongoing, that they would
17  continue to recognize the validity of the claim to the extent
18  that what had been submitted was sufficient for a prima facie
19  claim.  And that continued forward to the present time.
20      My understanding -- and speaking with my client earlier
21  this morning and late at the end of last week -- was that
22  counsel, Mr. Mack, had been in contact with my client and
23  continued to indicate that there was a distinct possibility of
24  settlements -- a settlement could, in fact, be reached with my
25  client -- and hopefully in the not too distant future --

A-98

*Writer's Cramp, Inc.*

1  dependent, to some extent, on what was resolved today with

2  regards to the CMO.

3      But in all fairness, and considering the equitable powers

4  of this Court and the jurisdiction of this Court, it would seem

5  to me on behalf of my client to be inherently unfair if the CMO

6  was, as proposed, put into place because it would require my

7  client to undergo substantial costs, incur substantial costs

8  with regards to looking at product ID -- which I might add as a

9  footnote, ironically, any information we might have had about

10  product ID ironically was destroyed in a fire in April of 2002,

11  much of the information that Delaware had compiled at that

12  time.  So that complicated matters.

13      But nonetheless, subsequent to that and both prior to

14  that, there was information provided on market share analysis

15  theory which was accepted at that time and still, to my

16  understanding by counsel for the Debtor, that recognizes that

17  yes, there is something of a claim, there is some validity to

18  the claim.  Exactly how much would ultimately be paid out will

19  be determined either by settlement negotiations or ultimately,

20  if necessary, by litigation.

21      So in that light, I would echo much of what Mr. Speights

22  has said and indicate to the Court that we feel as though in

23  the effort to save Delaware and its claim, at least, that it

24  would be inherently unfair to push the CMO through at this time

25  as proposed and force us to undergo and incur a lot of expense,

A-99

46

1  which probably is not necessary in light of everything that's

2  transpired to this point in time.

3          THE COURT: All right. So you want to go back to

4  mediation to see if you can get it resolved there, too?

5          MR. DROUSE: That's correct, Your Honor.

6          THE COURT: All right.

7          MR. DROUSE: Thank you, Your Honor.

8          THE COURT: Anyone else? Miss Hogan?

9          MS. HOGAN: Your Honor, we can move by -- we can make

10 a motion for the CMO and have objections if the Court deems

11 that necessary. We let the Court know back in August that we

12 would be holding a status conference and we got the CMO to all

13 parties on September 28th and asked -- have been calling them

14 ever since. And some people didn't return calls. So we didn't

15 know until this morning what Speights & Runyan was gonna say

16 either.

17         We -- you know, this case has been going on for some time.

18 And we did engage in mediation for a long time and were

19 unsuccessful. And we would just urge the Court to consider

20 running on parallel tracks - enter a CMO and we'd be glad to

21 mediate. We'll continue to talk. We were too far apart to

22 have it make sense to continue, despite what happened to

23 Professor McGovern. And I'd -- we don't have a mediator at

24 this point. So if we are gonna go back into mediation, we need

25 a mediator, obviously.

A-100



*Writer's Cramp, Inc.*

1    THE COURT:  Well, yes.  I think obviously you need a

2  mediator.  I think that's the least of the problems though.

3  Getting somebody up to speed may take some time.  But I think

4  these issues really are not rocket science issues, I think.

5  They are something that can be capable of settlement if the

6  parties want to settle.  And if you don't then there will be a

7  CMO process in place at some point, because I will manage the

8  litigation through some case management proceeding.  I don't

9  know of any better way to do it, frankly.

10    MS. HOGAN:  Right.  We -- the Debtor wanted to move

11  the case along and needed to get through the discovery pieces

12  so that we could make the objections.  And it's -- we seem to

13  be saying the same -- Mr. Speights and I seem to be saying the

14  same thing.  He just disagrees with the procedural steps we

15  took.  We want the same thing, which is to try to resolve the

16  cases through mediation.  But if not, we want to move this

17  forward and we want to hear what they have to say about

18  property -- about product ID, about Statute of Limitations.  I

19  do want to say for the record that, again, he mentions the 3rd

20  Circuit upheld conspiracy claims.  The 3rd Circuit dismissed

21  the conspiracy claims against Owens Corning and Fiber Board

22  which -- -

23    THE COURT:  Yes, but I am not aware that those

24  conspiracy claims as against these Debtors were upheld.  There

25  are some states, of course, that permit the conspiracy claim.

