# Mesothelioma among Employees in Public Buildings

Henry A. Anderson, MD
Lawrence P. Hanrahan, MS
Joseph Schirmer, MPH
Dee Higgins, RN
Priscilla Sarow

Wisconsin Division of Health
P.O. Box 309
Madison, WI 53701

As presented at the Collegium Ramazzini Conference "The Third Wave of Asbestos Disease: Exposure to Asbestos in Place. Public Health Control" June 7-9, 1990, NY, NY

A-160

## SLIDE 1

I would like to recognize the valuable contributions made by my co-investigators and acknowledge the partial support for this project provided through a cooperative agreement with the National Institute of Occupational Safety and Health (NIOSH) and the Agency for Toxic Substances and Disease Registry (ATSDR). We also wish to thank the Wisconsin Division of Health's Center for Health Statistics for their assistance in providing data from the Wisconsin Cancer Reporting System and Wisconsin mortality vital statistics.

## SLIDE 2

In 1932, at a conference on the *Effects of Dusts Upon The Respiratory System* sponsored by the Industrial Commission of Wisconsin. Dr. Robert E. Russell, Surgeon, United States Public Health Service, presented a case of asbestosis seen in a maintenance worker. He had worked for about 6 years cleaning and restoring asbestos pipe insulation in a government hospital. Preventive intervention to protect other workers did not ensue.

Hundreds of thousands of schools and other public buildings have been constructed incorporating asbestos containing building materials. Millions of construction workers completed their tasks and care of the new buildings became the responsibility of a new team of employees. Ignorant of the unique hazards of breathing asbestos containing dust, building managers and maintenance staff failed to perceive a need for even rudimentary health protective precautions when work created asbestos containing dust.

Sometimes obviously, and other times insidiously, asbestos containing materials deteriorated and needed repair or replacement. Building occupant needs changed, requiring renovation and remodeling which also disturbed the material, releasing asbestos. Over time, the intermittent asbestos exposures to building staff accumulated. As latency periods were reached, work experiences similar to Dr. Russell's case, brought other sentinel disease events, specifically mesothelioma.

Unfortunately, as Congress found in 1984, occupational disease surveillance in the United States was and remains fragmented, unreliable, and 70 years behind the communicable disease surveillance networks. No sentinel disease surveillance mechanism was in place to sound an early warning. Without effective hazard recognition and risk communication, preventive action was never taken. Predictably, the cumulative impact of these failures may lead to what Dr. Selikoff has described "The Third Wave of Asbestos Disease."

A-161

In 1978, Wisconsin implemented a state-wide, population based cancer reporting system. The system included information



from all acute-care general medical-surgical hospitals in
Wisconsin.

## SLIDE 3

A case-control mortality study was conducted on the
Wisconsin mesothelioma cases to examine occupational and industry
exposure risks. A case was defined as a report with an ICD –
Oncology (ICD9 extension histology (morphology) code of 9050
through 9053, indicative of a mesothelial neoplasm. Cases were
then merged with the death certificate file. Fifteen controls
per case were randomly selected from the death certificate file
1981 – 1988 after excluding lung and digestive cancers ( ICD9
150–163) because they may be associated with asbestos exposure.

## SLIDE 4

Sex specific, age adjusted odds ratios were constructed.
Odds ratios were computed using iterative, unconditional, maximum
likelihood fit of a logistic regression model. Occupation and
industry exposures were examined separately in the models, using
the 1980 census classifications contained on the death
certificates.

## SLIDE 5

Usual industry and occupation as listed on Wisconsin's death
certificates provide a broad overview of the deceased
individual's work history. Our analytic approach did have
sufficient sensitivity to identify industries and occupations
which are known to have historic asbestos exposure and increased
risk for mesothelioma. Insulation workers had the highest odds
ratio (33) followed by ship building (6). Although Wisconsin
does not come to mind when thinking of shipyards, we did have
several yards operating during WWII and two continue today.

## SLIDE 6

Of particular interest were statistically significant odds
ratios for public safety workers (odds ratio of 3.7 with 95%
confidence interval of 1.5 to 9.4), schools (odds ratio of 3.5
with 95% confidence interval of 1.5 to 8.3), postal workers (odds
ration of 3.29 with 95% confidence interval of 1.3 to 9) and
janitors (odds ratio of 2.83 with 95% confidence interval of 1.4
to 6). The public safety category includes both fire fighters
and law enforcement officers.

Analyses were not performed for females. Usual occupation
and industry coding on female death certificates was found to be
far from complete, with only 40% containing useable codes.
Significant differences were seen between the case and control
death certificates. Thirty-one percent of the female
mesothelioma cases had no occupation or industry code compared to
25% of the controls. Additionally 39% of mesotheliomas were
coded as housewives compared to 58% of controls. In contrast,
all male mesothelioma death certificates had both industry and



occupation coded. Only 2% of the control males were missing either industry or occupation.

### SLIDE 7

The above analyses provide interesting leads and demonstrate that at least for males, death certificate data and cancer reporting systems can contribute to sentinel occupational disease surveillance. However, it is possible that some of these mesothelioma cases may have experienced direct short-term, occupational asbestos exposures, which were not part of the individual's usual employment and not indicated by the occupation/industry coded from the death certificate. In order to identify all possible asbestos exposure, we have expanded our case search to the years 1968 - 1983; begun review of available medical records; are identifying and interviewing available next of kin and treating physicians; are reviewing public employment and licensing records as well as building asbestos inspection reports. The following examples are taken from the reviews already completed.

### SLIDE 8

These are two cases of school maintenance workers. The first began as a public employee 35 years before he developed a mesothelioma. After school he joined his father's home construction firm. No asbestos was reportedly used by the company. The second case is that of a life-long carpenter. He began as a municipal worker 50 years before he developed his mesothelioma.

### SLIDE 9

These two are school employees. The first was a teacher. Notable in her history is 25 years in a school district which had significantly damaged asbestos material identified and removed in 1979. The second was a school cafeteria cook. In her hospital record she reported flaking asbestos ceiling material had been in the kitchen and had to be removed sometime in the 70s.

### SLIDE 10

These two cases are public protection employees. The first was a public employee for 57 years. He was a fireman and then a building maintenance worker. His medical record indicates interstitial fibrosis was noted on an x-ray taken in 1979; two years before his mesothelioma developed. The second began employment as a policeman 40 years before his mesothelioma developed. His medical records indicate he spent at least 8 years as court liaison officer for the police department spending much time in a court house known to contain friable asbestos which was later removed.

A-163

3

## SLIDE 11

What is the current status of asbestos containing materials in Wisconsin public buildings? A decade of state and federal experience and programmatic evolution has brought us to today's State based Asbestos Hazard Emergency Response Act (AHERA) school program.

### SLIDE 12

In Wisconsin we have 429 public school districts containing 1,930 schools with a total of 2,230 buildings covered by AHERA. There are an additional 988 private schools.

### SLIDE 13

We have completed review of the AHERA inspections and asbestos management plans from 385 of the school districts. Only 5% of these districts have only schools with no asbestos containing materials. Significantly damaged friable thermal system insulation was reported from 36% of the districts. More than twice that number of districts (76%) reported friable thermal insulation. Friable surfacing material containing asbestos was reported by 19%, with 4% of the inspections reporting friable surfacing materials which were significantly damaged. Only 3% of the districts found significantly damaged miscellaneous materials (primarily floor and ceiling tile).

The low prevalence of significantly damaged surfacing and miscellaneous material reflects the past ten years' priority to abate such circumstances. For maintenance staff, the high prevalence (36%) of significantly damaged friable thermal insulation represents a serious concern.

