IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Chapter 11 |
| OWENS CORNING, *et al.*, | : | Case Nos. 00-3837 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | |

Related to Docket No. 13515
Hearing Dates: January 24, 2005
May 16, 2005, June 27, 2005

Agenda Item No. 3 (June 27, 2005)

## ORDER GRANTING OBJECTION TO ASBESTOS PROPERTY DAMAGE CLAIMS OF THE STATE OF NORTH DAKOTA (CLAIM # 8774 AND # 8922)

Upon consideration of the Debtors' Objection to Asbestos Property Damage Claims of the State of North Dakota (claim # 8774 and # 8922) (the "Objection"), the responses thereto by the State of North Dakota, and the Debtors' reply, the Court finding good and sufficient cause for granting the relief requested in the Objection; and after proper notice and opportunity to respond to the Objection; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§1408 and 1409; and the Court having found that the holder of the claims objected to in the Objection was properly and timely served with a copy of the Objection, and the proposed order and the Court otherwise being fully advised in the premises, it is hereby

ORDERED that the Objection is granted in its entirety for the reasons stated on the record during the hearings on May 16, 2005 and June 27, 2005; and it is further

ORDERED that the asbestos property damage claims (claim # 8774 and # 8922) be, and hereby are, disallowed and expunged in their entirety; and it is further

ORDERED that Robert L. Berger & Associates, LLC, the official claims agent appointed in these cases, is hereby authorized and directed to make such revisions to the Claims Registry as are necessary to reflect the relief granted pursuant to this Order; and it is further

ORDERED that the Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

Dated: July __, 2005

Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

21975638v1



▷
14 F.3d 1274, Prod.Liab.Rep. (CCH) P 13,761, 39 Fed. R. Evid. Serv. 877

United States Court of Appeals,Eighth Circuit.
MDU RESOURCES GROUP, doing business as Montana-Dakota Utilities Co., Inc., Appellant,
v.
W.R. GRACE AND COMPANY, and W.R. Grace and Company-Conn., Appellees.
**No. 92-2794.**

Submitted Oct. 11, 1993.
Decided Jan. 27, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied March 24, 1994. FN*

> FN* Bowman and Beam, Circuit Judges, would grant the suggestion for rehearing en banc.

Commercial office building owner brought asbestos-removal claim against manufacturer of fireproof material which was installed in building. The United States District Court for the District of North Dakota , Bruce M. Van Sickle, J., entered judgment in favor of manufacturer in accordance with jury's special verdict. Appeal was taken. The Court of Appeals , Richard S. Arnold, Chief Judge, held that: (1) six-year North Dakota statute of limitation accrued when building owner could have learned with exercise of reasonable diligence that building had been contaminated by asbestos; (2) excluding trademark for nonasbestos substitute which was issued 25 years before building was constructed was harmful error; and (3) excluding article on asbestosis published two years before building was constructed was also harmful error.

Reversed and remanded.

West Headnotes

[1] **Federal Civil Procedure 170A ⚷2182.1**
170Ak2182.1 Most Cited Cases
Court of Appeals will not reverse on basis of jury instructions if instructions, as whole, adequately and sufficiently state law applicable to the case.

[2] **Federal Courts 170B ⚷776**
170Bk776 Most Cited Cases
District court's determinations of law are review de novo.

[3] **Products Liability 313A ⚷71.5**
313Ak71.5 Most Cited Cases
(Formerly 241k32(1))
Under North Dakota law, six-year statute of limitations applies to claim based on asbestos contamination. NDCC 28-01-16.

[4] **Limitation of Actions 241 ⚷95(1)**
241k95(1) Most Cited Cases
North Dakota applies discovery rule to determine point at which any statute of limitations begins to run.

[5] **Limitation of Actions 241 ⚷95(1)**
241k95(1) Most Cited Cases
Under North Dakota law, no cause of action exists until plaintiff suffers some compensable harm, regardless of plaintiff's knowledge of potential cause of action.

[6] **Limitation of Actions 241 ⚷95(7)**
241k95(7) Most Cited Cases
Under North Dakota economic-loss doctrine, mere discovery of asbestos in building is insufficient to begin running of six-year statute of limitations on claim for asbestos damages. NDCC 28-01-16.

[7] **Damages 115 ⚷36**
115k36 Most Cited Cases
North Dakota economic-loss doctrine prevents tort recovery for losses that are not attributable to physical injury to persons or other property; tort law is appropriate vehicle for recovery only when

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defective product causes personal injury or injury to property other than itself, but not to reallocate balance of buyer-seller relationship.

[8] **Limitation of Actions 241 ⚿95(7)**
241k95(7) Most Cited Cases

**Limitation of Actions 241 ⚿200(1)**
241k200(1) Most Cited Cases
Six-year statute of limitations in asbestos removal claim accrued under North Dakota law when building owner could have learned, with exercise of reasonable diligence, of harm caused by presence of asbestos in building and, thus, instructing jury that claim accrued when building owner learned of presence of asbestos in building was error. NDCC 28-01-16.

[9] **Federal Courts 170B ⚿901.1**
170Bk901.1 Most Cited Cases
(Formerly 170Bk901)

**Products Liability 313A ⚿81.1**
313Ak81.1 Most Cited Cases
Harmful error resulted from excluding evidence that manufacturer was aware of alternatives to asbestos before asbestos-containing product was installed in office building in 1968, including trademark for asbestos substitute issued in 1943 and scientific article on asbestosis published in 1966; excluded evidence was necessary to refute manufacturer's assertion that it was unable to replace asbestos before office building was constructed.

[10] **Witnesses 410 ⚿244**
410k244 Most Cited Cases
Examiner must be required to ask questions of nonhostile witnesses as if on direct when cross-examination goes beyond scope of direct and is designed to establish affirmative defense. Fed.Rules Evid.Rules 611 , 611 note, 28 U.S.C.A.

[11] **Products Liability 313A ⚿96.1**
313Ak96.1 Most Cited Cases
Commercial office building owner was not entitled under North Dakota law to jury instruction that state-of-the-art was no defense to strict liability on part of manufacturer of asbestos-containing product installed in building. Fed.Rules Evid.Rule 104(b), 28 U.S.C.A.

*1275 Daniel A. Speights , Hampton, SC, argued ( Steven C. Lian , Minot, ND, and Jon M. Arnston, Fargo, ND, on the brief), for appellant.
Hugh V. Plunkett III , Minneapolis, MN, argued ( John C. Childs and Allen W. Hinderaker , Minneapolis, MN, and Steven A. Storslee, Bismarck, ND, on the brief), for appellees.

Before RICHARD S. ARNOLD , Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

RICHARD S. ARNOLD, Chief Judge.
The appellant in this asbestos-removal case, MDU Resources Group, d/b/a Montana Dakota Utilities Co. (MDU), sued W.R. Grace & Co. (Grace) in 1990, two years after MDU learned that the Grace-manufactured fireproofing installed in its building in September of 1968 was releasing harmful asbestos fibers. After an eight-week trial, the jury returned a special verdict in favor of Grace on all of MDU's theories of liability. MDU now argues that several errors occurred at trial. First, MDU argues that the District Court used the wrong measuring point to determine when the statute of limitations began to run and, in so doing, misapplied North Dakota's discovery rule. Second, MDU argues that the District Court improperly excluded pieces of evidence MDU needed to establish key elements of its case-in-chief. Third, MDU argues that the District Court incorrectly instructed the jury on strict liability because it failed to instruct that state-of-the-art is no defense to a strict-liability claim. Finally, MDU argues that the District Court's permissive conduct towards Grace during the trial resulted in a proceeding that was fundamentally unfair. We agree with some of these contentions and now reverse.

I.

Since the trial of this case was lengthy and complicated, we will present only the facts *1276 and portions of the trial relevant to the issues presented in this appeal. In 1967 and 1968, MDU completed construction of its five-story general

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

office building in Bismarck, North Dakota. In 1968, Monokote fireproofing, manufactured by Grace, was sprayed on the structural steel and decking of the building. The application was completed by September of that year. At the time of installation, Grace was aware that the Monokote fireproofing contained asbestos. MDU, however, was not aware of this fact until September of 1980, when Health Department tests revealed that the Monokote contained 15-25% asbestos. The Health Department report also stated that the asbestos was " apparently intact" and that there were "no employee overexposure hazards." Nonetheless, the Department recommended that MDU investigate carefully removing the material, because the Monokote eventually would begin to deteriorate and would then pose a health hazard. Although MDU received conflicting information from a subsequent test in 1985, the original test's results were corroborated in 1987, and both parties agree that MDU was aware of its asbestos problem as early as 1980.

MDU first learned that the asbestos in the Monokote was releasing fibers and contaminating its building in early 1988. A report from HTI Engineering showed that the building had been contaminated. Subsequent tests confirmed this and found an average of more than 78 billion asbestos fibers per square foot on horizontal surfaces below the fireproofing. This number of fibers created asbestos levels in the air from 490 to 110,000 times normal, meaning that the asbestos needed to be removed immediately to protect the health of MDU workers. MDU brought this suit in 1990 to obtain the costs of removal.

MDU sued under a number of different theories: negligence, strict liability, failure to warn, and breach of warranty. Grace mounted a two-fold defense. It argued first, that the statute of limitations had run on MDU's claims, and second, that MDU had suffered no harm from the asbestos Monokote. At trial, MDU argued that Grace was aware of the inherent dangers of asbestos, that Grace knew that Monokote contained asbestos, and that, prior to 1968, Grace had a readily-available alternative, Cellufloc. FN1

FN1. Cellufloc is a paper and wood-pulp product that Grace ultimately used to replace the asbestos in Monokote in 1973.

Grace told the jury in its opening statement that it took the asbestos out of Monokote in 1973, but claimed that a non-asbestos substitute was not available before 1968. Transcript (Tr.) 57, 3425-28. In order to prove that an alternative substance was available, MDU offered into evidence, among other things, a 1943 trademark for Cellufloc that tended to show that Cellufloc had been available before 1968. The District Court excluded this evidence because the trademark did not demonstrate the efficacy of the product. Tr. 2823.

MDU also sought to introduce a one-page document from Grace's insurance carrier to Grace's Safety Administrator entitled "Asbestosis." The document, plaintiff's exhibit P-83A, summarized a 1966 article published by the American Insurance Association on the relationship between asbestos exposure and cancer. P-83A discussed the health risks inherent in fitting, cutting, and removing asbestos materials in buildings. MDU offered the document at trial to show that Grace knew, before September 1968, that asbestos was harmful to human health. While recognizing that the summary was highly probative and relevant, the Court ultimately excluded P-83A on the grounds that an improper foundation had been laid. The Court concluded that MDU had not established that Grace received the document before September of 1968. FN2

FN2. We do not address MDU's third evidentiary claim-that the District Court improperly admitted into evidence an article from "Science" magazine. Any error from this admission may have been corrected by the District Court's permitting MDU to introduce its own articles in response. In any event, the District Court will have an opportunity to reassess the article's admissibility on remand.