A-100

1   But nonetheless, you still have to show what the damages are

2   and that may be even more difficult then showing the claim in

3   that kind of a context.  And with respect to product ID,

4   whether there is -- I'm not sure what the conspiracy is with

5   respect to putting somebody else's asbestos product in a

6   building.  That doesn't make a great deal of sense, frankly.

7           MS. HOGAN:   Right.

8           THE COURT:   So, I don't see how you get around the

9   product ID issue.  If you have a claim against Owens, you have

10   to have some evidence that it's Owen's product involved, as far

11   as I can understand the law.  If there's something different in

12   some other states, certainly I think you need a chance to brief

13   that to show me those briefs.  But I do not think that's going

14   to be the general rule with respect to the 50 states.

15     I'm also not clear at this point that we need to get into

16   the damage aspects though, because I think right now we first

17   of all need to know whether there is a claim.  And I think the

18   claim itself is still going to require some nexus to the

19   Debtors in the case.  If there is no nexus, there is no claim.

20   So, however that nexus is going to be substantiated, it has to

21   be proven and it's the burden of the claimants to do it.  It

22   is, however -- I think Mr. Speights is quite correct -- the

23   Debtor's burden to affirmatively assert the Statute of

24   Limitations and the other affirmative defenses.

A-101

25     So maybe what we should do is start with having the Debtor

1    file objections to claim -- have the Debtor file the
2    substantive objections to the claims, get a mediator appointed,
3    see whether while the Debtor is in the process of filing these
4    objections the mediation can be successful.  To the extent that
5    it is, then that will be the end of that matter.  To that
6    extent that it isn't, at least the objections will be teed up.
7    At that point, I think you may need some discovery, because I
8    don't know at this point, without having the product
9    identified, whether you even know what all of the objections
10   are that you may have to the claim.  So I think some basic
11   information is going to have to be provided by the claimant in
12   order to even tee the objection process up.  Maybe you folks
13   are in a better position to talk about that than I am to make
14   rulings without having you vet the issue first.

15          MS. HOGAN:  Well, I think -- I think that you are
16   right.  That if -- if we were to have filed the objections
17   first, then the objections from Mr. Speights would have been,
18   "Oh, we didn't have a discovery process in place.  We didn't
19   have a discovery schedule.  We didn't get to ask the Debtors
20   for their information.  They don't know enough about our
21   claims."  And so, we sort of tried to skip that by filing a
22   proposed CMO that sets forth a discovery schedule so that in
23   April when dispositive motions are due, all of this can be
24   vetted.  And if he -- and if Mr. Speights or any other property
     A-102
25   damage claimants don't have product ID at that point, they can

1  argue in their briefs that no product ID is required under

2  Minnesota Law or North Dakota Law. And we can argue that it is

3  or --

4            THE COURT:  But --

5            MS. HOGAN:  -- whatever the state law is.

6            THE COURT:  But I still need an objection to the

7  claim. I mean, the problem with the CMO is that it sets you on

8  a discovery track and sets dispositive motions, but on what?  I

9  don't have an issue in dispute until there is someone who

10  raises an objection to that claim. So I think the objection to

11  claim has to be filed. If you want some, you know, ADR or

12  mediation process after that, that's fine. And a discovery

13  schedule is certainly appropriate. But I think at least the

14  preliminary objections to claims should be filed. That should

15  set the discovery course. The discovery may very well mean

16  that the objections have to be modified. And at that point in

17  time, I think a CMO in the nature of what the Debtor is

18  proposing makes sense in terms of the schedule.

19       In terms of the product identification, if the Debtor's

20  objection is that there's no indication in the Proof of Claim

21  that the Debtor's product is used, that puts the ball back into

22  the court of the claimant saying, "Here's our product

23  identification," or "Here's why we don't need it."

24       So I still think the best thing to start with is the

       A-103

25  objection to claim and then some Case Management Order that

51

1   sets the response by the claimants to the Debtor's objection,

2   and then a discovery schedule. And at the end of that time, if

3   modifications are necessary, that may be appropriate. And

4   meanwhile, I think you should be mediating.