### SLIDE 14

Is there evidence of asbestosis among Wisconsin school maintenance workers?

In 1985 the Wisconsin Division of Health entered into a cooperative agreement with NIOSH to explore the utilization of state data bases as occupational disease surveillance tools. Pilot surveillance programs were established. In 1987 Wisconsin's pilot program was expanded under the NIOSH Sentinel Event Notification System for Occupational Risks (SENSOR) initiative.

### SLIDE 15

One component of the program is a free radiologic consultation service to provide ILO "B" interpretation of chest radiographs for physicians and industry based programs. And to assist concerned individuals, regardless of whether an abnormality was reported by their physician, workers can request their films be evaluated. However, they must have had at least

4

33

10 years in a dusty trade. Through 1989, 1,450 individual's x-rays have been evaluated.

Two studies have been initiated in response to reported sentinel cases of pneumoconiosis. The first identified a previously unrecognized chronic asbestos exposure in the paper manufacturing industry. The second is investigating cases of asbestosis among school maintenance workers.

## SLIDE 16

To comply with the AHERA regulations, some schools chose to use their maintenance staff to conduct asbestos inspections and collect samples. They also intended to train these staff to be responsible for repair of asbestos containing materials. Before implementing these plans, they provided their maintenance staff baseline clinical evaluations. In several instances, the clinics chosen to perform the exams forwarded abnormal films to the consultation program.

In order to determine the prevalence of abnormalities identified, the total number examined was needed. The clinics were contacted and reported 494 individuals were eligible to have an exam. The consultation program determined that 457 records (93% of eligible workers) had sufficient information to analyze. The ILO "B" reading of the initial reader was used in the analysis.

## SLIDE 17

Length of school maintenance employment ranged from under 1 year to 42 years. Only 3% of those with less than 10 years of school maintenance work had abnormal x-rays. Of the 28 individuals with more than 30 years of maintenance work, 43% had x-ray abnormalities consistent with pneumoconiosis. Duration of employment was significantly associated with prevalence of radiographic pneumoconiosis. The mean age of the whole study group was 43. Those with abnormal x-rays had a mean age 10 years older (52 years). Mean length of employment was 15 years for the whole group, but 23 years for those with pneumoconiotic x-ray abnormalities.

## SLIDE 18

Twenty-six of the 37 with abnormal x-rays had pleural thickening or plaques. Eleven individuals had irregular small opacities. Among those with 30+ years, 39% had pleural abnormalities and 7% had parenchymal irregular small opacities.

The profusion of irregular opacities was associated with increasing mean years of employment. Those with profusion 0/0 had a mean employment of 13 years, those with 0/1 16 years and those with 1/2 26 years. Those with pleural abnormalities had a mean employment of 23 years.

# INDUSTRIAL COMMISSION

## OF

# WISCONSIN

FRED M. WILCOX
Commissioner, Chairman

R. S. KNUTSON
Commissioner

VOYTA WRABETZ
Commissioner

A. J. ALTMEYER, Secretary

HARRY A. NELSON, Director of Workmen's Compensation

## Proceedings of Conference Concerning

# EFFECTS OF DUSTS UPON THE RESPIRATORY SYSTEM

Held at Medinah Athletic Club, Chicago
November 16–17, 1932



Wis. Historical Library

JUN 9 1953

Public Document Dept.

FEBRUARY, 1933

SLIDE 3

## METHODS - SELECTION
## CASE-REFERENT MORTALITY

**Cases:**
* 1981-1998 Deaths
* Cases From Tumor Registry
* ICD9-O Histology 9050-9053

**Controls:**
* Random 1981-1998 Deaths
* Excluding Lung & Digestive CA
* Referent / Case Rate:
    15    to    1

**Results:**
* 3810 Referents, 254 Cases

SLIDE 4

## METHODS - STATISTICS
## CASE-REFERENT MORTALITY

**Odds Ratios:**
    Sex Specific
    Age Adjusted
    Logistic Regression

**Exposures:**
    Occupation (1980 Census)
    Industry   (1980 Census)

A-167

36



### 1981–1983 Mesothelioma Deaths
### Odds Ratios
### Known Asbestos Industry/Occupation

| Industry/Occupation | N | Odds Ratio* |
|---|---|---|
| Insulation Workers | 3 | 33.35 |
| Ship Building | 5 | 5.63 |
| Plumbers | 6 | 4.65 |
| Electric Power | 4 | 4.00 |
| Electricians | 4 | 3.29 |

*Male Age Adjusted Odds Ratio, P < 0.05

### 1981–1983 Mesothelioma Deaths
### Odds Ratios
### Public Buildings

| Industry/Occupation | N | Odds Ratio* |
|---|---|---|
| Public Safety (Fire & Police) | 6 | 3.70 |
| Schools | 7 | 3.50 |
| Postal Workers | 5 | 3.29 |
| Janitors | 9 | 2.84 |

*Male Age Adjusted Odds Ratio, P < 0.05

A-168



37

SLIDE 7

## Identified Mesothelioma*
## Cases among Wisconsin Residents
## 1968 - 1988

### Selected Public Employee Occupations

- 8  Municipal building maintenance
- 11  School maintenance
- 13  Teachers
- 3  Other school employees
- 4  Fire fighters
- 6  Law enforcement

\* Cancer reporting system 1977-88;
Death certificates 1968 - 1976

SLIDE 8

## Public Employee Mesothelioma
## Case Examples

#30  74 yo male; school maint; d 1984
     Pleural mesothelioma
     1927-1942 home const
     1943-1957 city bldg, inspector
     1957-1969 city const/maint super.
     Widow awarded worker's comp 1986
     No military service

#22  72 yo male; school maint; d 1987
     Pleural mesothelioma
     1927-1955 city streetcar orpter
     1955-1977 Brd of Ed carp/painter
     Calcified plaques on x-ray
     No military service

38

SLIDE 9

## Public Employee Mesothelioma
## Case Examples

#31   66 yo female; teacher; died 1980
      Pleural mesothelioma.
      Life long teacher; same dist 1955-77
      Friable signif. damaged asb rem 1979
      1980 - signif damaged thermal asb

#19   64 yo female; school cook; d 1984
      Pleural mesothelioma
      School cafeteria cook — only job
      Asbestos ceiling flaking in kitch
      Removal in 1970s

SLIDE 10

## Public Employee Mesothelioma
## Case Examples

#23   79 yo male; fireman/bldg maint; d 1983
      Pleural mesothelioma
      1926-1957 city fire dept
      1957-1977 city bldg maint
      Interstitial fibrosis 1979
      No military service

#20   62 yo male; policeman; died 1986
      Pleural mesothelioma
      1946-1972 policeman
      9 yrs court liaison - friable asb rem
      1972-1983 hospital secur/dir maint.
      Military service - Air Force

A-170

SLIDE 11

## What is
## the status of Asbestos
## Containing Materials in
## Wisconsin Schools?

SLIDE 12

## Wisconsin
## Public Schools

| | |
|---|---|
| 429 | School Districts |
| 1,923 | Schools |
| 2,230 | Buildings |

SLIDE 13

## 385 Wisconsin Public School
## District AHERA Plan Reviews

**Thermal Insulation**
76%    Friable
36%    Significantly damaged

**Surfacing Material**
19%    Friable
4%    Significantly damaged

**Miscellaneous Material**
21%    Friable
3%    Significantly damaged

5%    No Asbestos
A-171

40

SLIDE 14

# Is There Evidence of Asbestosis Among Wisconsin School Maintenance Workers?

SLIDE 15

## State Consultation Program Pneumoconiosis 1985 - 1989

| | |
|---|---|
| 1,450 | Individual's x-rays |
| 117 | Public building maintenance |
| 31 | Pneumoconiosis* |