In addition to the evidentiary issues, MDU also

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disputes the District Court's permissive treatment of Grace's cross-examination strategy. In pre-trial conference, MDU requested***1277** that the District Court confine Grace's cross-examination of MDU's witnesses to the scope of direct. The District Court gave MDU that assurance. At trial, however, the Court allowed Grace to ask MDU's witnesses leading questions that were designed to establish Grace's statute-of-limitations defense. Although MDU objected to this practice, the Court continued to allow it. At one point, during MDU's case-in-chief, the Court prodded MDU to question its witness regarding Grace's statute-of-limitations defense. Tr. 2397. MDU also alleges that several other occurrences at trial tainted the proceedings with a fundamental unfairness. FN3

FN3. MDU alleges that the trial was fundamentally unfair because Grace was allowed to show a blow-up photograph of MDU's CEO while MDU was prevented from doing the same with Grace's CEO. Certainly, this type of demonstrative evidence is unnecessary on either side. Additionally, MDU argues that, during cross-examination, the District Court allowed Grace to present evidence as to MDU's size-to show MDU's knowledge of asbestos hazards-but prevented MDU from making reference to Grace's size. Grace's size is, of course, irrelevant to anything but punitive damages; by the same token, the relevancy of MDU's size to this case is dubious at best. Finally, MDU argues that the Court improperly allowed Grace to discuss MDU's gravel pit, acquired one month before trial, which Grace claimed was an asbestos mine. At one point, the Court itself referred to this pit as an "asbestos mine." Regardless of whether this pit did or did not contain asbestos, it is irrelevant to the question of what MDU and Grace knew or did not know in 1968 (when the Monokote was installed) and 1980 (when MDU discovered the presence of asbestos)-the relevant dates for liability and statute-of-limitations purposes.

Finally, two of the Court's instructions to the jury are challenged. First, the District Court instructed the jury that in order to find in favor of Grace on its statute-of-limitations defense, it must find that MDU knew or with the exercise of reasonable care should have known

1. That the Monokote fireproofing installed in certain areas of MDU's General Office Building contained asbestos;
2. That the asbestos-containing Monokote in MDU's General Office Building might pose a hazard; and
3. That the defendants were possibly liable.

Jury Instruction Number 27. The District Court further instructed that Grace had to prove these elements by a preponderance of the evidence.

Second, before the Court gave its strict-liability instruction, MDU requested that the Court include an instruction that it is no defense to strict liability that the product was state-of-the-art. Because the District Court had told the jury that such evidence was a valid defense to a negligence claim, MDU wanted the negative instruction included in the strict-liability instruction for clarity. Grace contended that MDU was not entitled to such an instruction. Although the District Court agreed that MDU's proposed language correctly stated North Dakota law, it declined to give the instruction. The jury returned a verdict in favor of Grace.

II.

A.

[1] [2] This Court will not reverse on the basis of jury instructions if they, "as a whole, adequately and sufficiently state the law applicable to the case." *Sterkel v. Fruehauf Corp.*, 975 F.2d 528, 531 (8th Cir.1992). We review the District Court's determinations of law *de novo*. Because the District Court's jury instructions on the statute of limitations failed to state the law adequately and sufficiently as to when discovery of asbestos triggers the running of the statute of limitations, we are unable to affirm this judgment for the defendant Grace on the basis of its limitations defense.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[3] [4] Under North Dakota law, the statute of limitations for a cause of action based on asbestos contamination is six years. N.D.Cent.Code § 28-01-16 (1991). To determine the point at which any statute of limitations begins to run, North Dakota applies the discovery rule. *Wall v. Lewis,* 366 N.W.2d 471, 473 (N.D.1985) (legal malpractice); *Iverson v. Lancaster,* 158 N.W.2d 507 (N.D.1968) (medical malpractice). Originally adopted for medical-malpractice claims, North Dakota applied this rule to asbestos cases in *Hebron Public School District No. 13 v. U.S. Gypsum Co.,* 475 N.W.2d 120, 126 (N.D.1991) (certified question answered): "a cause of *1278 action, or claim for relief does not accrue until the aggrieved party discovers the facts which constitute the basis for its cause of action or claim for relief...."

Grace argues that *Hebron* stands for the proposition that discovery of the presence of asbestos equals discovery of the facts which constitute the basis for MDU's cause of action. Therefore, they argue, MDU knew of its cause of action in 1980 and filed its claim long after the statute of limitations had begun to run. MDU contends that, under North Dakota's economic-loss doctrine, it could not have brought suit until it could show its building had been "injured" by the asbestos; therefore, the "facts which constitute the basis for its cause of action" were not known until MDU discovered the asbestos contamination in 1988. The District Court instructed the jury based on Grace's theory of the statute of limitations.

[5] [6] Regardless of the plaintiff's knowledge of a potential cause of action, no cause of action exists until the plaintiff suffers some compensable harm. See *Wall v. Lewis, supra,* 366 N.W.2d at 473. *Hebron* does not stand for nearly so broad a principle as Grace suggests, FN4 and a study of this Court's precedents in asbestos litigation and of North Dakota's economic-loss doctrine demonstrates that mere discovery of asbestos is insufficient to begin the running of the statute of limitations.

FN4. The issue in *Hebron* was whether the six-year period began to run when the asbestos was installed, 1963, or from when the asbestos was discovered to be present, 1983. Because the School District discovered that plaster in its building contained a dangerous level of asbestos and brought suit within three years of that discovery, it was well within the statute of limitations. Additionally, the tile in *Hebron* was friable and had begun to release harmful asbestos fibers into the air. *Hebron Public School District No. 13 v. U.S. Gypsum,* 690 F.Supp. 866, 870 (D.N.D.1988). Therefore, the issue of whether the point of injury was discovery of the asbestos itself or the release of harmful fibers into the air was neither presented nor addressed either by this Court (see *Hebron Public School Dist. No. 13 v. U.S. Gypsum,* 953 F.2d 398 (8th Cir.1992) ) or by the North Dakota Supreme Court (see *Hebron, supra,* 475 N.W.2d 120).

[7] Before we can determine when the statute of limitations began to run on MDU's claims, we must first determine when an asbestos plaintiff is injured and can bring suit. The issue of when injury occurs was implicitly decided in *Tioga Public School District # 15 v. U.S. Gypsum,* 984 F.2d 915 (8th Cir.1993). Although not a statute-of-limitations case, *Tioga* does address the point at which an asbestos plaintiff may be said to be injured under North Dakota law. In *Tioga,* the plaintiff school district discovered that the acoustical covering on the ceiling tiles contained asbestos and sued to recover abatement costs. The defendant argued that the school district had suffered only economic loss and could not recover. The *Tioga* Court concluded that, although the North Dakota Supreme Court had adopted the economic-loss doctrine, FN5 it would be unlikely for it to hold that the doctrine barred recovery in asbestos cases. This Court stated, "The asserted injury here is not simply an injury to the [covering] or to the school buildings; rather, the injury is the *contamination* of the Tioga school buildings by asbestos and the consequent health risk to the building's occupants." *Id.* at 918 (emphasis supplied). The Court then cited several other jurisdictions that had similarly so held. See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir.1987) (injury at issue was contamination of Greenville's city hall, which endangered the health of the occupants); *Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich.App. 694, 703-04, 493 N.W.2d 513, 518 (1992) (because asbestos may contaminate a building, rendering it unfit for occupation, economic-***1279** loss doctrine does not apply); *Board of Educ. v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 640-46, 546 N.E.2d 580, 585-91 (1989) (economic-loss doctrine does not bar recovery when the asbestos has contaminated the building, thereby damaging other property). All of these jurisdictions based their determinations, at least in part, on the fact that asbestos contamination presents a grave health risk. This leads to the conclusion that the injury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos. FN6

FN5. The premise behind the economic-loss doctrine is that tort law is the appropriate vehicle for recovery when a defective product causes personal injury or injury to property other than itself, but is not appropriate for use to reallocate the balance of the buyer/seller relationship. *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591, 594 (N.D.1984) (adopting the economic-loss doctrine as the rule in North Dakota and citing with approval *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). The allocation of purely economic loss, such as occurs when the product or a component part of the product destroys only the product itself, see *Cooperative Power Ass'n v. Westinghouse Electric Corp.*, 493 N.W.2d 661 (N.D.1992), is better handled through contract and warranty than tort. Thus, the economic-loss doctrine prevents recovery for losses that are not attributable to physical injury to persons or other property.

FN6. The District Court in *Hebron, supra*, and *Drayton Public School District No. 19 v. W.R. Grace*, 728 F.Supp. 1410 (D.N.D.1989), rejected the defendant's economic-loss argument on the basis that the building had been contaminated. See *Hebron, supra*, 690 F.Supp. at 870 (" However, it appears that the coating functioned satisfactorily in its intended role except that, Hebron alleges, it released harmful asbestos fibers into the building"); *Drayton, supra*, 728 F.Supp. at 1412-13 (quoting *Hebron* and saying that the Drayton School District's claim that the dangerous levels of asbestos in the ceiling plaster made the building hazardous to health meant the economic-loss doctrine did not apply).

The *Tioga* Court drew support for its conclusion by distinguishing the only case to hold an asbestos claim barred by the economic-loss doctrine, *Adams-Arapahoe School District No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir.1992). The *Tioga* Court stated that *Tioga* differed from *Adams-Arapahoe* in an important respect: "in *Adams-Arapahoe* the school district did not show that there had been any release of asbestos from the asbestos-containing materials (nonfriable tiles) in its schools so as to result in the contamination of the schools." *Tioga, supra*, 984 F.2d at 919 (citing *Adams-Arapahoe*, 959 F.2d at 874). Since the Tioga School District had shown that the asbestos in its schools was friable and had released asbestos fibers into the air, its claim was not barred by the economic-loss doctrine. *Tioga, supra*, 984 F.2d at 919-20.

[8] MDU alleges that its building was contaminated by the Monokote fireproofing because the Monokote was releasing harmful asbestos fibers. Indeed, under the criteria set forth in *Tioga*, had MDU brought its cause of action before its building was contaminated, its claim would have been barred by the economic-loss doctrine. *Cf. Cooperative Power Association v. Westinghouse Electric Corp.*, 493 N.W.2d 661, 663 n. 5 (N.D.1992) ("In the context of products liability cases, economic loss generally means pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair together with consequential lost

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

profits *when there has been no claim of personal injury or damage to other property,*" (emphasis added)). FN7 Therefore, the District Court erred when it instructed that the issue for purposes of the statute of limitations was when MDU learned of the presence of asbestos in its building; instead, the proper question was when MDU could have learned, with the exercise of reasonable diligence, that its building had been contaminated by asbestos. FN8 See *Froysland v. Altenburg,* 439 N.W.2d 797 (N.D.1989) (requiring diligence on the part of the plaintiff to discover his cause of action); *Tioga, supra.* It is at this point that North Dakota's six-year statute of limitations began to run. We hold that the jury was incorrectly instructed on this point, and so reverse its finding that the statute of limitations had expired. FN9

FN7. In *Cooperative Power,* the plaintiff contended that if a product was unreasonably dangerous or defective, the economic-loss doctrine would not bar recovery for products that damage only themselves. Therefore, it is likely that the North Dakota Supreme Court would find that MDU had no cause of action until the asbestos Monokote injured something other than itself-in other words, until some amount of harm, either to the building or to the occupants, occurred.