5           MS. HOGAN: So, just so I'm clear, should we contact

6   the Court about appointment of a mediator?

7           THE COURT: Yes, I think you're going to want

8   somebody appointed so he or she can get paid. Right?

9           MS. HOGAN: Okay.

10          THE COURT: So I think you're going to want to do

11  that. If you can agree on who it is, it's fine with me. I

12  have, you know, no suggestions one way or the other as to who

13  it can be. Anybody that you think can help you settle is fine

14  with me, provided that they can get through the

15  disinterestedness process. I am most concerned about making

16  sure that the mediator is disinterested.

17          MS. HOGAN: Okay. Just one other thing, Your Honor.

18  There was something that was said earlier that I just wanted to

19  clarify. Mr. Speights mentioned that he thought that property

20  damage claims had to be resolved through a trust. And the

21  reason the Owens Corning claims are not resolved through a

22  trust is there are not future Owens Corning property damage.

23  It's unlike the personal injury case when you have latent

24  diseases that don't show up for 30 or 40 years. The property

    A-104

25  damage claims have been well known for over 20 years. In fact,

52

1  it's the Debtor's position that many of them are barred by the

2  Statute of Limitations even now.  And so that's why they're

3  treated as General Unsecured Creditors under the current Plan.

4          THE COURT:  Okay.  I have not looked at the

5  transcript from March.  My understanding of what -- of what I'm

6  trying to convey now isn't that they need to be resolved

7  through a trust, but I think they could be very well be paid

8  through a trust if the Debtor chooses to set that kind of

9  function up.  If there are no future claims, obviously 524

10  isn't going to apply anyway.  You don't --

11          MS. HOGAN:  Right.

12          THE COURT:  -- need the benefit of that channeling

13  injunction if there are not future claims.  So, all I was

14  trying to say is if you're looking for a 524(g) injunction, the

15  way to get it is to set up a trust.  If you're not asking for

16  one, 524 has no meaning.

17          MS. HOGAN:  That's right.  And the Debtors are not

18  asking for one with respect to property damage.

19          THE COURT:  All right.  So then there won't be a

20  trust if that's the case.  The Debtor will, I guess, as Mr.

21  Lockwood said, try to reconcile these through the other trade

22  claims -- other unsecured claims.

23          MS. HOGAN:  Thank you, Your Honor.

24          THE COURT:  Okay.  All right.  Well, having said all

25  of that, where do we stand?  Do you want to give me an order

A-105

1  that will appoint a mediator, meet with Mr. Speights and I
2  guess Mr. Drouse and I guess find out -- and whoever represents
3  the State of Louisiana -- see if you can come up with a
4  revised, at least, initial -- I'll still call it a Case
5  Management Order. One that will set objections by any party
6  who chooses to file them and responses by the claimants, and
7  then set the discovery track. That seems to me to be
8  appropriate. At the end of the discovery, if you want to put
9  in timeframes for dispositive motions, that's fine. It might
10  be better just to come back with a status conference at that
11  point, because you may have resolved them through mediation
12  anyway. But that's up to you.

13          MR. PERNICK: And probably if we can't agree on a
14  mediator, Your Honor, I guess we would just file a Form of
15  Order that will request the Court to appoint one?

16          THE COURT: Okay. That's fine.

17          MR. PERNICK: I mean, we'll try to do that, but if we
18  --

19          THE COURT: All right. If you're going to do that,
20  though, how about at least each side giving me two names --

21          MR. PERNICK: Okay.

22          -- THE COURT: -- of people that you would like without
23  telling me whose advocating them with a CV?

24          MR. PERNICK: I mean, we'll also direct the parties
                                    A-106
25  that aren't aware that there is a mediation -- a list of

54

1  approved mediators actually, in Delaware in the local rules,

2  which is, you know, relatively extensive. I think there's 15

3  or 20 people on there, some of whom are, you know, pretty

4  experienced.

5          THE COURT: All right. I think there are many

6  mediators who are doing this type of work in some of the other

7  cases too. Now whether they will be the disinterestedness

8  standards here or not, I don't know. I mean, if the parties

9  here are happy with Professor McGovern, I don't know what

10  context he had with respect to this issue and whether he's

11  disqualified. You know, if you think he can help you, I don't

12  care who it is, as long as they can -- that can person can meet

13  the disinterested standards.