\* small opacities ≥ 1/0 and/or
pleural abnormalities not C/P angle blunting

SLIDE 16

## School Maintenance Worker Pneumoconiosis Screening

| | |
|---|---|
| 404 | Eligible to participate |
| 10 | Refused |
| 26 | Incomplete records |
| 1 | Un-readable x-ray |

457 (83%) Records analyzed

A-172

41

SLIDE 17

## 457 School Maintenance Worker's
## Pneumoconiosis Screening

| Employment | N | Pneumoconiosis* |
|---|---|---|
| 1 - 9.9 yrs | 172 | 4 ( 2%) |
| 10 - 19.9 yrs | 200 | 14 ( 7%) |
| 20 - 29.9 yrs | 57 | 7 (12%) |
| 30 + yrs | 28 | 12 (43%) |

    * small opacities ≥ 1/0 and/or
     pleural abnormalities not C/P angle blunting

SLIDE 18

## 457 School Maintenance Worker's
## Pneumoconiosis Screening

| Employment | N | ≥ 1/0 only | pleura only | Both |
|---|---|---|---|---|
| 1 - 9.9 yrs | 72 | 0 | 3 ( 1.7%) | 1 (0.5%) |
| 10 - 19.9 yrs | 200 | 5 (2.5%) | 8 ( 4 %) | 1 (0.5%) |
| 20 - 29.9 yrs | 57 | 2 (3.5%) | 5 ( 8.8%) | 0 |
| 30 + yrs | 28 | 1 (3.6%) | 10 (35.7%) | 1 (3.6%) |

A-173

42

SLIDE 19

## 457 School Maintenance Worker's Pneumoconiosis Screening

| School Occupation | School yrs | Other dust exposure |
|---|---|---|
| Plasterer* | 14 | 1 yr foundry (1948) |
| Boiler attendant* | 12 | 1 yr foundry (1951) |
| Maintenance* | 17 | Foundry & sandblasting |
| Painter° | 33 | Painter 5 yrs before |
| Painter* | 16 | 2 yrs quarry (1971-72) |
| Painter** | 30 | 4 yrs sandblaster |
| Laborer* | 32 | 16 yrs sandblaster |

\* Pleural abnormalities present

\*\* Small irregular opacities 1/0

SLIDE 20

## Mesothelioma Cases From Screened School Districts

#18  72 yo male; school maint; d 1980
     Pleural mesothelioma
     Painter

#30  74 yo male; school maint; d 1984
     Pleural mesothelioma
     Bldg. const/maint supervisor

#14  77 yo male; school maint; d 1987
     Pleural mesothelioma
     School boiler maint

43

SLIDE 21

# Conclusions

1.  School maintenance workers
    are at risk for:

    asbestosis
    mesothelioma

Quantification of cancer risk needed.

SLIDE 22

2.  Some other employment may
    present a risk for mesothelioma.

    Schools
    Janitors
    Law enforcement
    Fire fighters
    Postal workers

Need to identify/prevent exposure sources.

Quantification of cancer risk needed.

SLIDE 23

3.  Current asbestos disease
    surveillance is inadequate.

    Establish

    A national occupational
    disease and exposure
    surveillance network.

A national mesothelioma registry.

44

*Tom Kelseh*

## SB 2542 - COMMENTS

I.   **What the Bill Does:**

SB 2542 does three things:

A.   <u>It extends</u> the current Statute of Limitations to August 1, 1997.  The current Statute of Limitations is six years from the date when the owner of property knew or should have known of facts giving rise to cause of action.

B.   <u>It revives</u> all actions that are barred from the beginning of time.

C.   It will bar any asbestos action after August 1, 1997, for all public buildings.

<u>SB 2542 Would Violate North Dakota Constitution:</u>

A.   <u>Art. I, §18 - Ex Post Facto Law Provides That:</u>

"No bill of attainder, <u>ex post facto law</u>, or law impairing the obligations of contracts shall ever be passed."

An Ex Post Facto Law is defined as: "A law passed after the occurrence of a fact or commission of an act, which retrospectively changes the legal consequences or relations of such fact or deed." (Black's Law Dictionary, 5th Ed.)

SB 2542 revives actions that are time barred, it changes the legal relation between the building owner and the asbestos manufacturer <u>after the fact</u>.  In doing this, it is a constitutionally prohibited ex post facto law.

B.   <u>Art. I, §12 - Due Process Provides That:</u>

"No person shall . . . be deprived of life, liberty or property without due process of law."

The barring of an action because of the passage of time becomes a property right upon which we all rely.  To revive a barred cause of action deprives a defendant of that property right without due process.

C.   <u>Art. I, §21 - Equal Protection Provides That:</u>

". . . Nor shall any citizen or class of citizens be granted privileges or immunities which upon the same

₁ A-176

45



terms shall not be granted to all citizens."

By reviving barred causes of action for asbestos damage, SB 2542 grants a privilege to only public building owners. Others whose actions are barred get no such privilege and they are thereby denied equal protection of the law. SB 2542 discriminates against one class of manufacturers and operators to single out one special interest group.

## III. SB 2542 Is Against Public Interest

A.  SB 2542 does violence to long-standing public policy embodied in Statutes of Limitation. The public policy reasons for Statutes of Limitation are:

1.  To place a time limit on liability exposure;

2.  To discourage plaintiffs from sleeping on their rights;

3.  To require action be brought while evidence is still fresh and available, and memories have not faded or witnesses deceased; and

4.  To unburden the Courts from stale claims where, through the lapse of time, evidence concerning the true facts has been lost or difficult to prove.

B.  Opens a Pandora's Box.  If this legislature revives and extends asbestos actions, what reason can be advanced for not reviving all barred actions, such as suits for debt which are barred in six years; claims against an estate which are barred in 90 days after publication of a notice to creditors; and wrongful death actions which are barred in two years.

C.  Anti Business.  We are all working hard to encourage businesses and manufacturers to locate in North Dakota. This bill sends a fearful message by undoing our efforts at tort reform.  Whatever the limitations on a tort may be, it is essential that that limitation has meaning.  If our legislature lifts the time bar to the detriment of one group, who will be next.  No business looking to come into North Dakota will be able to rely on any Statute of Limitations in North Dakota.

## IV. SB 2542 - Not Needed

A.  Suits Have Already Been Brought.  As far back as 1983, EPA advised schools in North Dakota about the hazard of asbestos.  This hazard has been common knowledge for about 10 years.  Responsible persons have checked this out and a number of lawsuits have been brought.  In 1985, a class



action lawsuit was filed on behalf of all schools. Schools would not be affected by this bill because they have already brought their suits. A class action for all colleges and universities was filed in 1987.

B.   **Current Statute of Limitations Sufficient.** Our current Statute of Limitations on asbestos claims, is six years from the date upon which the owner of the property knew or should have known of facts giving rise to the cause of action. Public building owners who knew or should have known that asbestos was a problem for their building have had all the intervening years to act.

C.   **Innocent Building Owner Already Protected.** If there are public building owners around who do not know or do not have knowledge of facts that would cause them to know of an asbestos problem, the six-year statute will not have begun to run against their claim. SB 2542 would limit these innocent building owners to only four years.

D.   If this bill is passed, public building owners will be here next session asking for appropriation to do studies on their buildings to determine if they contain asbestos. They will say that they will lose their right to sue even if they do not know about the asbestos. This may cost $30,000.00 for each public building.

A-178

47

TESTIMONY OF DOUGLAS A. BAHR
ON
SENATE BILL NO. 2542

Mr. Chairman, members of the Committee, I am Douglas A. Bahr, assistant attorney general, testifying on behalf of the Attorney General in support of Senate Bill 2542.