FN8. The harm necessary to begin running the statute of limitations would certainly be manifest upon discovery of contamination, and possibly earlier. If, for example, MDU expanded or remodeled its building between May of 1980 and six years before filing suit, such remodeling could trigger abatement costs and would begin running the statute of limitations. Since the record does not demonstrate whether MDU renovated its building during the time period in question, we merely note this issue for purposes of the new trial.

FN9. Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action-until an injury is suffered, the statute of limitations cannot begin to run.

***1280** B.

We now address the other errors raised by MDU. The two most important are evidentiary in nature. First, MDU asserts that the District Court erred when it excluded the 1943 Cellufloc trademark. After presenting evidence that replacing the asbestos with a non-asbestos substitute, Cellufloc, was technologically feasible in the early 1970s, MDU attempted to show, by offering the 1943 trademark for Cellufloc, that the substitute was available before 1968. The Court excluded the trademark because the trademark itself did not show that the substance would be an adequate substitute for asbestos. This Court reviews the trial court's determination under the abuse-of-discretion standard. We will find abuse of discretion when the decision of the trial court is based on "an erroneous view of the law or a clearly erroneous assessment of the evidence." *Waible v. McDonald's Corp.,* 935 F.2d 924, 926 (8th Cir.1991) (citations omitted).

We agree with the District Court that for Cellufloc to be a feasible replacement it must be both technically sufficient and economically viable. However, the Court's requirement that the trademark itself demonstrate its own effectiveness misses the point. Grace denied that a substitute even existed, regardless of feasibility. MDU offered the trademark to rebut this argument by showing availability. The trademark tended to show that a product with the same name as the one Grace ultimately used to replace asbestos existed in 1943, long before Monokote was installed in MDU's building. That the product bore the same name was not the only evidence offered by MDU. MDU also presented evidence to the effect that the 1943 Cellufloc, like the Cellufloc used by Grace, was a filler-in plastics and casings for steel arc-welding rods. Additionally, the Cellufloc ultimately used by Grace was a paper and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 F.3d 1274, Prod.Liab.Rep. (CCH) P 13,761, 39 Fed. R. Evid. Serv. 877
**(Cite as: 14 F.3d 1274)**

wood-pulp product; the company receiving the trademark for Cellufloc was a timber and wood-pulp company. Taken together, this evidence is sufficient to establish the relevancy of the trademark, because the jury could infer that the two products were similar. This inference would not be unduly prejudicial to Grace. If the 1943 Cellufloc would not have been a feasible alternative to asbestos, if the earlier and later Cellulflocs were completely different, or if Grace was unaware of the 1943 product's existence, Grace could introduce evidence to that effect. FN10 In excluding this relevant evidence, the District Court misapprehended the purpose for which the trademark was offered. Its decision to exclude the trademark was therefore an abuse of discretion.

FN10. The trademark was assigned in 1963 to the Georgia-Pacific Corporation, which renewed the trademark in 1966 and 1986.

[9] The Court's exclusion of this evidence was not harmless error. Without it, MDU was unable to refute Grace's assertion that Grace was unable to replace the asbestos before 1968. Tr. 3425-28. This becomes all the more important since Grace's own representative testified that reformulation and testing efforts aimed at producing Monokote without asbestos before 1968 would have been possible had a substitute been available. Tr. 2816-17. Furthermore, the 1943 trademark was not the only feasibility evidence excluded by the Trial Court. The Court also excluded documents provided by Grace to MDU that tended to show that Grace was aware of alternatives to asbestos before 1968. Tr. 2861-63, 2868-69. Had other evidence of alternative design been admitted, exclusion of the 1943 trademark might have been harmless. As it is, however, the exclusion was prejudicial and warrants reversal. FN11

FN11. Grace cites *Anderson v. Malloy*, 700 F.2d 1208 (8th Cir.1983), for the proposition that the District Court here did not commit reversible error. However, *Anderson* stands for precisely the opposite conclusion. In *Anderson*, to controvert the hotel-owner defendants' contention that effective security measures were not feasible at the time the plaintiff was raped, the plaintiffs wanted to present evidence that the owners had later installed peepholes and chain locks. The District Court excluded this evidence under rule 407 as evidence of subsequent remedial measures. This Court reversed, saying that "the trial court committed a prejudicial abuse of discretion when it excluded the evidence" because evidence that these devices were later installed went directly to the question of whether installing such devices was feasible. *Id.* at 1213-14. Similarly, the Cellufloc trademark goes to feasibility, providing evidence that substitute eventually used by Grace in 1973 was available to it before September of 1968.

*1281 The second evidentiary ruling MDU challenges is the trial Court's decision not to admit plaintiff's exhibit P-83A. A summary of a 1966 article entitled "Asbestosis," P-83A was the last of five stapled pages. The pages had been given to Grace by its insurance carrier, and all but the last were dated 1967. MDU offered P-83A to demonstrate that Grace was aware of the dangers of asbestos before September of 1968. The District Court initially admitted this exhibit subject to foundation. Later, the Court determined that the document would not be admitted because an improper foundation had been laid and because it had hearsay concerns with the first paragraph. MDU redacted the first paragraph and resubmitted the exhibit. The Court then rejected the exhibit because MDU had failed to establish the date of its receipt by Grace.

Rule 104 of the Federal Rules of Evidence provides that preliminary questions of admissibility are to be determined by the Court subject to the requirements of subsection (b): "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fed.R.Evid. 104(b). Once evidence sufficient to support the finding is introduced, it is then appropriate to allow the jury to determine whether the predicate fact is established. "If preliminary questions of conditional relevancy were determined solely by the judge, ... the functioning of the jury as a trier of fact would be greatly restricted and in some cases virtually destroyed." Fed.R.Evid. 104(b) Advisory Committee's Note.

When the District Court determined that MDU had failed to establish the date of receipt, it was, in effect, determining that a preliminary fact (when Grace received the document) had not been established. This was error. As a matter of law, MDU produced sufficient evidence to allow the jury to establish the date of receipt. First, when evidence is in the control of one party and not produced to the other, the factfinder may infer that the evidence would establish what the other party proposes. In other words, the documents in question, which came out of a file folder, Folder K, were in the sole custody and control of Grace when they were produced. Since Grace did not provide MDU with the evidence necessary for it to establish date of receipt, such as the nature of the filing system Grace used, the factfinder could infer that any such evidence would establish that the document was received before September of 1968.

Second, the fact that the "Asbestosis" article was the fifth page of five pages stapled together raises an inference that the pages were received at the same time. It is too much to ask of the plaintiff to present specific proof that the last sheet was received before September of 1968. Finally, of a total 197 pages in File Folder K, all those that were dated have dates of 1968 or earlier. Each document in the folder located before P-83A is dated before September of 1968; moreover, 100 pages of the documents after P-83A are dated September of 1968 or before. Only four documents in the folder bear a date after September of 1968; all of them were located after P-83A in the folder, and three of them refer to work done in late 1968.

These facts are sufficient, as a matter of law, to support a finding that Grace received P-83A before September of 1968. Once the plaintiff established these facts, the District Court should have made a preliminary determination that facts sufficient to prove the relevancy of the document had been established. It should have then submitted the document to the jury with an instruction that, if it found that Grace received the document before September of 1968, the jury could consider it as evidence that Grace was aware of the hazards of asbestos before Monokote was installed in MDU's building. If the jury did not find that the document was received before September of 1968, then the document would be irrelevant to the question of liability. Grace can still argue that the document was not received before September of 1968, but any such argument would be for *1282 the jury to consider in determining whether P-83A's relevancy was established and would not alter the fact that MDU met Rule 104's requirements for admissibility. FN12

FN12. Stating that an improper foundation was laid is often another way of saying that the document was not properly authenticated. However the issue is phrased, the analysis is the same. Rule 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To satisfy this requirement, MDU needed only to demonstrate a rational basis for its claim that the evidence is what MDU says it is. *United States v. Long,* 857 F.2d 436, 442 (8th Cir.1988), *cert. denied,* 502 U.S. 828, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991).

As with exclusion of the Cellufloc trademark, we cannot say the exclusion of P-83A was harmless. The District Court commented that the document was "a pretty critical piece of paper" if received by Grace before September of 1968 and stated that P-83A "establishes a level of knowledge of the existence of a problem" that "throw[s] a cloud on the position of W.R. Grace." Tr. 2422, 2440. The Court also remarked that the document had "some more relevance than substantially other instruments..

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.." Tr. 2445. These comments show that P-83A was critical to MDU's case because it would have enabled MDU to establish the knowledge necessary to hold Grace liable on a failure-to-warn theory. Under the circumstances, excluding P-83A was prejudicial error.

[10] [11] Many of the other errors alleged by MDU are mooted by this remand; however, a few comments by way of guidance would be helpful to the retrial of this case. First, although the scope of cross-examination is within the discretion of the trial court, Fed.R.Evid. 611, FN13 it should not be allowed to get out of hand. When cross-examination goes beyond the scope of direct, as it did here, and is designed, as here, to establish an affirmative defense (that the statute of limitations had run), the examiner must be required to ask questions of non-hostile witnesses as if on direct. Fed.R.Evid. 611(c), Advisory Committee's Note. FN14 In other words, Grace should not be permitted to ask leading questions in its attempt to establish its statute-of-limitations defense through cross-examination of witnesses called by MDU in its case-in-chief, unless those witnesses' direct testimony bears significantly on the limitations issue, or unless Grace can sufficiently demonstrate that those witnesses are hostile. Second, we do not find reversible error in the Court's strict-liability instruction, and we agree that MDU is not necessarily entitled to an express instruction that state-of-the-art is no defense to strict liability. However, since this cause is to be remanded, we recommend that the District Court use the strict-liability instructions in *Spieker v. Westgo, Inc.*, 479 N.W.2d 837 (N.D.1992), as a model. Because the North Dakota Supreme Court held that these instructions were sufficient without a negative state-of-the-art instruction, using them as a model will insure that the jury instructions, as a whole, adequately state North Dakota law.

FN13. Rule 611(b) provides: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

FN14. The Comment to subdivision (c) states: "The purpose of the qualification ' ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact...."

III.

The District Court misapplied North Dakota's discovery rule when it failed to instruct the jury that there must be some harm, such as contamination, beyond the mere discovery of the presence of asbestos, for the statute of limitations to begin to run. The District Court also erred in excluding key pieces of evidence offered by MDU: the 1943 Cellufloc trademark and the summary of the " Asbestosis" article, exhibit P-83A. Therefore, we reverse and remand for a new trial in accordance with this opinion.