14          MR. PERNICK: Right.

15          THE COURT: I doubt that he may be interested but --

16          MS. HOGAN: Mary Beth Hogan for the Debtor. I just

17  want to clarify -- I'm sorry, if I'm not getting this

18  procedurally. What you just said, I think, Your Honor, was

19  that the Debtor should file a revised CMO with an objection

20  deadline. But I thought what we had just discussed was that

21  the Debtors should --

22          THE COURT: No, no. An objection to claim deadline.

23          MS. HOGAN: Okay.

24          THE COURT: I thought the CMO should start, you know,
                         A-107
25  on or before a blank date, anybody who wants to file an

55

1  objection to any of the property damage claims has to file and

2  serve that objection.  And then on or before blank date, the

3  claimant has to respond to that objection with some specifics

4  as to what -- if for example, the Debtor says there's no

5  product ID and the claimants' position is, "Well, we just

6  didn't state it and here's the product ID," that should be set

7  forth.  So, you know, you can invoke the rule 26 disclosures if

8  that's appropriate, since this should be largely, but not

9  exclusively, documentary, and set a discovery schedule.  At the

10  end of discovery, if you want a status conference, that's fine.

11  If you want summary judgement processes, that's okay.  My

12  preference at this point would be to set it for a status

13  conference first, because while you're going through mediation,

14  you may be able to resolve some of these matters.  And rather

15  then setting up an artificial deadline for summary judgements,

16  if they're settled, it would seem to make sense just to hold a

17  status conference.  But as I said, that's up to you.  You folks

18  have a better understanding of how you're going to litigate

19  this then I have.  So --

20       MS. HOGAN:  Okay.  Thank you.

21       THE COURT:  All right.  So an order's going to be

22  submitted with a revised CMO that can be subject down the road

23  to some further proceedings if what you do is stop at the end

24  of discovery with this one, certainly.  And you'll contact the

A-108

25  parties who have had some opposition to this one to get their

56

```
1   input.  Folks, please respond promptly to the Debtor.  I expect
2   to have this issue resolved before the next hearing.  So if
3   you're contacted and don't resolve -- don't give your comments
4   back to the Debtor, then you can expect that you're going to
5   get an order without my hearing any further comments.  So, I
6   don't expect that the telephones don't work both ways in this
7   case.
8            MR. PERNICK:  The next hearing, just for the record,
9   Your Honor, is November 15th.
10           THE COURT:  Oh.
11           MR. PERNICK:  It's a little bit short but it's --
12           THE COURT:  Well, it's probably --
13           MR. PERNICK:  -- you know, 3 weeks.
14           THE COURT:  -- still doable.  If it's not doable,
15  then by December.  Certainly by December, you ought to have a
16  mediator that you agreed upon in place.  So either one of those
17  dates is fine, depending on your schedules.  I'll just make a
18  note.  I'll expect that before the December hearing.  If it
19  comes in earlier, that's fine.
20           MR. PERNICK:  Okay.  I think that's December 20th,
21  Your Honor.
22           THE COURT:  Yes.  That's in Pittsburgh, too. --
23           MR. PERNICK:  Correct.  Your Honor, from the Debtor's
24  side, we have nothing further for today.
                              A-109
25           THE COURT:  Okay.  Anybody else have any matters to
```

*Writer's Cramp, Inc.*

57

1  address?

2          ALL:   (No verbal response).

3          THE COURT:  Okay.  We're adjourned.  Thank you.

4          MR. PERNICK:  Thank you, Your Honor.

5      (Court adjourned)

6

7

8

9                        CERTIFICATION
   I certify that the foregoing is a correct transcript from the
10 electronic sound recording of the proceedings in the above-
   entitled matter.

11

12  _____          11-3-04
   Signature of Transcriber            Date

13

14

15

16

17

18

19

20

21

22

23

24
                        A-110
25

EXHIBIT "B"

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
Fax 212 909 6836
www.debevoise.com

November 11, 2004

The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge
District of Delaware

In re Owens Corning, et al. No. 00-3837 (JKF)
Property Damage Claims

Dear Judge Fitzgerald:

As you may recall, at the hearing on September 25, 2004, the Court instructed the Debtors and counsel for certain asbestos property damage claimants to agree on a new mediator or submit the names of four proposed mediators (without identifying which party proposed which mediator) from which the Court would select one.