Senate Bill 2542 extends the statute of limitations for actions against manufacturers of asbestos containing materials for removal of asbestos from public buildings. The Bill also revives any actions for removal of asbestos from public buildings which may be barred by the statute of limitations. The Bill serves the interest of the citizens of the State of North Dakota by encouraging prompt removal of this health hazard from public buildings while at the same time permitting the State of North Dakota and other entities to recoup the expense of removing the asbestos from public buildings.

The health and safety of the citizens of North Dakota is an important concern of the Legislature. Senate Bill 2542 recognizes that asbestos in public buildings poses a significant health hazard to North Dakota citizens that should be promptly corrected. Allowing building owners who correct asbestos problems in public buildings to seek reimbursement against others who may be more directly responsible for the problem encourages removal of the health hazard. Further, requiring that any action to recover the cost for removal of materials containing asbestos from a public building be brought before August 1, 1997, encourages prompt

A-179

48



correction of the dangers presented by the asbestos. Thus, the Bill protects the health and safety of North Dakota citizens by encouraging prompt removal of asbestos containing materials by permitting building owners to seek reimbursement from the manufacturers of the asbestos materials if an action is brought prior to August 1, 1997.

Senate Bill 2542 also protects the public treasury against the monumental cost of removing and replacing asbestos in public buildings. The building owner with the greatest number of public buildings containing asbestos in North Dakota is the State of North Dakota. Asbestos containing materials will need to be removed from state buildings under containment if the materials will be disturbed upon renovation or remodeling, if deterioration necessitates removal, or if a building is demolished. Removal under containment is an expensive procedure. Either the taxpayers of this state or the manufacturers of the asbestos will have to pay to have the asbestos removed from state buildings. This Bill gives the state a specific deadline by which to assess its asbestos problem and initiate legal proceedings to place the cost of removing this serious health hazard upon the manufacturers rather than the taxpayers.

If the state brings an action to recover for removal of asbestos or materials containing asbestos at this time, asbestos manufacturers will most likely attempt to defend the action by the technical defense of statute of limitations. The statute of limitations

A-180

49

which would most likely apply to this type of action  would not begin to run until the "building owner" knew or reasonably should have known of the asbestos material and its health hazard.  This is called the "discovery rule."  The matter of when a public entity knew or reasonably should have known that a particular wrong had been committed is complicated because the person whose knowledge is controlling may not be readily identifiable.  Numerous officials may have served in different capacities over different periods of times with varying degrees of knowledge regarding the presence of asbestos and its health hazards.  Thus, a substantial amount of state time and resources will be spent in trial over the issue of when the state became aware or reasonably should have become aware of the asbestos material and its health hazards.  Senate Bill 2542 removes this issue from litigation by setting a specific date by which all such actions must be brought.

One of the reasons the Office of Attorney General and state agencies have not brought actions against asbestos manufacturers to date is that the Legislature has not appropriated funds to the Office of Attorney General or to state agencies to bring such actions.  The Bill under consideration sets a specific date in which state agencies must assess the extent of their asbestos problem and seek the necessary appropriation to solve the problem and bring an action against the responsible asbestos manufacturers. Absent passage of this Bill, the substantial cost of removing



asbestos from state buildings will be placed upon the taxpayers rather than the responsible manufacturers.

In addition, Senate Bill 2542 also protects asbestos manufacturers from what would otherwise be virtually unlimited and perpetual exposure to civil actions. The Bill bars any action to recover for removal of asbestos or materials containing asbestos from a public building unless the action is brought before August 1, 1997. Thus, the Bill limits what would otherwise be virtually unlimited and perpetual exposure to liability for asbestos manufacturers without eliminating liability entirely; it affords a reasonable period within which asbestos or asbestos containing materials can be removed from public buildings and suits brought to recover the cost of such removal.



Enactment of the Bill will also not create additional litigation by the State of North Dakota. Most asbestos cases settle rather than go to trial. When manufacturers do successfully defend asbestos cases, it is usually because they can utilize the statute of limitations or another technical defense. The major issue of the trial thus becomes when the building owner became aware of or reasonably should have become aware of the asbestos material and its health hazards. Enactment of the Bill removes this time consuming portion of a trial by setting a specific date by which public building owners must bring actions against asbestos manufacturers. Because this issue would be removed, it is more

4

likely that asbestos actions would be settled. Even if the actions do go to trial, the trial will be limited to the issue of liability of the asbestos manufacturer, substantially reducing the time and judicial resources exhausted through the trial. The amount of litigation would also be reduced because after August 1, 1997, any further litigation regarding asbestos removal would be barred.

Because there are no manufacturers of asbestos containing materials in the State of North Dakota, this Bill will not adversely affect any company or entity in North Dakota. It is believed that the Bill will have a positive effect on North Dakota citizens and taxpayers, encouraging prompt removal of asbestos from public buildings while permitting public building owners to seek reimbursement for the cost of removing asbestos against the responsible asbestos manufacturers.

With regard to the constitutionality of Senate Bill 2542, numerous courts have addressed and upheld the constitutionality of statutes extending and reviving actions by building owners against manufacturers of asbestos containing materials. The one court that addressed the constitutionality of a statute similar to the Bill, extending and reviving actions with regard to public buildings, found the statute to be constitutional. See City of Boston v. Keene Corp., 547 N.E.2d 328 (Mass. 1989). Those courts' findings, as well as numerous North Dakota Supreme Court decisions, provide support for the constitutionality of Senate Bill 2542.

5

A-183

# Asbestos in U. S. Buildings

## Current Facts
## and
## Changing Opinion

Updated for The Envir. nental Roundtable
A-184
November 1991

# ASBESTOS MATERIALS IN BUILDINGS: A REVIEW OF CURRENT SCIENCE

A number of independent and government-sponsored studies have been released since 1984 on the safety of asbestos-containing materials (ACM) in buildings. Although each of the studies differs somewhat in approach, three major findings are consistently confirmed throughout the research:

- The typical levels of asbestos in building air are so low that they are virtually the same as outdoor air.

- Such extremely low concentrations of airborne asbestos do not put building occupants at a significant risk.

- Removal efforts, even when performed correctly, can increase rather than decrease concentration of asbestos fibers in building air.

As a result of these conclusions, many experts advocate management rather than removal of ACM from buildings. As EPA Administrator William K. Reilly told the nation in an NBC-TV "Meet The Press" interview, "There's a misperception that if you've got asbestos tiles on your floor, on your roof or in your insulation, you ought to get it out. And it's often the worst thing you can do. Disturbing the stuff is what usually creates the health hazard...you're better off leaving it in place."

## SIGNIFICANT STUDIES AND ARTICLES

### HEI-AR

The Health Effects Institute-Asbestos Research released a congressionally-mandated report on September 25, 1991 which stressed the safety of in-place asbestos. Co-sponsored by the Environmental Protection Agency and a broad range of private sector organizations, the study caps more than seven years of medical and scientific analysis showing that low-level exposure to asbestos in buildings is *not* an occupant health hazard.

Specifically, HEI's multi-disciplinary panel of experts concluded that: "Asbestos-containing material (ACM) within buildings in good repair is unlikely to expose office workers and other general building occupants to airborne asbestos fiber concentrations above the levels found in air outside such buildings."

Additionally, the panel noted that the added life-time risk of cancer for occupants in well-maintained buildings is very low when compared with the risks of other indoor air pollutants.

The HEI-AR's Board of Directors is chaired by Archibald Cox, University Professor (Emeritus), Harvard Law School and the Literature Review Panel consists of seventeen highly respected international scientists.