C.A.8 (N.D.),1994.
MDU Resources Group v. W.R. Grace and Co.
14 F.3d 1274, Prod.Liab.Rep. (CCH) P 13,761, 39 Fed. R. Evid. Serv. 877

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

475 N.W.2d 120, 70 Ed. Law Rep. 201, Prod.Liab.Rep. (CCH) P 12,935

**(Cite as: 475 N.W.2d 120)**

Supreme Court of North Dakota.
HEBRON PUBLIC SCHOOL DISTRICT NO. 13 OF MORTON COUNTY, State of North Dakota, Appellee,
v.
UNITED STATES GYPSUM COMPANY, Appellant.
**Civ. No. 900415.**

Sept. 17, 1991.

In action involving use of asbestos in construction of a school building, the United States Circuit Court of Appeals certified questions of law. The Supreme Court, VandeWalle, J., held that: (1) six-year statute of limitations on cause of action or claim of relief does not accrue until aggrieved party discovers facts which constitute the basis for its cause of action or claim for relief, and (2) statute of repose covering construction of improvement to real property does not apply to manufacturer of building materials used in improvement.

Questions answered.

West Headnotes

**[1] Limitation of Actions ⚷95(1)**
241k95(1) Most Cited Cases
For purposes of six-year statute of limitations cause of action, or claim for relief do not accrue until aggrieved party discovers facts which constitute basis for its cause of action or claim for relief. NDCC 28-01-16, subd. 1.

**[2] Products Liability ⚷71.5**
313Ak71.5 Most Cited Cases
(Formerly 241k30)
Statute of repose, preventing actions being brought against "any person performing or furnishing the design, planning, supervision or observation of construction, or construction of an improvement more than ten years after substantial completion," does not apply to a manufacturer of building materials used in an improvement to real property. NDCC 28-01-44.

*120 Daniel A. Speights, of Speights & Runyan, Hampton, S.C., Steven C. Lian (appearance), of Farhart, Lian, Maxson, Howard, Sorensen & Louser, Minot, and Jon M. Arntson (appearance), of Arntson & Stewart, Fargo, for appellee.

Thomas B. Kenworthy, of Morgan, Lewis & Bockius, Philadelphia, Pa., and Wickham Corwin (appearance), of Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, for appellant.

VANDE WALLE, Justice.

This case comes to us on certified questions of law from the United States Court of Appeals for the Eighth Circuit pursuant to Rule 47, N.D.R.App.P.

The Court of Appeals certified the following questions of law:

"(1) Whether, for purposes of N.D.Cent.Code § 28-01-16(1) (Cum.Supp.1989), a cause of action, or claim for relief, does not accrue until the aggrieved party discovers the facts which constitute the basis for its cause of action or claim for relief.

"(2) Whether N.D.Cent.Code § 28-01-44 (Cum.Supp.1989) applies to a manufacturer of building materials used in an improvement to real property."

We answer the first certified question in the affirmative, and the second in the negative.

Pursuant to Rule 47(c)(2), N.D.R.App.P., the Court of Appeals provided the following statement of the relevant facts:

"In 1959 and 1963 an acoustical ceiling plaster manufactured by United States Gypsum Co. (USG) was installed on the ceiling of a school building addition in Hebron Public School

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

District No. 13 (Hebron). The acoustical ceiling plaster manufactured by USG had been specified by the architect hired by Hebron and installed by general and sub-contractors. Hebron had no communications with USG about the specification or installation of the acoustical ceiling plaster. USG had no contacts with Hebron and had no knowledge about the Hebron school addition project.

"In August 1983 Hebron tested the school building ceiling and discovered asbestos. In 1986, some 23 years after the *121 acoustical ceiling plaster had been installed, Hebron filed this action in federal district court against USG to recover the costs of removing the asbestos-containing acoustical ceiling plaster and punitive damages. In response USG filed a motion for summary judgment. First, USG asserted the action was time-barred under N.D.Cent.Code § 28-01-16(1) because North Dakota applies the discovery rule for accrual only to causes of action alleging fraud. USG also asserted the action was time-barred, whether the cause of action accrued at the time of installation in 1963 or when asbestos was discovered in 1983, because USG, as a manufacturer of building materials used in an improvement to real property, was protected by N.D.Cent.Code § 28-01-44. The district court denied USG's motion for summary judgment. The case was tried to a jury, which found in favor of Hebron and awarded Hebron compensatory and punitive damages. This appeal followed."

[1] Section 28-01-16, N.D.C.C., (Cum.Supp.1989) provides in part:

"The following actions must be commenced within six years after the claim for relief has accrued:

"1. An action upon a contract, obligation, or liability, express or implied, subject to the provisions of sections 28-01-15 and 41-02-104.

* * * * * *

"6. An action for relief on the ground of fraud in all cases both at law and in equity, the claim for relief in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

The Legislature has not defined when a claim for relief accrues for purposes of commencing the running of the six-year limitations period. In the absence of such a definition it is a judicial function to determine when a cause of action accrues. *Harig v. Johns-Manville Products Corp.*, 284 Md. 70, 394 A.2d 299 (1978).

Earlier codified as Code of Civil Procedure § 54, Revised Codes of the Territory of Dakota (1877), what is now codified as § 28-01-16, N.D.C.C., was derived from New York Code of Procedure § 91 (1848). *Roether v. National Union Fire Ins. Co.*, 51 N.D. 634, 200 N.W. 818 (1924). Relying on *Liberty Mut. Ins. Co. v. Sheila-Lynn, Inc.*, 185 Misc. 689, 57 N.Y.S.2d 707 (App.Term 1945), United States Gypsum Company (Gypsum) contends that no discovery rule is applicable to § 28-01-16(1), N.D.C.C. The court in *Liberty* held that the statute of limitations barred a suit brought more than six years after the sale of the merchandise involved, after stating:

"What is the time of accrual of a cause of action for a breach of warranty? The traditional doctrine is that a cause of action for a breach of warranty of quality and fitness normally accrues at the time of the sale, notwithstanding the fact that the purchaser may not then be aware of the existence of any cause of action. Williston on Sales, sec. 212-a. 'Inability to ascertain the quality or condition of property warranted to be, at the time of the sale, a particular quality or in a certain condition, has never been allowed to change the rule as to the time when a right of action for a breach of the warranty occurs.' Allen v. Todd, 6 Lans. 222, 224." 57 N.Y.S.2d at 710.

The court concluded that the application of a discovery rule "seems untenable in the light of the authorities in this state." 57 N.Y.S.2d at 711. That conclusion has not changed to this day. "[T]he New York Court of Appeals has steadfastly declined to alter the traditional New York rule that the statute of limitations commences to run when the cause of action accrues, even though the plaintiff is unaware that he has a cause of action." *Practice Commentaries*, CPLR § 203, p. 140 (1990).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 N.W.2d 120 Page 3

475 N.W.2d 120, 70 Ed. Law Rep. 201, Prod.Liab.Rep. (CCH) P 12,935

**(Cite as: 475 N.W.2d 120)**

Other authorities agree with the New York position. "The statute of limitations begins to run when there is a complete and present cause of action.... [I]gnorance of a cause of action does not prevent the running of the statute of limitations unless there has been fraudulent concealment on the part of those invoking the statute." *122*Hunter v. Connelly,* 247 Ark. 486, 446 S.W.2d 654, 657 (1969). 43 Cal.Jur.3d, *Limitation of Actions* § 22 (1978), states:

"The code provides that an action must be commenced within the prescribed period 'after the cause of action shall have accrued.' This is an expression of the general rule that the statute of limitations does not begin to run until the cause of action accrues that is, until an action can be maintained on the cause of action. In other words, the statute of limitations is ordinarily set in motion at the time of the act giving rise to the cause of action, not at the time of discovery of the act or its perpetrator."

"In the absence of fraud, misrepresentation, or concealment, even ignorance of the facts constituting a cause of action does not ordinarily prevent the running of the statute of limitations." *Id.*, at § 140. "[T]he majority of the courts have adopted as a general rule the view that limitations begin to run from the date of the alleged wrong and not from the date the alleged wrong is discovered by the plaintiff." 51 Am.Jur.2d, *Limitation of Actions,* § 146 (1970). *See also,* 54 C.J.S., *Limitations of Actions* § 87a (1987).

Other courts have adopted exceptions to the general rule and have applied the discovery rule in certain cases. "[U]nder the so-called 'blameless ignorance' doctrine the statute of limitations has been held to run only upon discovery of the fact of the invasion of a right which will support a cause of action." 51 Am.Jur.2d, *Limitation of Actions* § 146 (1970).

"Initially, the [discovery] rule was applied to malpractice actions, but subsequent decisions have gone much further and have acknowledged the relevance of the doctrine whenever equity and justice have seemed to call for its application. The purpose of permitting a discovery rule to be applied to a statute of limitations is based on the logic of the matter; limitations should not bar a claimant before he has a reasonable basis for believing he has a claim. In situations in which the plaintiff is unaware that his legal rights have been infringed, he cannot be said to be sleeping on his rights.

* * * * * *

"The discovery rule applies only in relation to an accrual period of limitations and not to a period of limitations based upon a fixed objective event.

* * * * * *

"Some jurisdictions have adopted the 'capable of ascertainment' test for determining when the period of limitations begins to run; when the fact of damage becomes capable of ascertainment, the statute of limitation is put in motion."

54 C.J.S., *Limitations of Actions* § 87a (1987).

California courts, construing a statute of limitations that, like § 28-01- 16, N.D.C.C., and the New York statute, CPLR § 203, commences to run when a cause of action has "accrued," have recognized a number of exceptions to the general rule and have applied the discovery rule in a variety of cases. In *April Enterprises, Inc. v. KTTV,* 147 Cal.App.3d 805, 195 Cal.Rptr. 421, 437 (1983), the court held that "the discovery rule may be applied to breaches [of contract] which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." The court said: "[T]he discovery rule has replaced the date-of-injury accrual rule in a growing number of actions in California. Indeed, one commentator has suggested the ever-expanding number of exceptions to what is stated as the general rule, threatens to 'swallow' that rule entirely." 195 Cal.Rptr. at 434. The court noted that the discovery rule "avoids dismissing a suit on grounds of limitation when a plaintiff is blamelessly ignorant of his cause of action." 195 Cal.Rptr. at 433. The court (195 Cal.Rptr. at 435) also recognized that "inability to recognize and inability to observe the injury--provide the primary rationale for the growing number of judicial decisions" applying the discovery rule and said:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-214

"A common thread seems to run through all the types of actions where courts have applied the discovery rule. *123 The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance."

195 Cal.Rptr. at 436. "[A] plaintiff's cause of action for property damage caused by latent construction defects accrues 'from the point in time when plaintiffs became aware of defendant's negligence as a cause [of damage to the property], or could have become so aware through the exercise of reasonable diligence.' (Citation omitted.)" *Allen v. Sundean,* 137 Cal.App.3d 216, 186 Cal.Rptr. 863, 866 (1982). The general rule "has not been applied when it would simply be unjust to deprive a litigant of a cause of action before that party has become aware he has been injured." *Sherman v. Lloyd,* 181 Cal.App.3d 693, 226 Cal.Rptr. 495, 498 (1986).