The parties have not agreed on a mediator and therefore submit the following four names (along with their attached curriculum vitae) for your consideration and selection of a mediator:

1. Coleman F. Fannin

2. Arthur Spector

3. Lawrence M. Watson

4. Roger M. Whelan

Respectfully submitted,

Mary Beth Hogan
Counsel for the Debtors

cc:  Dorothy Franklin (by facsimile w/ enclosures)
     General Counsel S&P Company (by facsimile w/ enclosures)

A-112

The Honorable Judith K. Fitzgerald          2                    November 11, 2004

Philip J. Goodman (by facsimile w/ enclosures)
William C. Heck (by facsimile w/ enclosures)
Deborah J. Israel (by facsimile w/ enclosures)
Marilyn Keuper (by facsimile w/ enclosures)
Marc S. Moller (by facsimile w/ enclosures)
Scott Patton (by facsimile w/ enclosures)
Theodore Tacconelli (by facsimile w/ enclosures)



THE RESOLUTION EXPERTS

Hon. Coleman F. Fannin (Ret.) is one of the nation's preeminent mediators and arbitrators. Judge Fannin has been helping people resolve disputes for almost 30 years.

ADR Experience and Qualifications

- Multi-party, complex case experience in virtually all areas of the law including intellectual property, environmental, toxic torts, class actions, employment including sexual harassment and discrimination, professional malpractice, insurance, bad faith, catastrophic personal injuries and wrongful death
- Continuously handles over 200 different disputes per year
- Extremely proficient at mediation with one of the highest rates of bringing parties to closure

Representative Matters

- Class actions including toxic releases, product liability and unfair competition matters
- Catastrophic personal injury cases involving paraplegic, quadriplegic, brain injuries, burn injuries and wrongful death
- Insurance disputes including allegations of bad faith, as well as first-party and third-party claims
- Complex business disputes involving partnership dissolution, shareholder actions, licensing agreements and other contractual issues

Professional Interests

- Mediations
- Multi-arbiter arbitrations including international arbitrations

Honors, Memberships, and Professional Activities

- Recognized as a Top 50 California Neutral, *Daily Journal Extra*, 2003
- Selected as One of California's Most Sought-After Mediators - *Daily Journal Extra*, 2002
- Distinguished Mediator of the Year, San Francisco Trial Lawyers Association, 2001
- Trial Judge of the Year, California Trial Lawyers Association, 1985
- Trial Judge of the Year, Alameda-Contra Costa Trial Lawyers Association, 1978
- Vice-President (1988) and Executive Board (1986-1988), California Judges Association
- McAuliffe Law Honor Society, University of San Francisco
- Established Contra Costa County's Bench-Bar Settlement Program
- Co-author, California Practice Guide: Alternative Dispute Resolution (The Rutter Group)

Background and Education

- Chairman of the Board of Directors, JAMS, August 1999-April 2004
- Judge, Contra Costa County Superior Court, 1972-1988; (Presiding Judge, 1977)
- Judge, Appellate Division, Contra Costa County Superior Court, 1982; (Presiding Judge, 1983)
- Partner, Watson, Hoffe, & Fannin, Richmond, CA, 1965-1972
- Grydyk & Fannin, Richmond, CA, 1960-1965
- LL.B., University of San Francisco School of Law, 1959
- B.S., University of San Francisco, 1953

References Available Upon Request

A-114

Arthur J. Spector--Bergersingerman

Print

Arthur J. Spector
(954) 713-7511
aspector@bergersingerman.com

## Arthur J. Spector

**Arthur Spector** is a shareholder and serves as the team manager for the firm's Business Reorganization Team, resident in the firm's Fort Lauderdale office.

Mr. Spector was a United States Bankruptcy Judge in the Eastern District of Michigan for eighteen years (1984-2002), where he was Chief Judge the last three years. He authored 170 published judicial opinions, including 25 in the Dow Corning case alone.

Before taking the bench, Mr. Spector was engaged in the general practice of law in Bay City, Michigan, with an emphasis on bankruptcy and litigation. From 1974 through 1976, Mr. Spector served as an assistant district attorney in New York County, New York.