### AMERICAN MEDICAL ASSOCIATION

In a report published in the August 8, 1991 edition of its *Journal*, the American Medical Association (AMA) stated that "[i]t would be wiser for American society to use its resources to learn to live with asbestos safely than to try to remove it."

The report, from the American Medical Association's Council on Scientific Affairs, also notes the vast amounts of money and energy that have been wasted on unwarranted asbestos removals and makes strong recommendations about managing asbestos materials in place.

Most significantly, the report directs physicians to advise the public that improper diet, inadequate exercise, smoking,

and alcohol and drug abuse are far greater causes of sickness and death than asbestos in buildings and homes.

This council report was adopted as AMA policy at its 1990 Interim Meeting.

### SCIENCE

"Does airborne asbestos present a risk to the health of individuals in schools and other buildings?" five eminent scientists asked in a report published January 19, 1990 in the American Association for the Advancement of Science's prestigious *Science* journal. Their answer, after considering the latest data: No.

The reason, they explained, is that in tests using leading-edge technology, recent measurements of building air show that the levels of airborne asbestos in buildings with even damaged materials "are magnitudes lower" than those found in the workplaces of the past and only about 1/100th of the maximum level allowed in today's workplaces.

Given the safety of asbestos materials in buildings, the experts warned that "the asbestos panic in the U.S. must be curtailed, especially because unwarranted and poorly controlled asbestos abatement results in unnecessary risks to young removal workers who may develop asbestos-related cancers in later decades."

The authors of the *Science* article included Dr. Morton Corn, former head of the U.S. Occupational Safety and Health Administration and now with Johns Hopkins University's School of Hygiene and Public Health; Dr. J. Bernard Gee of the Yale University School of Medicine; and Dr. Brooke T. Mossman of the University of Vermont College of Medicine.

### HARVARD UNIVERSITY

In a major report issued in August 1989, Harvard University's Energy and Environmental Policy Center summarized the conclusions of the International Symposium on the Health Aspects of Exposure to Asbestos in Buildings, held at Harvard the previous December. At the symposium, scientific and medical experts gathered

A-185

-1-

to evaluate the accumulating data on the health risks of asbestos in buildings. They concluded that under normal building conditions, the air in buildings with asbestos-containing materials contains "extremely low average levels of airborne asbestos" and the risk "posed by in-place asbestos is very small."

As the chart below (re-created from the report data) illustrates, the risk from asbestos in buildings is far below that of being hit by a car or struck by lightning.

Further, the experts noted that there is "an organized asbestos removal industry with a collective self-interest to promote additional removal." They warned, however, that removal activities disturb asbestos fibers that might not otherwise become airborne and "[t]here is a reasonable possibility that removal of asbestos may actually increase exposure to building occupants."

The experts who met at Harvard urged U.S. policymakers to "incorporate these recent findings in the formulation of new asbestos policies." They pointed out that "spending money on asbestos removal will likely decrease funding which might be available to support other public health and educational measures which could be far more effective in reducing environmental health risks."



Lifetime Probability of Premature Death (per 100,000)

## HEALTH EFFECTS INSTITUTE

To determine the research needs for a three-year study authorized by the U.S. Congress, the Health Effects Institute (HEI), an independent research organization (see HEI-AR above), issued a March 1989 report based on its consultation with a team of medical and scientific experts.

"From the exposure studies to date," the HEI report stated, "it is clear that exposure to asbestos and asbestos-containing materials is normally extraordinarily low."

Further, the scientists and medical experts of HEI "expressed the view that, for most building occupants, the risk [of exposure] was quite low, that abatement through removal of asbestos-containing materials... may often, some thought typically, actually increase exposure and therefore risk for all building occupants."

## NEW ENGLAND JOURNAL OF MEDICINE

In June 1989, the *New England Journal of Medicine* published a report entitled "Asbestos-Related Diseases" by Dr. Gee (Yale) and Dr. Mossman (University of Vermont). In their report, Doctors Gee and Mossman noted that "air monitoring in schools and public buildings has revealed infinitesimal amounts of airborne asbestos in comparison with conditions prevailing in the workplace of the past."

In addition, they characterized as "alarming" studies which have shown airborne asbestos concentrations to be higher after removal activities. Noting the absence of any studies which indicate a justification for removing ACM from buildings, the doctors concluded that "one must question the unprecedented expenses on the order of $100 billion to $150 billion that could result from asbestos abatement."

## ENVIRONMENTAL PROTECTION AGENCY REPORT TO CONGRESS

The results of an air-monitoring study conducted on 49 buildings with ACM were included in a 1988 report to Congress by the Environmental Protection Agency (EPA). In 83 percent of the samples, no asbestos fibers were found.

Importantly, the level of airborne asbestos in the buildings was not significantly different from the levels found in outdoor air, resulting in EPA's statement that "actions other than removal of ACM might be adequate to maintain relatively low exposure levels until the normal changes in building use dictates its removal."

EPA further reported to Congress that removal, "although attractive in concept, is not always the best alternative from a public health perspective."

## CONSUMER PRODUCT SAFETY COMMISSION STUDY ON HOMES

The Consumer Product Safety Commission (CPSC) released the initial results of a 1988 air-monitoring study conducted in 45 homes known to have damaged ACM — a condition likely to have prompted concern in the past. The study concluded, however, that despite the condition of the materials, the "levels of asbestos found throughout these 45 homes are low. In fact, taken as a group, the indoor values are essentially not greater than... levels seen outdoors."

A-186

# SUPPORTING STUDIES AND STATEMENTS



"In the general population of Quebec chrysotile mining towns, exposed over generations to chrysotile concentrations far greater than anything encountered in public buildings, there have been few if any cases of mesothelioma attributable to nonoccupational exposure."
— Epidemiologists J. Corbett McDonald and Alison D. McDonald, letter to the editor of Science (August 24, 1990)

"EPA has been trying, especially in the last few years, to emphasize the importance of managing asbestos 'in place' whenever possible. We've stressed that approach because the unnecessary removal of asbestos-containing materials may actually pose a greater health risk than simply leaving them alone..."
— William K. Reilly, Administrator, United States Environmental Protection Agency (June 12, 1990)

"[Many] experts now agree that [asbestos] removal should not be used until all other possible corrective actions have been ruled out. The removal of asbestos-containing material that is not damaged is a waste of money because, when it is in good condition, the material is not dangerous."
— New York State Department of Education, Report to the Board of Regents (November 1989)

"As environmental asbestos concentrations are 100,000 to 1,000,000 [times] less than those typically present in asbestos insulation or factory work during the 1940s or 1950s, the risk of developing an asbestos disease is 100,000 to 1,000,000 [times] lower than experienced by these workers."
— William J. Nicholson, Ph.D., Mount Sinai School of Medicine (1988)

"The levels of airborne asbestos fibers found in buildings in normal use, which contain asbestos materials in good condition [,] are very low, and are similar to those found by studies in other countries."
— U.K. Department of Environmental Health and Safety Executive and Department of Education and Science (1987)

"[A]sbestos removal is difficult to control...and in buildings in which average levels are low, the exposure to both workers and occupants caused by asbestos removal may actually increase the health hazard."
— Environmental Health Perspectives published by the National Institute of Environmental Health Sciences (December 1985)

"The environmental health risk from asbestos in buildings is of an extremely low order...and could perhaps be classed as negligible."
— U.K. Health and Safety Commission, reporting on the results of research by Sir Richard Doll and Professor Julian Peto (April 1985)

"The mere presence of asbestos in building material does not in and of itself pose a health risk to anyone. Asbestos-containing materials in good repair are not likely to release fibers into the air, and therefore removal of these materials is not essential."
— New Jersey Asbestos Policy Committee (1985)

"[ACM in buildings] will almost never pose a health hazard to building occupants...Even a building whose air has a fibre level up to ten times greater than found in typical outdoor air would create a risk of fatality that was less than one-fifth the risk of having a fatal automobile accident while driving to and from the building."
— Royal Commission on Matters of Health and Safety Arising from the Use of Asbestos in Ontario (1984)

"The mere presence of asbestos-containing materials in a building [does not constitute] a hazard requiring immediate abatement, but requires instead a systematic approach to assessing the situation."
— National Institute of Building Sciences (1984)

# THE ECONOMICS OF ASBESTOS IN BUILDINGS



Although scientific study after study points out that asbestos in buildings poses no significant health risk to building occupants, asbestos abatement in our nation's schools and public and commercial buildings continues, fueled by emotion and misdirected public policy. The impact on society is costly:

- It places a tremendous financial burden on school systems, taxpayers and building owners.
- It diverts sorely needed funding away from serious health and social concerns.