In holding that the discovery rule applied in an action alleging property damage due to asbestos contamination, the Vermont Supreme Court said that the views underlying application of a discovery rule "are especially persuasive in suits to recover the costs of removing asbestos, a material used extensively in construction before its dangers fully came to light--or at least before manufacturers warned purchasers of its hazards." *University of Vermont v. W.R. Grace & Co.,* 152 Vt. 287, 565 A.2d 1354, 1357 (1989). The Maryland Court of Appeals has held the discovery rule "to be applicable generally in all actions and the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677, 680 (1981). "The general rule applicable to federal statutes of limitations is that the limitation period begins to run when the claimant discovers or in the exercise of reasonable diligence should have discovered the acts constituting the alleged violation." 54 C.J.S., *Limitations of Actions* § 87a (1987).

In *Osland v. Osland,* 442 N.W.2d 907, 908 (N.D.1989), although we applied the discovery rule, we observed: "Generally, the statute of limitations commences to run from the commission of a wrongful act giving rise to the cause of action." We have, however, applied the discovery rule in a number of other actions.

In *Iverson v. Lancaster,* 158 N.W.2d 507 (N.D.1968), a medical malpractice action, this court construed § 28-01-18(3), N.D.C.C., which at that time provided:

"The following actions must be commenced within two years after the cause of action has accrued:

* * * * * *

"3. An action for the recovery of damages resulting from malpractice...."

This court, for the first time, applied the discovery rule:

"After studying the various approaches taken by the courts, the recent trend of decisions to depart from the 'general rule,' the indefinite language of our statute, and our belief that justice is best served when claims are adjudicated on their merits, we conclude that the best rule is that the limitation period commences to run against a malpractice action from the time the act of malpractice with resulting injury is, or by reasonable diligence could be, discovered."

*Iverson, supra,* 158 N.W.2d at 510. We quoted the following language in *Berry v. Branner,* 245 Or. 307, 421 P.2d 996, 998-999 (1966), and said that it accorded with our view:

"The objective of a statutory limitation on the time within which an action may be brought is, in malpractice cases, the protection of medical practitioners from the assertion of stale claims. We do not believe the legislature intended to limit patients asserting malpractice claims, *124 who by the very nature of the treatment had no way of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

immediately ascertaining their injury, to the same overall period of time that is allowed for bringing other tort actions that are normally immediately ascertainable upon commission of the wrong. The protection of the medical profession from stale claims does not require such a harsh rule. The mischief the statute was intended to remedy was delay in the assertion of a legal right by one who had slumbered for the statutory period during which process was within his reach."

*Iverson, supra,* 158 N.W.2d at 511. Since *Iverson* was decided, we have held or suggested that the discovery rule was applicable in a number of other medical malpractice cases [*Wheeler v. Schmid Laboratories, Inc.,* 451 N.W.2d 133 (N.D.1990); *Froysland v. Altenburg,* 439 N.W.2d 797 (N.D.1989); *Anderson v. Shook,* 333 N.W.2d 708 (N.D.1983) ], legal malpractice cases [*Herzog v. Yuill,* 399 N.W.2d 287 (N.D.1987); *Wall v. Lewis,* 393 N.W.2d 758 (N.D.1986); *Binstock v. Tschider,* 374 N.W.2d 81 (N.D.1985); *Wall v. Lewis,* 366 N.W.2d 471 (N.D.1985); *Phillips Fur and Wool Co. v. Bailey,* 340 N.W.2d 448 (N.D.1983); *Johnson v. Haugland,* 303 N.W.2d 533 (N.D.1981) ], assault and battery action based on sexual abuse when the plaintiff was a minor [*Osland v. Osland, supra* ], actions involving asbestos, drugs, and medical products [suggested in *Erickson v. Scotsman, Inc.,* 456 N.W.2d 535 (N.D.1990), an action involving a perceptible personal injury and, thus, governed by the general time-of-injury rule], "tort by negligence" [*Sylling v. Agsco,* 171 N.W.2d 825, 828 (N.D.1969) ], reformation of a written instrument on the ground of mutual mistake [*Ell v. Ell,* 295 N.W.2d 143 (N.D.1980) ]; and reformation of a deed [*Wehner v. Schroeder,* 335 N.W.2d 563 (N.D.1983) ].

The opening language in the statutes of limitation involved in all of the foregoing decisions of this court is the same: "The following actions must be commenced within ... years after the claim for relief [or cause of action] has accrued." We perceive no principled basis upon which to distinguish this action to recover the costs of removing asbestos from a building from many of the cases in which this court has already applied a discovery rule.

Nevertheless, Gypsum contends: "The Enactment Of N.D.C.C. § 28-01-24 Reflects A Legislative Recognition That There Is No Generally Applicable Discovery Rule." Section 28-01-24, N.D.C.C., provides:

> "When, by fraud or fraudulent concealment, a party against whom a claim for relief exists prevents the person in whose favor such claim for relief exists from obtaining knowledge thereof, the latter may commence an action within one year from the time the claim for relief is discovered by him or might have been discovered by him in the exercise of diligence. Such fraud or fraudulent concealment must be established to the satisfaction of the court or jury, as the case may be, by a fair preponderance of the evidence."

Gypsum argues: "If causes of action generally did not accrue until discovery, the enactment of § 28-01-24 would have been an idle act." *See also,* § 28-01-16(6), N.D.C.C., which provides that a claim for relief in a fraud case is "not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud," and *Phoenix Assur. Co. of Canada v. Runck,* 366 N.W.2d 788, 791 (N.D.1985), where we said, in dicta: "Unlike the other actions listed in § 28-01-16, N.D.C.C., a cause of action on the ground of fraud does not accrue until the aggrieved party discovers the facts constituting the fraud."

We recognize the strength of this argument and might be persuaded by it if we were writing on a clean slate. However, because of the range of our previous decisions applying a discovery rule in other actions in which such an argument would have been equally persuasive and in light of legislation incorporating discovery rules in other statutes of limitations, we decline to now hold that a discovery rule is not applicable to this action under § 28-01-16(1), N.D.C.C., to recover the costs of removing asbestos-containing acoustical ceiling plaster. To retreat to the constrictive *125 logic Gypsum would have us now employ would be contrary to the current concept of the purpose of statutes of limitation apparent from decisions in other jurisdictions and as demonstrated by the previous decisions of this court and recent legislative enactments.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Legislature has incorporated a discovery rule in a number of statutes of limitation. In 1965, the Legislature enacted § 41-02-104(2) ( U.C.C. § 2- 725), N.D.C.C., providing a discovery rule for a breach of warranty of future performance in contracts for sale:

"2. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

Since *Iverson* was decided, the Legislature has incorporated a discovery rule in § 28-01-18(3), (4), N.D.C.C., [FN1] for medical malpractice; § 28-01-22.1, N.D.C.C., [FN2] for actions against the state; and, significantly, § 28-01.1-02(4), (5), N.D.C.C., [FN3] for personal injury and property damage actions allegedly stemming from asbestos.

FN1. "*28-01-18. Actions having two-year limitations.* The following actions must be commenced within two years after the claim for relief has accrued:

* * * * * *

"3. An action for the recovery of damages resulting from malpractice; provided, however, that the limitation of an action against a physician or licensed hospital will not be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery thereof unless discovery was prevented by the fraudulent conduct of the physician or licensed hospital. This limitation is subject to the provisions of section 28-01- 25.

"4. An action for injuries done to the person of another, when death ensues from such injuries, and the claim for relief shall be deemed to have accrued at the time of the death of the party injured; provided, however, that when death ensues as the result of malpractice, the claim for relief is deemed to have accrued at the time of the discovery of the malpractice. However, the limitation will not be extended beyond six years of the act or omission of alleged malpractice by a nondiscovery thereof unless discovery was prevented by the fraudulent conduct of the physician or hospital."

This statute may reflect a legislative presumption that the discovery rule determines when a cause of action accrues except in those instances in which the Legislature specifies that the discovery rule is not applicable. The presumption that the discovery rule applies except where the Legislature specifies otherwise is consistent with the perception that the determination as to when a cause of action accrues is a judicial function in the absence of legislative definition of that term.

FN2. "*28-01-22.1. Actions against state--Limitation.* When not otherwise specifically provided by law, an action against the state or its employees and officials acting within the scope of their employment or office must be commenced within three years after the claim for relief has accrued. For purposes of this section, the claim for relief is deemed to have accrued at the time it is discovered or might have been discovered in the exercise of reasonable diligence. This may not be construed as a waiver of immunity."

FN3. "*28-01.1-02. Statute of limitation.*

"1. There shall be no recovery of damages for personal injury, death, or damage to property caused by a defective product, except as provided in subsections 4 and 5, unless the injury, death, or damage occurred within ten years of the date of initial purchase for use or consumption, or within eleven years of the date of manufacture of a product, where that action is based upon, or arises out of, any of the following:

"a. Breach of any implied warranties.

"b. Defects in design, inspection, testing,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 N.W.2d 120

Page 7

475 N.W.2d 120, 70 Ed. Law Rep. 201, Prod.Liab.Rep. (CCH) P 12,935

(Cite as: 475 N.W.2d 120)

or manufacture.

"c. Failure to warn.

"d. Failure to properly instruct in the use of a product.

* * * * * *

"4. Any action to recover damages based on injury allegedly resulting from exposure to asbestos composed of chrysotile, amosite, crocidolite, tremolite anthrophyllite, actinolite, or any combination thereof, shall be commenced within three years after the injured person has been informed of discovery of the injury by competent medical authority and that such injury was caused by exposure to asbestos as described herein, or within three years after the discovery of facts which would reasonably lead to such discovery, whichever is earlier. No action commenced under this subsection based on the doctrine of strict liability in tort shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer unless such seller is also the manufacturer of such product or the manufacturer of the part thereof claimed to be defective. Nothing in this subsection shall be construed to permit an action to be brought based on an injury described in this subsection discovered more than two years prior to July 1, 1983.

"5. Any action to recover damages based on injury to property allegedly resulting from the presence of products containing asbestos fibers of any type must be commenced within six years of the date upon which the owner of that property knew or should have known of facts giving rise to the cause of action."

*126 In *Jerry Harmon Motors, Inc. v. Farmers Union Grain Terminal Ass'n*, 337 N.W.2d 427, 431-432 (N.D.1983), we said:

"Even though this statute went into effect 1 July 1981 and is not retroactive, it contains a clear sense of direction we cannot ignore.... While we may not and do not apply NDCC § 42-04-02 retroactively and directly to this situation, nevertheless in determining what legal concept or principle of law should be applied in North Dakota, we can take a sense of direction from the enactment."