Mr. Spector is a contributing editor for Norton Bankruptcy Law & Practice II. He has authored numerous law review articles and monographs. Mr. Spector was an adjunct Professor of Law at the Thomas M. Cooley Law School in Lansing, Michigan, and instructed at law schools, and innumerable professional and judicial seminars.

He is a member of the American Bankruptcy Institute and of the National Conference of Bankruptcy Judges, where he served on the Board of Governors and committees.

Mr. Spector earned his juris doctorate *cum laude* in 1974 at the Boston University School of Law and his Bachelor of Arts degree at the City College of New York in 1971. He has achieved an AV rating in *Martindale-Hubbell*.

A-115



# Lawrence M. Watson, Jr.
## Upchurch, Watson, White & Max

**Principal**

Direct Dial: 800-863-1462 / 407-661-1123

Email: lwats@uww-adr.com

## Professional Education and Qualifications

J.D. University of Florida, Levin College of Law

Advanced Negotiations Program, Harvard University Law School

○ Certified Florida Circuit Court Mediator (All Circuits)

○ Certified U.S. District Court Mediator,
    Northern, Middle and Southern Districts of Florida

## Practice Experience

*Including but not limited to...*

○ Commercial Litigation
○ Construction
○ Class Action Disputes
○ Insurance /Reinsurance
○ Environmental / Land Use
○ Title VII Civil Rights
○ Intellectual Property
○ Professional Malpractice
○ Products Liability
*Specializing in complex multi-party issues*

## Background

Lawrence "Larry" Watson is a founding partner of the Upchurch Watson White & Max Mediation Group. He first came to the ADR profession in 1985 from an extensive practice in litigation and quickly developed national recognition as a pioneer civil trial mediator. He served fourteen terms as Chairman of the Florida Supreme Court Standing Committee on Mediation and Arbitration Rules and Procedures, and was awarded The Florida Dispute Resolution Center's *Outstanding Achievement Award* for his work on that committee. He was instrumental in developing one of the nation's first comprehensive set of ethical standards for mediators, which was adopted by the Florida Supreme Court in February 2000 and which earned him the Florida Academy of Professional Mediators *Award of Merit* for that same year. He has also been honored for outstanding service to the profession by the American College of Civil Trial Mediators.

Mr. Watson has mediated cases in Alabama, Colorado, Georgia, Illinois, Kansas, Missouri, Mississippi, North Carolina, New Jersey, New York, South Carolina, Tennessee, Pennsylvania, Texas, Virginia, West Virginia, and the United Kingdom, as well as Florida. He is a frequent lecturer and writer on mediation, litigation, dispute resolution procedures and ADR process design.

## Memberships, Publications

○ Past President, Founder and Fellow, American College of Civil Trial Mediators
○ Past Chair, FL Supreme Court Standing Committee on Mediation and Arbitration Rules & Procedures
○ Past Chair, ABA Section of Litigation, Construction Litigation Committee
○ Past Chair, ABA Section of Litigation, ADR Committee
○ Former Division Director, ABA Section of Litigation
○ Past President, The Florida Bar Trial Lawyers' Section
○ Author: *"Effective Advocacy in Mediation, A Planning Guide for a Civil Trial Mediation"*,
    *"The Case for Mediated Case Management"*
○ Co-Author: *"Survey on Arbitration"*, ABA Section of Litigation Task Force on ADR Effectiveness
○ Presentations: ABA Section of Litigation, Section of Dispute Resolution, Forum on the Construction Industry; Chartered Institute of Arbitrators (UK), CPR Institute for Dispute Resolution, The Florida Bar, South Carolina Bar, Florida Academy of Trial Lawyers.

900 Winderley Place, Suite 122, Maitland, FL 32751 •407-661-1123 •800-863-1462 •Fax: 407-661-3743
133 South Palmetto Avenue, Daytona Beach, FL 32114 •386-253-1560 •800-264-2622 •Fax: 386-255-7722
801 Brickell Avenue, Suite 900 , Miami, FL 33131 •305-739-6628 •Fax: 305-373-0189
2000 A SouthBridge Pkwy, Suite 400 , Birmingham, AL 35209 •205-933-9033 •888-435-9033 •Fax: 205-871-2208

# ROGER M. WHELAN
Attorney at Law

17508 Editor View Terr,
Ashton, MD 20861
Tel. 301-260-7707 • Fax 260-7204

Admitted in:
D.C.