But more importantly:
- Removal efforts, even when performed correctly, can increase rather than decrease concentrations of asbestos fibers in

building air — placing abatement workers and building occupants at risk.

The cost of asbestos abatement is indeed staggering, with estimates ranging from the low billions to the trillions.

For example:

- The U.S. Environmental Protection Agency (EPA) estimates that about 45,000 schools will implement response actions in compliance with the Asbestos Hazard Emergency Response Act (AHERA) over a 30-year period and at an average cost of $40,000. The total cost of this regulation over a 30-year period will be about $3.1 billion, according to the agency

A-187

-3-



- According to EPA estimates, AHERA-type requirements extended to public and commercial buildings (approximately 733,000 buildings) would cost an estimated $53 billion for asbestos abatement and disposal.

- According to Dr. Morton Corn, director of the Division of Environmental Health Engineering, School of Hygiene and Public Health at Johns Hopkins University, estimates for removal of asbestos from our nation's buildings are as high as $100 to $150 billion.

- Peter MacDowell, an environmental consultant, along with real estate consultant Ehud Mouchy, estimate total abatement costs of public and commercial buildings could be more than $2 trillion over the next 30 years — including not only direct abatement costs, but also lost wages due to displacement and other incidental costs.



**Could Asbestos Dollars Be Better Spent?**

According to estimates, EPA estimates, a could cost an close to $53.2 billion over a 30-year period for asbestos abatement in our nation's schools and public and commercial buildings. Meanwhile the 1988 federal budget offered only $0.4 billion for drug abuse programs, $0.1 billion for fighting AIDS, $7.2 billion for Head Start and $860 million for the home-less. Conceivably, the dollars that could be spent on asbestos abatement in this country could fund these programs for approximately six years.

## OPINION LEADERS QUESTION ASBESTOS RISKS AND COSTS

### SCIENTIFIC SOURCES

"In the absence of epidemiologic data or estimations of risk that indicate that the health risks of environmental exposure to asbestos are large enough to justify high expenditure of public funds, one must question the unprecedented expenses on the order of $100 billion to $150 billion that could result from asbestos abatement."
—*New England Journal of Medicine*, June 29, 1989

"In many cases, spending money on asbestos removal will likely decrease funding which might be available to support other public and educational measures which could be far more effective in reducing environmental health risks."
—Summary of Symposium on Health Aspects of Exposure to Asbestos in Buildings, Harvard University, June 20, 1989

### PUBLIC OFFICIALS

"...in a lot of buildings, asbestos presents no danger at all."
—Federal Judge Thomas M. Reavley, October 24, 1991

"Asbestos-containing material within buildings in good repair is unlikely to expose office workers and other general building occupants to asbestos fibers concentrations larger than the air outside the buildings."
—HEI-AR's Chairman of the Board, Archibald Cox, September 23, 1991

"I don't know why rational people would consider spending money on what has only been perceived as a problem [asbestos] when we have so many specific problems, like drugs."
—Rockville, Illinois school board member Terry Hodges, *Rockford Register-Star*, January 19, 1990

"It will require billions of dollars to remove asbestos from all our school buildings. Lightning rods and hurricane cellars might be a more prudent investment. Better yet, don't get near tobacco smoke."
—California State Sen. Leroy Greene (D-Sacramento), *Daily Recorder*, December 11, 1989

"...the near-national hysteria about asbestos may turn out to be one of the major quasi-scientific and technical frauds of the century."
—Retired Bell Labs chief William O. Baker to the New Jersey Board of Higher Education, *Science & Government Report*, April 15, 1989

"It would be foolish for the country to consider a large new program of asbestos control without first asking basic questions which could improve our response to asbestos in public and commercial buildings and probably provide public health protection at a lower cost."
—EPA Administrator Lee M. Thomas in a letter to then-Vice President George Bush and Rep. James C. Wright Jr., February 24, 1989

### ECONOMISTS/MANAGEMENT CONSULTANTS

"People are starting to ask, 'Do I need to spend all this money for a hazard [asbestos] that may not exist[.]'"
—John A. Schlosberg, air quality compliance manager, Hart Environmental Management Corp., *The National Underwriter, Property & Casualty/Employee Benefits Edition*, December 11, 1989

"As a society we have limited resources to devote to satisfying our wants. We must ask of any asbestos abatement program: Could this money purchase greater risk reductions if spent elsewhere?"

"...as a society and as individuals we behave as if we are willing to spend in the vicinity of $1 million per life to reduce small risks of premature mortality...We could buy much more public health improvement by spending our money on other programs."

A-188



57

—4—

"... one conclusion seems reasonably clear: we should resist squandering our resources on crash programs of asbestos removal to reduce already insignificant risks lest we find ourselves unprepared to cope with more acute risks from other hazards or even from the programs themselves."

—D.N. Dewees, professor of law and economics, University of Toronto, *American Scientist*, May-June 1987

## MEDIA COVERAGE

"Asbestos can never be eliminated from the environment, and Americans should learn how to live with it safely rather than try to remove all of it from buildings, a panel of the American Medical Association says."

"Asbestos poses far less risk to the health of the everyday occupants of buildings than that posed by smoking, drug and alcohol abuse, improper diet and lack of exercise."
—*New York Times*, Aug. 7, 1991

"No study has ever linked asbestos in schools, office buildings and homes with disease, and removing it can create a problem where none existed. Some researchers also question the degree to which asbestos presents a risk at all."

"When in doubt, don't tear it out. Asbestos is dangerous only when it's breathed; it can be breathed only if it's airborne, and it becomes airborne only if it is disturbed."
—*U.S. News & World Report* "The Asbestos Dilemma," Jan. 14, 1991

"Congress passed a law banning asbestos, and schools have spent billions removing it. Scientists are now calling this episode a 'panic,' and suggesting that the money was wasted."

"The National School Boards Association has estimated that asbestos removal costs for elementary and secondary schools to be about $6 billion. Put differently, instead of hiring new teachers, upgrading their curricula, initiating anti-drug programs or improving facilities, many schools squander their money on a federally declared, nonexistent health threat."
—*The Wall Street Journal*, "Scientific Faddism," February 6, 1990

"A revised assessment of [Delaware] schools and state buildings last year indicated it will take $36 million and eight to nine years to complete the asbestos removal, twice the cost and nearly twice as long as earlier estimates."
—*Wilmington, Delaware, Sunday News Journal*, January 21, 1990

"The result of asbestos fiber phobia has been the overnight growth of what is now a $3 billion industry... Alas, all this asbestos abatement isn't doing much good. The sad truth is that abatement usually raises the levels of asbestos fibers in a building short term, endangering abatement workers — who are often recruited from Third World countries — if not also occupants."
—*Forbes*, "Pestology," January 8, 1990

"The most cost-effective — and safest — approach, in most cases, is to leave the sleeping [asbestos] dog alone. It will save lives and perhaps hundreds of billions of dollars."
—*Reader's Digest*, "Great Asbestos Rip-Off," January 1990

"...the financial burden [of AHERA] is often proportionally heavier for the nation's 26,000 to 28,000 private schools, including denominational schools, which cannot raise taxes or float bonds to pay for the cleanup."