*See also Hopkins v. McBane*, 427 N.W.2d 85, 95-96 (N.D.1988) (VandeWalle, J., concurring specially):

"Ordinarily I believe the Legislature should enact legislation if there is to be a substantial change in our law.... Although this statute, ..., does not govern the case before us, I see no purpose in adhering to our previous case law in this instance in view of the fact that after July 8, 1987, the effective date of the legislation, such damages may be recovered. The policy reasons for deferring to the Legislature have been satisfied and the Legislature has decided damages for mental anguish and loss of society, comfort, and companionship are recoverable elements in wrongful-death actions."

While none of the discovery rules incorporated into statutes of limitation by the Legislature governs this case, "we can take a sense of direction from [their] enactment." *Jerry Harmon Motors, Inc.*, 337 N.W.2d at 432.

We conclude that for purposes of § 28-01-16(1), N.D.C.C., (Cum.Supp.1989), a cause of action, or claim for relief does not accrue until the aggrieved party discovers the facts which constitute the basis for its cause of action or claim for relief, and we answer the first certified question in the affirmative.

[2] The second certified question asks whether the statute of repose contained in § 28-01-44, N.D.C.C., applies to a manufacturer of building materials used in an improvement to real property. In *Vantage, Inc. v. Carrier Corp.*, 467 N.W.2d 446 (N.D.1991), we recently dealt with a faulty rooftop furnace that caused a fire. We held that Carrier was not protected by § 28-01-44, N.D.C.C.: [FN4]

FN4. *"28-01-44. Limitation of action—Person submitting plans for improvements to real estate.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-218

> "1. No action, whether in contract, oral or written, in tort or otherwise, to recover damages:
> "a. For any deficiency in the design, planning, supervision, or observation of construction or construction of an improvement to real property;
> "b. For injury to property, real or personal, arising out of any such deficiency; or
> "c. For injury to the person or for wrongful death arising out of any such deficiency,
> "may be brought against any person performing or furnishing the design, planning, supervision, or observation of construction, or construction of such an improvement more than ten years after substantial completion of such an improvement...."

"In this case, Carrier designed and manufactured the rooftop furnace, which was an assembly line product placed on the roof of the building. Carrier was not engaged in 'performing or furnishing the design, planning, supervision, or observation of construction, or construction of ... an improvement [to real property]' within the meaning of Section 28-01-44, N.D.C.C. The rationale in *Bellemare* [*v. Gateway Builders, Inc.*, 420 N.W.2d 733 (N.D.1988) ] indicates that that statute was not intended to cover manufacturers of products like Carrier."

467 N.W.2d at 450-451. At oral argument, counsel for Gypsum stated that *Vantage,* *127 *Inc. v. Carrier Corp., supra,* "probably has addressed" the second certified question and did not present any oral argument on the second certified question. We agree with counsel's assessment, and, without further discussion, answer the second certified question in the negative. We conclude that § 28-01-44, N.D.C.C., (Cum.Supp.1989) does not apply to a manufacturer of building materials used in an improvement to real property.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.

475 N.W.2d 120, 70 Ed. Law Rep. 201, Prod.Liab.Rep. (CCH) P 12,935

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

984 F.2d 915, 80 Ed. Law Rep. 554

United States Court of Appeals,Eighth Circuit.
TIOGA PUBLIC SCHOOL DISTRICT # 15 OF WILLIAMS COUNTY, STATE OF NORTH DAKOTA, Appellee,
v.
UNITED STATES GYPSUM COMPANY, Appellant.
**No. 90-5447.**

Submitted June 10, 1992.
Decided Jan. 28, 1993.
Rehearing Denied March 11, 1993.

School district sued plaster manufacturer to recover cost of removing asbestos-containing plaster used to coat school ceilings. The United States District Court for the District of North Dakota , Bruce M. Van Sickle, J., entered judgment on jury verdict for school district. Manufacturer appealed. The Court of Appeals , Bowman, Circuit Judge, held that: (1) economic loss doctrine did not bar recovery; (2) nuisance claim was improperly submitted to jury; and (3) General Services Administration (GSA) specifications were not " government standards" for purposes of state-of-the-art statute.

Reversed and remanded.

Larson, Senior District Judge, sitting by designation, issued dissenting opinion.

West Headnotes

[1] **Products Liability 313A 17.1**
313Ak17.1 Most Cited Cases
(Formerly 313Ak17)
Under economic loss doctrine, purchasers may not recover in tort when defective products cause purely economic loss.

[2] **Products Liability 313A 17.1**
313Ak17.1 Most Cited Cases
(Formerly 313Ak17)
Under North Dakota law, economic loss doctrine did not bar school district from recovering in tort from plaster manufacturer cost of removing asbestos-containing plaster used to coat school ceilings; risk of injury to those exposed to asbestos was best distributed by manufacturer, and presence of asbestos product and resulting danger had nothing to do with performance of product as acoustical plaster.

[3] **Nuisance 279 27**
279k27 Most Cited Cases

**Products Liability 313A 62**
313Ak62 Most Cited Cases
North Dakota nuisance law did not afford remedy against manufacturer of asbestos-containing plaster to owner whose building was contaminated by asbestos following installation of plaster; because manufacturer did not have control of building, it could not abate nuisance. NDCC 42-01-01.

[4] **Federal Courts 170B 904**
170Bk904 Most Cited Cases
Where nuisance claim was submitted to jury along with four other claims and jury returned general verdict for plaintiff, reversal was required under North Dakota law, despite plaintiff's claim that jury's award of punitive damages showed that jury must have found that defendant was negligent; jury was not expressly restricted to negligence theory in considering propriety of awarding punitive damages.

[5] **Products Liability 313A 26**
313Ak26 Most Cited Cases
"Government standards," as used in North Dakota statute providing state-of-the-art defense in products liability actions, did not include General Services Administration (GSA) specifications. NDCC 28-01.1 -01 , 28-01.1 -05 , subd. 3.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[6] **Federal Courts 170B** ⚿823
170Bk823 Most Cited Cases
Court of Appeals may reverse trial judge's rulings on admissibility of evidence only if there is abuse of discretion.

[7] **Federal Civil Procedure 170A** ⚿2011
170Ak2011 Most Cited Cases
Exclusion of evidence showing federal government's use of asbestos in building construction at time school district buildings were constructed was not abuse of discretion in school district's action against plaster manufacturer to recover cost of removing asbestos-containing plaster used to coat school ceilings; manufacturer had already presented considerable evidence regarding widespread use of asbestos-containing building materials during period schools were built, and trial court ruled that excluded evidence would not show anything more. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[8] **Federal Civil Procedure 170A** ⚿2182.1
170Ak2182.1 Most Cited Cases
(Formerly 170Ak2182)
In reviewing jury instructions, Court of Appeals decides whether, taken as whole, they fairly and adequately state applicable law.

*916 Kell M. Damsgaard, Philadelphia, PA, argued (Wickham Corwin, Fargo, ND, on the brief), for appellant.
Daniel A. Speights , Hampton, SC, argued (Jon M. Arnston , Fargo, ND, Steven C. Lian , Minot, ND and J. Martin Harvey, Jr., Hampton, SC, on the brief), for appellee.

Before BOWMAN , WOLLMAN , Circuit Judges, and LARSON, FN* Senior District Judge.

> FN* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

BOWMAN, Circuit Judge.
United States Gypsum Co. (USG) appeals from a final judgment entered in the District Court upon a jury verdict in favor of Tioga Public School District No. 15 (Tioga). For the reasons set forth below, we reverse the judgment of the District Court and remand the case for a new trial.

I.

During the 1950s and 1960s, USG manufactured an acoustical plaster known as Audicote that contained asbestos. Tioga constructed two of the three schools that it currently operates between 1957 and 1961. Tioga specified that plaster be used on the ceilings of the two schools, and the architect in charge of the construction selected Audicote from the various acoustical plasters available. Some of the acoustical plasters available at that time contained asbestos although others did not. Tioga does not appear to have known that the architect selected Audicote, or that Audicote contained asbestos. Tioga paid approximately $1,600.00 for the Audicote.

In the early 1980s, the Environmental Protection Agency (EPA) sent schools notices requiring them to identify asbestos-containing materials in the schools and warning them of the potential risks associated with asbestos. The Audicote ceilings were still in place in the two Tioga schools, although certain portions of the plaster had crumbled and there were a number of spots where contact with the ceilings had gouged the plaster.
Following receipt of the EPA notices, Tioga determined that the plaster contained asbestos and that it was friable. A friable material is one that, " when dry, *917 may be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 763.83 (1992). Friable asbestos-containing materials are of particular concern because asbestos fibers may be released from such materials.

Upon discovering that the ceilings in the two schools contained asbestos and that the plaster was friable, Tioga spent approximately $15,000.00 " encapsulating" the Audicote. Essentially, this involved painting the ceilings with latex paint to prevent the release of asbestos fibers from the plaster. Tioga introduced evidence at trial that it

encapsulated the Audicote as an interim measure, since it lacks the funds to pay for removal of the asbestos.

Removal of asbestos-containing materials is extremely costly because of the complicated procedures that must be followed to avoid contamination of the building from which the materials are being removed and to prevent the removal workers from being exposed to asbestos fibers. USG's evidence at trial tended to show that the cost of removal would be in the neighborhood of $400,000.00, while Tioga's evidence suggested a cost of approximately $1,100,000.00. Although current regulations do not require immediate removal of asbestos-containing materials in schools, they do require that such materials be removed when a building is renovated or demolished. 40 C.F.R. § 61.145 (1992).

Encapsulation of the Audicote ceilings has not completely contained the asbestos. Tioga introduced evidence that tended to show that the Audicote remained friable, that contact with encapsulated ceilings can result in the release of asbestos fibers, and that in some instances fissures had developed in the latex paint and in other instances the encapsulant had been punctured to repair leaks or by accident. Tioga also introduced evidence that dust samples collected in the schools a number of years after the encapsulation was completed contained higher than background levels of asbestos and that this asbestos had come from the Audicote ceilings. Finally, although the issue was hotly disputed, Tioga presented evidence that even low level exposure to asbestos presents health risks.

II.

Tioga originally brought this suit in North Dakota state court seeking to recover the cost of removing the Audicote. Tioga asserted theories of negligence, strict liability, fraud and misrepresentation, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of express warranty, nuisance, restitution, and indemnity. USG removed the case to the District Court pursuant to 28 U.S.C. § 1441(a) (1988).

USG moved for a directed verdict at the close of plaintiff's case and again at the close of all evidence. The District Court dismissed several of Tioga's claims, and submitted the case to the jury on five theories: negligence, strict liability, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and nuisance. The District Court denied USG's request to submit special verdict forms to the jury. The jury returned a general verdict for Tioga and awarded Tioga compensatory damages in the amount of $756,906.22. After the parties were given an opportunity to introduce additional evidence on the issue of punitive damages, the jury also awarded Tioga punitive damages of $75,000.00.