Roger M. Whelan maintains an independent law practice specializing in Insolvency, Bankruptcy law and Alternate Dispute Resolution. Mr. Whelan also served as a partner and senior counsel at the Washington law firm of Shaw Pittman LLP from 1989 through 2000. Prior to that time, Mr. Whelan was a shareholder and member of the Washington law firm of Verner, Liipfert, Bernhard, McPherson & Hand from 1984 through 1989. He served as a United States Bankruptcy Judge for the District of Columbia, July 1, 1972 through December 31, 1983. He was also designated by Chief Justice Warren Burger to serve on the United States Bankruptcy Court for the District of Maryland from August 1981 through December 1982.

As a Bankruptcy Judge, Mr. Whelan was a governor of the National Conference of Bankruptcy Judges, as well as an active member of the American Judicature Society and the National Conference of Special Court Judges for the American Bar Association. In 1973, Judge Whelan was appointed as Special Master by United States District Judge Charles Richey to preside over the National American Life Insurance Company Insolvency Proceeding. This was the first time that a federal bankruptcy judge (acting as Special Master) presided over a complicated reorganization hearing, together with two state court judges in one consolidated trial hearing. The reorganization trial was the first of its kind in the history of the nation (as evidenced by an article in the Judges Journal, Feb. 1972, of the American Bar Association). In 1984, Judge Whelan received an award for distinguished service from the Judicial Conference of

In 1995, Mr. Whelan was appointed by the Office of Independent Council to serve as a consultant and expert witness in the Whitewater proceedings involving former Governor Jim Guy Tucker, which proceedings resulted in convictions for all three named defendants. Currently, Mr. Whelan represents Washington Gas Holdings, Inc. in the Enron Chapter 11 cases, and he previously served as both a mediator and arbitrator in the Raytech Chapter 11 cases, pending in the U.S. Bankruptcy Court for Bridgeport, Connecticut. Mr. Whelan was also appointed as a mediator with expanded powers in the Loewen Group International, Inc. Chapter 11 case pending in Wilmington, Delaware. Mr. Whelan's role as a mediator continued through the year 2003 and over nine hundred cases were successfully mediated and concluded.

Mr. Whelan's educational background includes undergraduate work at Georgetown (cum laude), 1959; and a graduate degree from Georgetown University Law Center (J.D., 1962). He is also an active member of the Bar Association of the District of Columbia, a past Chairman of the Business Bankruptcy Subcommittee of the District of Columbia Bar Association, the American Bar Association, and served as past chairman of the Bankruptcy Litigation Section and was a member of the Executive Committee of the Federal Bar Association. Mr. Whelan also is an active member of the American Bankruptcy Institute and served as a member of their board of directors and in 1992 was appointed to the Executive Committee of the American Bankruptcy Institute; in addition he served for over ten years as Chairman of the Legislative Committee and was also a regional chairman of the ABI's Membership Committee. He is also a member of the Commercial Law League and in 1989 was elected as a fellow, and appointed to the Board of Regents of the then newly incorporated American College of Bankruptcy. Also in 1993, Mr. Whelan served as the Chairman of the Judicial Selection Committee for the American College of Bankruptcy. He served on the College's Board of Directors for four years through 2002. He has also been named as a Master of the Walter Chandler American Inn of Court, and currently maintains emeritus status with that organization. Moreover, he serves as Secretary-Treasurer of the Association of Former Bankruptcy Judges, and continues to appear as a guest lecturer on bankruptcy and ADR matters for various governmental agencies. He is also a member of the Maryland Bankruptcy Bar Association and has served as a past Director of that organization.

Finally, Mr. Whelan has participated in various international insolvency matters by advising the Canadian Commission in 1986 with its revisions to Canadian insolvency law; he served as an advisor to the American Bar Association's project dealing with the formulation of an insolvency law for Bulgaria and in 1999, Mr. Whelan was selected by the U.S. Agency for International Development to serve as a member of a three-person Commission to review and report on existing commercial law problems in the Ukraine. Because of funding problems, this latter project was cancelled. Mr. Whelan is included as a biographee in Who's Who In America and Who's Who In American Law. He is also included in the publication Best Lawyers In America.

Document # 1562562 v.1

A-118