"'Our schools are strapped as it is,' said Deborah Jacobs, associate director for education affairs for Agudath Israel of America, an Orthodox Jewish organization that operates more than 500 schools nationwide. 'Some of the schools don't know where the money is going to come from.'"
—*The New York Times*, December 13, 1989

"The cost of removing asbestos is nothing short of staggering. Sprayed on for about 25 cents in the 1960s, it can now cost $25 or more a foot to remove (up to $50 in New York City)..."

"By the time one finishes subtracting potential asbestos-related deaths from the potential deaths linked to ... other causes... the question is probably not how many lives we will save with our $100 billion (or more) investment but how many we will lose."
—Michael Fumento, *The American Spectator*, October 1989

"For the population at large, the [asbestos] risk seems ridiculously small...a child is 16 times more likely to die in a plane crash and 72 times more likely to drown than to get a fatal disease from asbestos in schools. So why aren't we spending that $6 billion on swimming lessons?"
—*Chicago Tribune*, September 20, 1989

"Building owners and taxpayers could spend $100 billion over the next 25 years to scrape [asbestos] out of buildings. But the cleanup might cost more lives than it saves."
—*Forbes*, "Why Throw Money at Asbestos?", June 6, 1989



The Environmental Roundtable is an organization of business enterprises whose aim is to assist in the development and implementation of rational public policy responses to the real and perceived threats that hazardous substances may pose to human health and the environment. The Roundtable believes that the public, when fully informed about the scientific realities of the risks that potentially hazardous substances pose to human health and safety, will encourage policymakers to respond rationally to these risks by weighing them against the social and economic costs of inappropriate regulation and liability.

58

In an effort to "set the record straight" on the Environmental Protection Agency's (EPA) "current policies and requirements for asbestos control in schools and public and commercial buildings," EPA states the following:

Fact One:     Although asbestos is hazardous, human risk of asbestos disease depends upon exposure.

Fact Two:     Prevailing asbestos levels in buildings ... seem to be very low ... Accordingly, the health risk to building occupants ... also appears to be very low.

Fact Three:   Removal is often not a building owner's best course of action to reduce exposure.

Fact Four:    EPA only requires asbestos removal in order to prevent significant public exposure to asbestos during building renovation or demolition.

Fact Five:    EPA does recommend in-place management whenever asbestos is discovered.

Source: "Managing Asbestos In Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials," published by the United States Environmental Protection Agency, July 1990.
A-190

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                  :        Chapter 11
                                        :
OWENS CORNING, et al.,                  :        Case Nos. 00-3837 (JKF)
                                        :
            Debtors.                    :        (Jointly Administered)

                                        Related to Docket No. ____
                                        Hearing Date: May 16, 2005 at 10:00 a.m.
                                        Agenda Item: _____


ORDER GRANTING DEBTORS' MOTION
PURSUANT TO DEL.BANKR.LR 9006-1(d) TO
FILE REPLY IN SUPPORT OF ITS OBJECTIONS
TO CERTAIN ASBESTOS PROPERTY DAMAGE CLAIMS


The Court, having considered the Debtors' Motion Pursuant to Del.Bankr.LR 9006-1(d)

to File Reply in Support of its Objections to Certain Asbestos Property Damage Claims (the

"Motion"), filed April 29, 2005, and good cause having been shown, it is

            ORDERED that, the Motion is GRANTED.


Dated: May ___, 2005

                              _____
                              The Honorable Judith K. Fitzgerald
                              United States Bankruptcy Judge


A-191

21901432v4
520190.1

MAY 1 9 2005

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                    :     Chapter 11
                                          :
OWENS CORNING, et al.,                    :     Case Nos. 00-3837 (JKF)
                                          :
        Debtors.                          :     (Jointly Administered)

                                                Related to Docket No. 15054
                                                Hearing Date: May 16, 2005 at 10:00 a.m.
                                                Agenda Item: _____

ORDER GRANTING DEBTORS' MOTION
PURSUANT TO DEL.BANKR.LR 9006-1(d) TO
FILE REPLY IN SUPPORT OF ITS OBJECTIONS
TO CERTAIN ASBESTOS PROPERTY DAMAGE CLAIMS

        The Court, having considered the Debtors' Motion Pursuant to Del.Bankr.LR 9006-1(d)

to File Reply in Support of its Objections to Certain Asbestos Property Damage Claims (the

"Motion"), filed April 29, 2005, and good cause having been shown, it is

        ORDERED that, the Motion is GRANTED.


Dated: May 16th, 2005

                                        _____
                                        Judith K. Fitzgerald
                                        The Honorable Judith K. Fitzgerald
                                        United States Bankruptcy Judge

21901432v4
32019a.1

DKT. NO. 15139
DT. FILED 5/16/05

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE.

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 00-3837 (JKF) |
| OWENS CORNING, *et al.,* | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Re: Docket Nos. 13515, 14093, |
| | ) | and 15054 |
| | ) | Hearing Date: May 16, 2005 at 10:00 a.m. |
| | ) | Agenda Item No. 5 |

STATE OF NORTH DAKOTA'S SUR-REPLY TO DEBTORS' REPLY TO STATE OF
NORTH DAKOTA'S RESPONSE TO DEBTORS' OBJECTIONS TO STATE OF NORTH
DAKOTA'S ASBESTOS PROPERTY DAMAGE CLAIMS (CLAIM #8783, CLAIM #8926)

As permitted by the Court, the State of North Dakota (the "State") files this Sur-Reply to
respond to the extensive legislative history attached to the Debtors' Reply. As discussed below, the
legislative history is particularly instructive for what it does not say.[1]

## I. ARGUMENT

The sole issue before the Court is whether the State's claims are time barred by a 1993 North
Dakota statute applicable to "those persons who may bring claims regarding materials containing
asbestos in public buildings." North Dakota Cent. Code ¶ 29-01-47 (the "Act"). The Debtors have
described the Act as providing a *quid pro quo* for the State: according to the Debtors, in exchange
for reviving asbestos property damage actions "which would otherwise be barred," the legislature
provided an August 1, 1997 deadline to bring such actions. Transcript (May 16, 2005) at 5-6. The
State has argued that the Act has no applicability because it had no right to "bring claims regarding

---

[1] The State previously joined in a Consolidated Response to the Debtors' Objections to Asbestos
Property Damage Claims filed by Speights & Runyan and in the First Supplemental Response to
Debtors' Objection to Asbestos Property Damage Claims of Garrison Public School District #51. The
Debtors later filed a Motion to File a Reply. At the May 16, 2005 hearing, the Court permitted the
Debtors to File their Reply, but gave the State an opportunity to file this Sur-Reply.

[the Debtors'] materials containing asbestos" before the deadline. Id. at 12-15.

Any consideration of the Debtors' Objections must be made in context of one undisputed fact: there is no evidence that the State's property had been injured by any of the Debtors' products when this Act was considered and adopted (or at anytime before August 1, 1997).[2] At the time the Act was considered, the Eighth Circuit Court of Appeals had already ruled that a public building owner could not bring an asbestos property damage lawsuit unless and until it had been injured (defined as contamination and health risk caused by the manufacturer's product). Tioga Public School # 15 of Williams County, State of North Dakota v. United States Gypsum Company, 984 F.2d 915 (8th Cir. 1993). Consequently, the State had no lawsuit against the Debtors which could have been or was revived by the Act. Stated differently, as to the Debtors, there was no "*quid*" and therefore no "*quo*" for the Act to apply. Indeed, to impose the deadline would punish the State without any benefit from the Act while at the same time providing the Debtors the "*quid*" and the "*quo*" in the form of an absolute immunity. Such an interpretation runs counter to the legislative history, which makes it clear that the legislature wanted to provide the State with *something*.