USG moved for a judgment notwithstanding the verdict or for a new trial. The District Court denied the motion. On appeal, USG argues that the District Court erred in: 1) allowing Tioga to recover in tort for economic loss; 2) submitting to the jury Tioga's nuisance claim; 3) improperly charging the jury with respect to Tioga's implied warranty claims; 4) refusing to charge the jury regarding USG's state-of-the-art defense and excluding evidence relevant to that defense; and 5) improperly charging the jury regarding punitive damages. FN1 As a federal court sitting in diversity, *918 this Court applies state substantive law, *American Home Assurance Co. v. Major Tool & Mach., Inc.*, 767 F.2d 446, 447 (8th Cir.1985), in this case, the law of North Dakota. This Court reviews de novo the trial court's determinations of North Dakota law. *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

FN1. In addition to these assertions of error, USG originally argued that Tioga's claims were barred by North Dakota's statute of limitations, N.D.Cent.Code § 28-01-16 (Supp.1989), and by a North Dakota statute of repose, N.D.Cent.Code § 28-01-44 (Supp.1989). Counsel for USG conceded at oral argument that these issues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are controlled by the subsequent decision of the North Dakota Supreme Court in *Hebron Public School District No. 13 v. United States Gypsum Co.*, 475 N.W.2d 120 (N.D.1991), and that, under that decision, Tioga's claims are not barred by these statutes.

III.

USG first argues that the economic loss doctrine bars Tioga from recovering the damages it seeks in tort. The economic loss doctrine was adopted by the North Dakota Supreme Court in *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591 (N.D.1984). The scope of the doctrine, and the logic underlying it are set out in the landmark case of *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) , which was cited approvingly in *Hagert*, and in cases such as *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (holding that the economic loss doctrine applies in admiralty cases), and *Miller v. United States Steel Corp.*, 902 F.2d 573 (7th Cir.1990).

[1] The premise of the economic loss doctrine is that, although tort law is an appropriate vehicle for providing a recovery for physical injury to persons or to other property caused by defective goods, tort law should not be held to undermine the law of sales' balancing of the relationship between buyers and sellers regarding whether or not, and how well, products work. Recovery in tort is allowed for physical injuries caused by defective products because such injuries are unexpected and can be overwhelming to consumers, and because the risk of such injuries is best insured and distributed by manufacturers. The risk of losses not attributable to physical injury to persons or to other property, however, is better contractually allocated between sellers and particular purchasers through bargaining for desired warranties. Thus, purchasers may not recover in tort when defective products cause purely economic loss. *Seely*, 45 Cal.Rptr. 17, 403 P.2d 145.

[2] Although the North Dakota Supreme Court has adopted the economic loss doctrine, we do not believe that that court would hold that the doctrine precludes Tioga from recovering in this case. The asserted injury here is the presence of Audicote in Tioga's schools and the contamination of the schools by asbestos. The asbestos poses a risk of devastating injury to those whose health may ultimately be harmed by it, a risk best distributed by the seller or manufacturer. Moreover, the presence of asbestos in Audicote and the resulting danger have nothing to do with the level of performance of the product. In fact, the evidence suggests that the Audicote, although encapsulated, is still functioning well as acoustical plaster. *Cf. Miller*, 902 F.2d 573 (economic loss doctrine bars recovery in tort for the cost of replacing steel walls that were supposed to be rust resistant but that rusted through).

USG calls to our attention the recent decision of the North Dakota Supreme Court in *Cooperative Power Ass'n v. Westinghouse Electric Corp.*, 493 N.W.2d 661 (N.D.1992). In that case the court held that the economic loss doctrine bars recovery in tort for damages which a defective part of a product causes to the rest of the product. That decision, however, does not control the present case. The asserted injury here is not simply an injury to the Audicote or to the school buildings; rather, the injury is the contamination of the Tioga school buildings by asbestos and the consequent health risk to the buildings' occupants. USG should not be allowed to escape liability by arguing that its product is merely a component of a larger product and that any damages are to the school buildings.

*919 Nor should the fact that none of the buildings' occupants has yet been shown to have a health problem attributable to asbestos serve as a bar to recovery. To reduce health risks associated with asbestos, the EPA has prescribed expensive removal procedures that must be followed when regulated asbestos-containing materials are removed from buildings and has mandated that such materials be removed from buildings when those buildings are renovated or demolished. Were any occupants of the Tioga school buildings to become ill as a result of their exposure to asbestos, those persons would presumably be entitled to recover from USG. Tioga should be no less able to recover the costs of removing the plaster in a safe manner

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consistent with EPA regulations designed to prevent such health risks.

That the overwhelming majority of courts deciding the issue under the law of other states have held that the economic loss doctrine does not bar tort recovery for the cost of removing asbestos-containing building materials supports our conclusion that the North Dakota Supreme Court would not find that the economic loss doctrine bars tort recovery in this case. In *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir.1987), the Fourth Circuit was presented with an asbestos-in-building case arising under South Carolina law. The Fourth Circuit held that South Carolina courts probably would not find that a suit for the cost of removing an asbestos-containing plaster was barred by the economic loss doctrine. The court pointed out that the injury at issue was the contamination of Greenville's city hall, which endangered the lives and health of the building's occupants, and that, unlike typical economic loss, this was not the type of risk normally allocated between parties by agreement. *See also, e.g., Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich.App. 694, 703-04, 493 N.W.2d 513, 518 (1992) (holding under Michigan law that because asbestos products may contaminate buildings rendering them unfit for occupation, the economic loss doctrine does not apply to claims to recover the cost of abatement); *Board of Educ. v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 640-46, 546 N.E.2d 580, 585-91 (1989) (holding that under Illinois law the economic loss doctrine does not bar recovery on an asbestos-in-building claim when the asbestos has contaminated the buildings thus damaging other property).

The only reported decision of which we are aware that bars recovery in tort for the costs of asbestos abatement is the recent decision of the Tenth Circuit in *Adams-Arapahoe School District No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir.1992). In that case, the Tenth Circuit held that the Colorado Supreme Court probably would find that any increase in renovation costs required to comply with the EPA's regulations was best characterized as an economic loss resulting from the failure of the product at issue to meet the school district's economic expectations in terms of performance. *Id.* at 871-72. The facts in the *Adams-Arapahoe* case, however, differ from those in the present case in an important respect: in *Adams-Arapahoe* the school district did not show that there had been any release of asbestos from the asbestos-containing materials (nonfriable tiles) in its schools so as to result in the contamination of the schools. *Id.* at 874. By contrast, Tioga has shown that the Audicote in its schools is friable and that it has released asbestos; that Tioga has undertaken an encapsulation and maintenance program to contain the Audicote; and that even encapsulation has not completely contained the asbestos hazard resulting from the Audicote.

In sum, Tioga is not seeking to recover the lost benefit of its bargain based on a claim that the plaster is deficient as acoustical plaster; such a claim would clearly be barred by the economic loss doctrine. Instead, Tioga is seeking to recover the cost of removing the asbestos-containing plaster from its schools on the ground that the asbestos poses a risk of injury to those exposed to it. We believe the North Dakota Supreme Court would find this case distinguishable on its facts from the *Adams-Arapahoe* case, and would in any case follow the strong majority of reported cases *920 in holding that the economic loss doctrine does not bar Tioga's recovery in tort. We therefore reject USG's argument to the contrary.

IV.

[3] USG next argues that Tioga's nuisance claim was improperly submitted to the jury. Tioga's nuisance claim was based on North Dakota's nuisance statute, which provides:

> A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:
>
> 1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
> 2. Offends decency;
> 3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
> 4. In any way renders other persons insecure in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

life or in the use of property.

N.D.Cent.Code § 42-01-01 (1983). The trial court's instruction to the jury on this claim was a verbatim statement of subsections 1. and 4. of the statute.

It has been stated that there is "perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people." W. Keeton, *Prosser and Keeton on Torts* § 86, at 616 (5th ed. 1984). One issue on which the courts appear to agree, however, is that nuisance law does not afford a remedy against the manufacturer of an asbestos-containing product to an owner whose building has been contaminated by asbestos following the installation of that product in the building. All of the courts that have considered the issue have rejected nuisance as a theory of recovery in such cases. *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646, 656 (D.R.I.1986) ; *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.*, 617 F.Supp. 126, 133 (D.N.H.1984) ; *County of Johnson v. United States Gypsum Co.*, 580 F.Supp. 284, 294 (E.D.Tenn.1984) ; *Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich.App. 694, 702-03, 493 N.W.2d 513, 517-18 (Ct.App.1992). These courts have noted that liability for damage caused by a nuisance turns on whether the defendant is in control of the instrumentality alleged to constitute a nuisance, since without control a defendant cannot abate the nuisance. Each court found that a defendant who had sold an asbestos-containing material to a plaintiff lacked control of the product after the sale. *City of Manchester*, 637 F.Supp. at 656; *Town of Hooksett*, 617 F.Supp. at 133; *County of Johnson*, 580 F.Supp. at 294; *Detroit Bd. of Educ.*, 196 Mich.App. at 702-03, 493 N.W.2d 513, 517-18.
We believe these decisions are well reasoned, and it seems clear to us that USG cannot be held liable to Tioga under traditional nuisance theory.

Tioga argues that, regardless of the limitations of traditional common law nuisance doctrine, North Dakota's nuisance statute is directly applicable by its terms to the facts of the present case, and that the trial judge therefore properly submitted Tioga's nuisance claim to the jury. Tioga has not presented us with any North Dakota cases extending the application of the nuisance statute to situations where one party has sold to the other a product that later is alleged to constitute a nuisance, nor has our research disclosed any such cases. North Dakota cases applying the state's nuisance statute all appear to arise in the classic context of a landowner or other person in control of property conducting an activity on his land in such a manner as to interfere with the property rights of a neighbor. *See, e.g., City of Minot v. Freelander*, 426 N.W.2d 556 (N.D.1988) (defendant's unsanitary, odorous house held to be a nuisance). When one considers the fact that the statute is over a hundred years old, the absence of analogous cases supports an inference that the statute was neither intended nor has it been understood to extend to cases such as the present case.

In addition to the lack of case law extending North Dakota's nuisance doctrine to cases involving the sale of goods, we draw support for the idea that the statute was not intended to extend to such a situation from a recent nuisance case decided by *921 the North Dakota Supreme Court. In *Jerry Harmon Motors v. Farmers Union Grain Terminal Ass'n*, 337 N.W.2d 427 (N.D.1983), the court applied the coming-to-the-nuisance defense in a nuisance case, although the defense is nowhere mentioned in the statute. This suggests that the court does not believe that the common law nuisance doctrine has been wholly changed and replaced by the nuisance statute. In addition, the North Dakota Supreme Court, speaking much closer in time to the year when the state's nuisance statute was enacted, has stated that statutory provisions are "but a continuation of the common law to be construed therewith." *Reeves & Co. v. Russell*, 28 N.D. 265, 148 N.W. 654, 659 (1914).

Moreover, to interpret the nuisance statute in the manner espoused by Tioga would in effect totally rewrite North Dakota tort law. Under Tioga's theory, any injury suffered in North Dakota would give rise to a cause of action under section 43-02-01 regardless of the defendant's degree of culpability or of the availability of other traditional tort law theories of recovery. Nuisance thus would become a monster that would devour in one gulp the entire law of tort, a development we cannot imagine the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

North Dakota legislature intended when it enacted the nuisance statute. In short, we do not believe that the North Dakota Supreme Court, under the facts of this case, would hold that Tioga has a cause of action for nuisance against USG, and we therefore hold that the trial court erred in submitting Tioga's nuisance claim to the jury.