The Debtors recognize that the legislative history demonstrates that the Act "sets a specific deadline by which all claims must be brought," but attempt to deal with the predicament of there being no claims under Tioga and no benefit for the State by asserting that the Act entitled "Limitation of Action for Asbestos Claims" actually created a new cause of action inconsistent with the Tioga decision (and almost every other property damage case in the country). Transcript (May

_____

[2]This Court has recognized the universal rule that the Debtors have the burden of proof with respect to their affirmative statute of limitations defense. Hearing (October 25, 2004). In addition, the Debtors convinced the EPA to find that their products are not presently friable and have argued in support of their Objections that, "There is no evidence of any harm arising from the Debtors' product." See Speights & Runyan's First Supplemental Response to Debtors' Objections to Asbestos Property Damage Claims of Garrison Public School District #51 at 7-8.

A-194

2

16, 2005) at 8, 30. Specifically, the Debtors have argued that under the Act, the State could have filed a lawsuit against them before August 1, 1997 and recovered without proving any injury. What the legislative history reveals is that there is no evidence whatsoever to support such absolute liability, not even a concern from the industry representatives who would have screamed if such a preposterous suggestion·had been made.

In contrast to the Debtors' explanation, the Court suggested that the legislature might have intended to enact a statute of repose against the State and no one else. Transcript (May 16, 2005) at 16-18. Only two years before the Act was adopted, the North Dakota Supreme Court held that the statute of repose does not apply in an asbestos property damage action brought by a public building owner. Hebron Public School District of Morton County v. United States Gypsum Co., 475 N.W.2d 120 (N.D. 1991). Yet, neither the Act nor the legislative history mentions the word repose or the impact of the Act on the Hebron decision. It defies logic to conclude that the North Dakota Legislature, which wanted to assist public building owners, would impose a repose upon them for nothing in return (again, the State had no claim to bring against the Debtors before August 1, 1997). To accept this interpretation would simply mean that the legislature intended to provide immunity to those asbestos manufactures whose products had not caused an injury. There is nothing in the legislative history to suggest that the legislature intended to bar a public building owner from bringing a lawsuit it never had the right to bring and to reward the asbestos manufacturers with absolute protection from such lawsuits before the underlying claims accrued.

Finally, the legislative history does clarify the concern of the legislature. Two years before the Act was passed, the North Dakota Supreme Court held that in an asbestos property damage case, the statute of limitations accrues when the building owner knew or should have known that it had been injured. Hebron Public School District of Morton County v. United States Gypsum Co., 475

A-195

3

N.W.2d 120 (N.D. 1991). In the next case to go to trial, the asbestos company ignored the injury component and focused its proof on what the building owner knew or should have known. <u>Montana-Dakota Utilities Co. v. W.R. Grace & Co.</u>, 14 F.3d 1274 (8th Cir. 1994). Because of the knowledge of the State concerning the dangers of asbestos, the State supported the enactment of legislation which would remove the knowledge component (*not* the injury component) from the trial. Every reference pointed to by the Debtors evidences a concern over the knowledge of the State about existing claims. There is nothing in the legislative history that suggests that the legislature intended to change the definition of when a building owner was injured and had the right to bring a lawsuit.

Dated: June 17, 2005
Wilmington, Delaware

FERRY, JOSEPH & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
824 Market Street, Suite 904
PO Box 1351
Wilmington, DE 19899
(302) 575-1555

-and-

SPEIGHTS & RUNYAN
Daniel A. Speights (SC Bar No. 4252)
200 Jackson Avenue East
Post Office Box 685
Hampton, South Carolina 29924
(803) 943-4444

Co-Counsel for the Speights & Runyan
Claimants

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| OWENS CORNING, *et al.*, | : | Case Nos. 00-3837 (JKF) |
| | : | |
| Debtors. | : | (Jointly Administered) |

Related to Docket No. 13515
Hearing Date: June 27, 2005 at 10:00 a.m.
Agenda Item No. 3

## CERTIFICATION OF COUNSEL REGARDING DEBTORS' OBJECTION TO ASBESTOS PROPERTY DAMAGE CLAIMS OF THE STATE OF NORTH DAKOTA (CLAIM # 8774 AND # 8922)

The undersigned, counsel to the above-referenced Debtors, hereby certifies that:

1.     On December 3, 2004, the Notice of Objection (the "Notice") and Debtors' Objection to Asbestos Property Damage Claims of The State of North Dakota (Claim Nos. 8774 and 8922) (the "Objection") (Docket No. 13515) were filed with the Court.

2.     Responses to the Objection were due December 7, 2004.

3.     On December 7, 2004, Speights & Runyan filed a Consolidated Response to the Objection (Docket No. 14093).

4.     Subsequently, the Debtors filed the Debtors' Summary of and Compendium of Legal Authorities (Filed February 22, 2005) (Docket No. 14540). Thereafter, Speight's & Runyan filed a First Supplemental Response to Debtors' Objections to Asbestos Property Damage Claims of Garrison Public School District #51 (Claim #8783, Claim #8926) (Filed March 4, 2005) (Docket No. 14619) and the State of North Dakota also filed a Joinder in Speights & Runyan's First Supplemental Response to Debtors' Objections to Asbestos Property Damage Claims of Garrison Public School District #51 (Claim #8783, Claim #8926) (Filed March 4, 2005) (Docket No. 14620).

A-197

5.      On April 29, 2005, the Debtors filed a Reply in Support of its Objections to

Certain Asbestos Property Damage Claims (Docket No. 15054). On June 11, 2005, the State of

North Dakota filed its Sur-Reply to Debtors' Reply to State of North Dakota's Response to

Debtors' Objections to State of North Dakota's Asbestos Property Damage Claims (Claim

#8783, Claim #8926) (Docket No. 15285).

6.      Hearings were held on the Objection on January 24, May 16, and June 27, 2005.

Following the June 27, 2005 hearing, the Court directed counsel for the Debtors to submit a

revised form of order granting the Objection.

7.      Attached hereto is a proposed Order Granting Objection to Asbestos Property

Damage Claims of the State of North Dakota (Claim # 8774 and # 8922) (the "Proposed Order").

On June 28, 2005, special counsel for the Debtors circulated a copy of the Proposed Order to

counsel for the State of North Dakota and requested counsel provide any comment to the

Proposed Order by July 1, 2005 so that the Proposed Order could be submitted to the Court on

July 5, 2005. Counsel for the State of North Dakota did not comment on the form of Proposed

Order. Accordingly, the Debtors respectfully request the Court enter the Proposed Order

attached hereto.

Dated: July 5, 2005                              SAUL EWING LLP

                                    By:     _____
                                            Norman L. Pernick (No. 2290)
                                            J. Kate Stickles (No. 2917)
                                            222 Delaware Avenue, Suite 1200
                                            Wilmington, DE  19801
                                            (302) 421-6800

                                            Counsel for the Debtors
                                            and Debtors-In-Possession

                                            - and -

A-198
-2-

DEBEVOISE & PLIMPTON LLP
Mary Beth Hogan, Esquire
Sean Mack, Esquire
919 Third Avenue
New York, NY 10022
(212) 909-6000

Special Counsel for Debtors
and Debtors-in-Possession