We reject Tioga's contention that our consideration of the nuisance issue is foreclosed by the decision of this Court in *Hebron Public School District No. 13 v. U.S. Gypsum,* 953 F.2d 398, 403 (8th Cir.1992). USG points out that the nuisance issue was not raised in the briefs in *Hebron.* Moreover, our Court's statement of the issues in *Hebron,* 953 F.2d at 400, demonstrates that we did not consider this issue to have been before us for decision at that time. Similarly, our Court's summing up of its decision in the penultimate paragraph of the *Hebron* opinion, 953 F.2d at 404, further demonstrates that the Court did not decide the nuisance issue in that case. We are satisfied that the Court's indirect references in the *Hebron* opinion to the plaintiff's nuisance theory of liability, 953 F.2d at 403, will simply not bear the weight Tioga would have us give them.

[4] Five of Tioga's claims were submitted to the jury, which returned a general verdict for Tioga. Because the nuisance claim was improperly submitted, the judgment rendered in favor of Tioga must be set aside and the case remanded for a new trial. *Dudley v. Dittmer,* 795 F.2d 669, 673 (8th Cir.1986) ("The rule in this circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand. "). Tioga seeks to escape the reach of *Dudley* by arguing that this case is like *Robertson Oil Co. v. Phillips Petroleum Co.,* 871 F.2d 1368 (8th Cir.1989), in which we upheld a judgment for the plaintiff even though three of four theories on which the case had been submitted to the jury were held to be improper. In *Robertson Oil,* however, special interrogatories were submitted to the jury. The fact that improper theories were submitted to the jury did not taint the jury's verdict on the properly submitted theory, and we could know with certainty from the interrogatories that the jury had found for the plaintiff on this theory. Neither the logic underlying *Robertson Oil* nor the holding of that case support Tioga's argument, and the argument fails.

Tioga also seeks to escape the holding of *Dudley* by arguing that the jury's award of punitive damages shows that the jury must have found that USG was negligent. Tioga points out that its only fault-based theory of recovery was the negligence theory and argues that counsel for both parties characterized the negligence theory as being the only theory for which USG's conduct was relevant. Tioga argues that, because the jury must have found that USG was negligent, and because USG does not challenge the propriety of the trial court's submission of the negligence theory to the jury, the judgment appealed from should be affirmed. *See* *922 *Mueller v. Hubbard Milling Co.,* 573 F.2d 1029, 1039 (8th Cir.) (holding that court may affirm verdict if it is "fairly convinced" that jury proceeded on a sound basis), *cert. denied,* 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 174 (1978).

This argument also fails. The jury instruction on punitive damages did not restrict the jury to awarding punitive damages on Tioga's negligence theory. Authority exists for the proposition that punitive damages may be awarded in a strict liability case. *See, e.g., Ferren v. Richards Mfg. Co.,* 733 F.2d 526, 529 (8th Cir.1984) (applying Missouri law). We cannot say that, in this case, the jury, which was not expressly restricted to the negligence theory in considering the propriety of awarding punitive damages, did not award these damages on another theory such as the improperly submitted nuisance theory.

To conclude, we hold that Tioga's nuisance theory was improperly submitted to the jury and that it might have been the theory on which the jury returned its verdict for Tioga. This case falls squarely within the rule of *Dudley;* hence the judgment of the trial court must be set aside and the case remanded for a new trial. Because we are remanding, we think it may be helpful to the trial court and to the parties for us to address some of the other issues raised in this appeal that are likely to arise again in the context of a new trial. We turn now to these issues.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

V.

USG argues that the trial judge erred in improperly charging the jury with respect to Tioga's implied warranty claims. Although there seems to have been some confusion during the course of the trial, the parties agree that Tioga ultimately sought to assert its implied warranty theories in tort. In other words, because the statute of limitations barred all contractual warranty actions, Tioga asserted a claim for implied warranty of merchantability in tort, and a claim for implied warranty of fitness for a particular purpose in tort.

We are somewhat perplexed by the idea of asserting these implied warranty theories in tort, and we note that Tioga presented no North Dakota authority other than an unpublished transcript of a state trial judge's ruling on a motion to dismiss a multi-count complaint to support its argument that North Dakota recognizes such implied warranty theories as causes of action in tort. Such unpublished authority may not be cited under the rules of this Court. 8th Cir.R. 28A(k). A panel of this Court, however, recently recognized the propriety of these same implied warranty theories in tort, *Hebron Pub. Sch. Dist. No. 13 v. U.S. Gypsum*, 953 F.2d 398, 402 (8th Cir.1992), thus we are not free to hold that they do not exist under North Dakota law.

We note that, while the authorities cited in *Hebron* do indeed support the parallel between the strict liability in tort theory and contractual implied warranty theories, they do not go so far as to suggest that one may assert implied warranty theories in tort. Rather, they simply address the parallels between the elements of the strict liability in tort theory and the contractual implied warranty theories. *See, e.g., Herman v. General Irrigation Co.*, 247 N.W.2d 472, 476 (N.D.1976) They also point out that early in its evolution, as the courts struggled to impose liability on manufacturers of defective products, what came to be the strict liability theory was sometimes called "warranty." *See* Restatement (Second) of Torts § 402A, Comment m. In this case, Tioga asserted a strict liability claim in tort. Were Tioga's contractual implied warranty claims not barred by the statute of limitations, Tioga could also have asserted such claims. But to suggest that Tioga may also assert implied warranty theories in tort would seem to give it a third bite at the apple unwarranted by North Dakota or other precedent.

Because we have severe doubts as to whether the North Dakota Supreme Court would recognize the implied warranty of merchantability and implied warranty of fitness for a particular purpose as tort theories, we would give strong consideration to certifying the issue to the North Dakota Supreme Court if this case came *923 before us again on appeal. Of course, one implication of our doubts about the propriety of these implied warranty theories is that, on remand and retrial, the trial court may wish to submit the case to the jury on a special verdict form rather than a general verdict form. This would reduce the possible need for a third trial of the case should the implied warranty theories ultimately be found to be improper.

VI.

[5] USG also argues that the trial judge erred in refusing to charge the jury regarding USG's state-of-the-art defense and in excluding evidence relevant to that defense. USG sought a jury instruction under § 28-01.1 -01 of the North Dakota Centennial Code, basing its claim of entitlement to the instruction on Audicote's compliance with General Services Administration (GSA) specifications, existing at the time Tioga's schools were constructed, that guided federal agencies in making procurement decisions. Section 28-01.1 -01, which is part of North Dakota's Products Liability Act, provides that:

> There is a rebuttable presumption that a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product or the methods and techniques of manufacturing, inspecting, and testing the product were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product or the methods and techniques of manufacturing, inspecting, and testing the product were adopted.

N.D. Cent.Code § 28-01.1 -05(3) (Supp.1989).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We do not believe that the North Dakota Supreme Court would hold that the "government standards" referred to in this section include mere GSA specifications. If the North Dakota legislature had intended to include government specifications within the reach of the statute it could have expressly done so. *See, e.g.,* Wash.Rev.Code § 7.72.050(2) (1992) ("When the injury-causing aspect of the product was, at the time of manufacture, in compliance with a specific mandatory government contract specification relating to design or warnings, this compliance shall be an absolute defense."). "Government standards" more likely refers to standards established by statute or regulation that govern an industry. We note that the GSA specifications at issue would not even have applied to the Tioga school construction, since Tioga is not a federal agency. Because we believe that the North Dakota Supreme Court would hold that the "government standards" referred to in the statute do not include the GSA specifications, we hold that the trial judge did not err in refusing to give USG's requested jury instruction.

[6] [7] USG also argues that the trial judge erred in refusing to admit into evidence not only the GSA specifications but also a slew of other documents showing the federal government's use of asbestos in building construction at the time the Tioga school buildings were constructed. We may reverse a trial judge's rulings on the admissibility of evidence only if there is an abuse of discretion. *Northside Mercury Sales & Serv., Inc. v. Ford Motor Co.,* 871 F.2d 758, 760 (8th Cir.1989). In this case USG admits that it already had presented considerable evidence regarding the widespread use of asbestos-containing building materials during the period when the schools at issue in this case were built. The trial judge pointed this out in ruling that the excluded evidence would not show anything more and therefore would not be admitted. *See* Fed.R.Evid. 403 (evidence may be excluded when its probative value is substantially outweighed by considerations such as waste of time or needless presentation of cumulative evidence). We hold that the trial judge did not abuse his discretion in excluding the evidence in question.

VII.

[8] The last argument that USG raises concerns the punitive damages instruction given to the jury. In reviewing jury instructions, we decide whether, taken as a whole, they fairly and adequately state the ***924** applicable law. *Circle J Dairy, Inc. v. A.O. Smith Harvestore Prods., Inc.,* 790 F.2d 694, 698-99 (8th Cir.1986). Reviewing under this standard the punitive damages instruction given at trial, we note that it closely resembles the charge given in *Stoner v. Nash Finch, Inc.,* 446 N.W.2d 747, 756 n. 7 (N.D.1989), and we find that it fairly and adequately states the applicable North Dakota law on punitive damages.

Because we are remanding this case for a new trial, we decline to address the arguments made by USG against the constitutionality of North Dakota's punitive damages law. We note that in *Stoner,* which was decided before the United States Supreme Court's decision in *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the North Dakota Supreme Court affirmed the constitutionality of the award of punitive damages then before it. We leave it to the District Court to apply on remand the standards set forth in *Haslip.*

For the reasons stated above, we reverse the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

LARSON, Senior District Judge, dissenting.

I dissent to the granting of a new trial to USG on the ground that the nuisance theory was improperly submitted to the jury. After an eight day trial, the district judge submitted five theories of liability to the jury. The jury returned a general verdict in favor of Tioga, including a modest punitive damage recovery.

The district court, in an extensive and thorough memorandum and order, denied the motion of USG for judgment n.o.v. or for a new trial. The district court reviewed the North Dakota nuisance statute and concluded that Tioga's nuisance claim was properly submitted to the jury. I agree with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

district judge that North Dakota broadly defines nuisance by statute and does not require the control that USG and the majority would like to engraft on the statute. The district court concluded that, because all claims were properly submitted to the jury, a new trial was unnecessary.

I do agree with the majority opinion that, if it was error to submit the nuisance theory, there should be a new trial because the general verdict does not allow the court to determine on what theory the jury found for the plaintiff. I believe, however, that the nuisance theory was an acceptable interpretation of North Dakota law. Accordingly, I would affirm the judgment of the district court in all respects.

C.A.8 (N.D.),1993.
Tioga Public School Dist. No. 15 of Williams County, State of N.D. v. U.S. Gypsum Co.
984 F.2d 915, 80 Ed. Law Rep. 554

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.