UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  . Case No. 00-03837(JKF)
                                        .
                                        . (Jointly Administered)
OWENS CORNING, et al.,                  . Related to Docket No. 13257
                                        .
                                        . USX Tower – 54th Floor
                                        . 600 Grant Street
                                        . Pittsburgh, PA 15219
                         Debtors.       .
                                        . May 16, 2005
. . . . . . . . . . . . . . . . . . . . 9:59 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:                 Saul Ewing LLP
                                 By:  J. KATE STICKLES, ESQ.
                                 222 Delaware Avenue
                                 Suite 1200
                                 Wilmington, DE   19801

                                 Debevoise & Plimpton, LLP
                                 By:  MARY BETH HOGAN, ESQ.
                                 919 Third Avenue
                                 New York, NY   10022


Audio Operator:                  Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES (Cont'd.):

For the Futures Rep:

Young Conaway Stargatt & Taylor, LLP
By:   SHARON M. ZIEG, ESQ.
The Brandywine Building
1000 West Street
17th Floor
P.O. Box 391
Wilmington, DE   19899

For Credit Suisse First
Boston, as agent for the
Bank Group:

Kramer, Levin, Naftalis &
  Frankel, LLP
By:   GARY M. BECKER, ESQ.
        RICHARD COBB, ESQ.
          (telephonically)
919 Third Avenue
New York, NY   10022

For the State of North
Dakota:

Speights & Runyon
By:   DAN SPEIGHTS, ESQ.
200 Jackson Avenue, East
P.O. Box 685 Hampton
South Carolina 29924

1           THE COURT:   Good morning.   This is the matters of
2  Owens Corning, bankruptcy number 00-3837.   The participants I
3  have listed by phone are Gordon Harris, James McClamy, John
4  Schaeffer, David Baldwin, Joseph Gibbons, David Parsons, Gerald
5  Stein, Bruce White, Howard Ressler, Monty Travis, Michael
6  Davis, Scott Davidson, Neil Levitsky, Linda Carmichael, Francis
7  Monaco, William Suddell, Mark Hurford, Eric Suddy, David
8  Clouder, Michael Joyce, John Rapisardi, Timothy Grahlick,
9  Richard Cobb, Theodore Taconelli, Scott Beechert, and Rosalyn
10 Briggs.   I'll take entries of appearances of those of you in
11 Court, please.

12           MS. STICKLES:   Good morning, Your Honor.

13           THE COURT:   Good morning.

14           MS. STICKLES:   Kate Stickles on behalf of the
15 debtors.

16           THE COURT:   You have to use the microphone.

17           MS. STICKLES:   Good morning, Your Honor.   Kate
18 Stickles on behalf of the debtors.

19           MS. HOGAN:   Mary Beth Hogan, Debevoise and Plimpton,
20 for the debtors.

21           MR. BECKER:   Good morning, Your Honor.   Gary Becker,
22 Kramer, Levin, Naftalis, and Frankel, for Credit Suisse First
23 Boston as agent for the Bank Group.

24           MS. STICKLES:   Good morning, Your Honor.   On Friday
                          A-258
25 the debtors filed an amended agenda with the Court indicating

**J&J COURT TRANSCRIBERS, INC.**

1  that one matter would go forward this morning.  That is agenda

2  item number five, the debtors' objection to the property damage

3  claim of the State of North Dakota.  Ms. Hogan will present

4  argument on that issue.  All other matters on the agenda, Your

5  Honor, have either been continued with consent, resolved, or an

6  order has been entered.

7          THE COURT:  All right.  Good morning.  I think we're

8  getting a few other people.  Maybe we -- gentlemen, do you wish

9  to enter appearances in Owens Corning?

10         MR. SPEIGHTS:  I do, Your Honor.  I'm Dan Speights.

11         THE CLERK:  You'll have to use the mike.

12         THE COURT:  Good morning.

13         MR. SPEIGHTS:  Good morning, Your Honor.  I'm Dan

14  Speights, S-p-e-i-g-h-t-s, and I'm appearing in Owens Corning

15  on behalf of the State of North Dakota.

16         THE COURT:  Thank you.  Okay, Ms. Hogan.  Thanks.

17         MS. HOGAN:  Good morning.  Mary Beth Hogan for the

18  debtors.  Your Honor, as Ms. Stickles noted, we were able to

19  settle the six other objections up for today, so the only thing

20  we're here about on property damage, and, actually, the only

21  thing we're here about today at all is North Dakota's claim.

22  Before we get to that objection, I wanted to give the Court

23  just a very quick update on where we are on property damage.

24         As you know, we started with almost 700 claims, about

25  350 each against Owens Corning and Fiberboard.  We are now down

A-259

J&J COURT TRANSCRIBERS, INC.

1  to 32 against Owens Corning and 59 against Fiberboard, although
2  31 of those 59 have been previously settled, and we'll be
3  filing an objection to deal with those claims shortly.  And
4  because almost every claim is actually filed against Owens
5  Corning and Fiberboard, what we really have are about 32
6  separate claimants left, and that's it on property damage.

7       Once the debtors have rulings on the North Dakota
8  objection, which we hope to get today, and those previously
9  filed Fiberboard -- previously settled Fiberboard cases, we
10 will then move for entry of the case management order which
11 will put in place a process by which we can resolve the
12 remaining claims.

13      The debtors filed an objection to the North Dakota
14 claims for one basic reason.  There is a relevant North Dakota
15 statute that is attached to our objection on exhibit D which is
16 a special statute of limitations that was passed by the North
17 Dakota Legislature in 1993 to apply to all public building
18 owners in the State of North Dakota, and it enabled them to
19 bring claims against asbestos defendants until August 1st,
20 1997.  The claims that we're talking about here were brought in
21 the spring of 2002, and the debtors maintain that they are
22 barred under the statute of limitations.

23      The language of the statute actually could not be
24 more clear.  It is a clear quid pro quo passed by the
                        A-260
25 Legislature.  It gives the State more time to evaluate and

1  assess -- at least in 1993 it gave the State more time to
2  evaluate and assess the asbestos problem in its buildings and
3  to bring actions against asbestos manufacturers, but it also
4  set a deadline by which all and any claims related to asbestos
5  in public buildings had to be brought, and that was again
6  August 1st, 1997.

7        There are three sections to the statute which is
8  attached to the objection.  The first sets forth the purpose of
9  the statute, and it explicitly says that the statute sets, "the
10 specific date by which public owners must bring a cause of
11 action for removal or other abatement costs associated with the
12 presence of asbestos in buildings."

13        The second section is actually two sentences.  The
14 first is a sentence that North Dakota in its reply really does
15 not deal with.  It sets a deadline, "For any and all actions to
16 recover costs for any problem related to asbestos in a public
17 building including costs to locate the asbestos."  Again, it
18 says those claims must be brought by August of 1997.  The
19 second sentence relates specifically to those claims that were
20 otherwise barred as of the date the statute was passed, and it
21 said, "For those claims which need to be revived under the
22 statute, they too must be brought by August 1st, 1997."

23        And subsection three makes clear that public
24 buildings are covered, and all of the buildings -- there's no
25 claim that any of the buildings at issue in the North Dakota

A-261

J&J COURT TRANSCRIBERS, INC.

7

1 claim are not covered by the statute -- or not the types of
2 buildings that were covered by the statute.

3       The debtors submit that this language is clear, and
4 it bars North Dakota's claims against Owens Corning and
5 Fiberboard that were not brought until 2002.  But if the Court
6 has any doubt whatsoever about this, we would ask that the
7 Court then look to the Legislative history, which is also
8 attached to our objection.  At page 10, minutes of the House
9 Standing Committee, the bills -- the senator who introduced the
10 statute, Senator Stenaham, said there are pluses and minuses
11 for both sides with regard to this bill.  What it will do is
12 revive and extend the statute of limitations for any claim for
13 asbestos removal from public buildings.  It will close that
14 statute of limitation, close the litigation on August 1st,
15 1997, and he made clear that it applies only to public
16 buildings not to any buildings in the private sector.  He said,
17 "It put all these agencies on notice that they have until that
18 time to bring their claims."

19       An attorney named John Armstrong who argued in
20 support of the bill made the point that, "Along with extending
21 and reviving the statute, the bill does give something back to
22 the manufacturers, because the bill does say that the action
23 must be commenced before August 1st, 1997."  "The way the bill
24 is written, that's a closure," he said.

25       Most significant, however, the words of the North

A-262
J&J COURT TRANSCRIBERS, INC.

1  Dakota Assistant Attorney General who testified on behalf of
2  the State Attorney General in favor of this bill, and that's
3  found on pages 16 through 20 of the legislative history that's
4  attached.  He noted that the bill requires public building
5  owners to bring any actions related to asbestos in the
6  buildings by August, 1997, and he said that the deadline was
7  supposed to incentivize North Dakota to take prompt action to
8  locate and deal with the asbestos issue in the buildings.  It
9  said the statute gives -- he said that, "This statute gives the
10 state a specific deadline by which to assess its asbestos
11 problem and initiate legal proceedings to place cost on the
12 manufacturer rather than on the taxpayers."  And he explained
13 that the statute will do away with the whole aspect of the
14 litigation surrounding statute of limitations which was a very
15 costly thing for the state and also costly for manufacturers
16 because the question of who knew and when they knew it and when
17 they should have known was tying up cases for years.  And he
18 explained that this statute will do away with that costly
19 statute of limitations litigation.

20         Then he said -- but he also noted the explicit quid
21 pro quo.  He said, "That statute sets a specific deadline by
22 which all claims must be brought."  He explained how the bill
23 protects asbestos manufacturers from virtually unlimited and
24 perpetual exposure to civil actions by setting an absolute
                              A-263
25 deadline while giving state agencies a reasonable time -- for

 1 | more years -- to assess the problem and commence actions.

 2 |        He also noted that after August of 1997 any further
 3 | litigation regarding asbestos removal will be barred.  That's
 4 | all the State Attorney -- Assistant Attorney General speaking
 5 | on behalf of the State of North Dakota.

 6 |        Now, North Dakota in its response to our motion -- to
 7 | the debtors' motion spends its first eight pages of its ten-
 8 | page reply talking about an Eighth Circuit case -- MDU case and
 9 | the law of other jurisdictions.  It first mentions the specific
10 | statute of limitations that applies to public buildings in
11 | North Dakota on the eighth or ninth page of its ten-page brief.
12 | But the Eighth Circuit MDU case is distinguishable.  It does
13 | not deal with public buildings.  It's a -- it deals with a
14 | private building owner, and it talks about the statute that
15 | guides and governs private actions by private building owners
16 | in North Dakota.  It does not deal with public building owners
17 | which is specifically dealt with the by the statute 28:01-47,
18 | which is the statute we've been talking about.

19 |        The MDU -- the Eighth Circuit in MDU knew about the
20 | North Dakota statute.  It referred to it in another case that
21 | did deal with the public buildings right around that same time
22 | -- the Adams-School District case.  It did not repeal the North
23 | Dakota statute.  It could not repeal the North Dakota statute,
24 | and the North Dakota Legislature certainly would've known about
                                    A-264
25 | the Eighth Circuit MDU case dealing with North Dakota law, and

J&J COURT TRANSCRIBERS, INC.

10

1  it did not go back and repeal 28:01-47.  It had three years to
2  do so before the deadline, before the bar date, and it did not
3  do so.

4        North Dakota has also argued that under <u>MDU</u> North
5  Dakota public buildings didn't have a cause of action before
6  1997, because what <u>MDU</u> says about when a statute starts to run
7  for private buildings is that it starts to run on contamination
8  of the building, and their argument is that presumably many of
9  their buildings they argue are not contaminated yet, so the
10 statute wouldn't have run.

11       The debtors' response to that is that's not the
12 statute that applies.  Again, the statute that applies to
13 public buildings is 28:01-47 that was never repealed by the
14 North Dakota Legislature and is still on the books.

15       And finally, the argument also raised by North Dakota
16 that it just wouldn't make sense for public buildings to have a
17 stricter, more stringent standard than private buildings is --
18 it just -- it simply ignores the fact that the North Dakota
19 Legislature obviously didn't feel that way, because if it did,
20 it could've repealed this legislation any time in the three
21 years between <u>MDU</u> and the bar date for actions by the North
22 Dakota public building owners, and it did not.  That's all.
23 Thank you.

24       THE COURT:  Thank you.
                A-265
25       MR. SPEIGHTS:  Your Honor, I filed, for me at least,

1  a rather extensive brief, and I actually filed it in the
2  Garrison case which has now been settled, but I filed a joinder
3  in that brief on behalf of the State of North Dakota, and I
4  will try not to repeat the arguments I made there.  But I
5  believe -- and I will stand on the brief.  What I was trying to
6  say and not how its characterized it seems like every time I
7  appear before you, Your Honor, I start off with procedural and
8  technical objections to where we are, and, frankly, I have a
9  few of those today, but I have decided to skip over to the
10  merits and come back to the procedure, because I don't want the
11  Court to get the impression that in any way I'm shying away
12  with dealing with the merits of this objection to the State of
13  North Dakota's claim.  I will have to cover all the bases,
14  however, because while the debtors understandably want to
15  present a picture that this PD has been contained to a few
16  claims, this one claim, the State of North Dakota, involves 232
17  buildings through the State of North Dakota, and most of the
18  bankruptcies, at least after the plan, each building is
19  considered a separate claim.  These buildings are state
20  buildings and university buildings and college buildings and
21  hospitals, etcetera, etcetera, so it is a significant claim.
22  Of course, any claim that I represent I take the position is
23  significant.  This is something that I need to be real careful
24  about going through all of my defenses to this objection that's
25  been raised, but I will fast forward to the merits.

A-266

1        And it seems to me that it's pretty simple.  The
2  statute on its face applies to, "Those persons who may bring
3  claims," and, of course, we're talking about state claims.
4  We're not talking about claims on behalf of private building
5  owners.  The problem with the debtors' argument is -- we're
6  fortunate in North Dakota, when dealing with North Dakota law,
7  we have at least four published decisions in asbestos building
8  cases, three of which decided by the Eighth Circuit and one by
9  the Supreme Court of North Dakota that give us a lot of data on
10 some asbestos property damage cases in the State of North
11 Dakota.

12        And the problem with the debtors' argument here is
13 not that it runs in the face of MDU per se.  It's a problem
14 that it runs in the face of Tioga.  Tioga is also a 1993 case
15 in which the Eighth Circuit ruled that in order to have a
16 property damage lawsuit within the State of North Dakota, the
17 building owner must be able to prove injury, and that injury in
18 an asbestos building case is contamination which presents a
19 health risk.  Before you have that, you have no lawsuit, and
20 they distinguish the Tenth Circuit case of Adams Zarapaho, a
21 floor tile case, in which the Tenth Circuit had thrown out the
22 case, because they had not shown contamination or injury.  They
23 said the school district, Adams Zarapaho, did not have a
24 lawsuit.  It could not bring a lawsuit, and the Eight Circuit
A-267
25 said, no, when you have contamination and health hazard, you

1 | can bring a lawsuit.

2 |      All of these cases, I might add, involve surface
3 | material.  All of the cases involve either W.R. Grace or USG,
4 | to of the debtors that are here now that manufactured this
5 | indisputably friable material in those buildings, and all of
6 | those cases in which the Eighth Circuit upheld jury verdicts
7 | had evidence of contamination and health hazard.  That's the
8 | background of North Dakota.

9 |      Now, the statute says again on its face that it
10 | applies to those persons who may bring claims.  There is no
11 | evidence in this record -- and they have the burden of proof.
12 | Your Honor has said that at a previous hearing involving my
13 | claimants and the debtors in this bankruptcy.  They have the
14 | burden of proof on the statute of limitations defense.  There
15 | is no evidence that any of these 232 building owners --
16 | actually, four, five, or six agencies.  There is no evidence
17 | that they could have brought a lawsuit before the 1997 date in
18 | this action.  None whatsoever.  There's no evidence that the
19 | debtors have produced that there was contamination in these
20 | buildings resulting from thermal system insulation of the type,
21 | OC and Fiberboard made.  And by the way, they have conceded OC
22 | is in some of the buildings in North Dakota -- one or more of
23 | the buildings.

24 |      There's no evidence of a health hazard emanating from
25 | the debtors' products or thermal system insulation products in

1  those buildings, and there's simply no evidence that the State

2  of North Dakota could've brought a lawsuit before 1997 that the

3  State of North Dakota had been injured, in the words of <u>Hebron</u>,

4  had a lawsuit at all.  This statute was not meant to grant

5  lawsuits that they rely on.  I'll deal with the statute in a

6  minute.  But the problem is under the words I keep quoting,

7  "may have claims," they had no lawsuit, at least on the record

8  that's before Your Honor.

9          Indeed, Your Honor, the situation is even a little

10  more than just being an absence of facts.  In this case we have

11  two other factors.  Owens Corning persuaded EPA to pass a

12  regulation which found that unlike Grace's material and USG's

13  material, the type of material they made, thermal system

14  insulation, is not presently friable.  That's the AHERA, A-H-E-

15  R-A, regulation passed in the late 1980s.  Most convincingly,

16  however, on this point is that Owens Corning and Fiberboard,

17  the debtors in this case, in the very pleading -- in the very

18  objection that's before you now, have said their products do

19  not cause harm, and that's the exact position W.R. Grace found

20  itself in in the <u>MDU</u> case, the latest statute of limitations

21  case saying the statute does not run until you've got an

22  injury.  When Chief Judge Arnold for a unanimous Eighth Circuit

23  said that you cannot have it both ways, W.R. Grace.  You cannot

24  argue that your product does not contaminate and say that MDU

25  should've known that it had been injured.  Taking that --

A-269

1 taking Judge Arnold's remarks to this case, how can OC ever

2 argue that North Dakota had a claim -- had a lawsuit before

3 1997 when it has argued in this case it still does not have a

4 claim, it still has not been harmed?

5          Now, Your Honor, I lead off with that, because it

6 goes into my logic section, which I call it.  Can we find from

7 this statute, which the State of North Dakota passed for the

8 benefit of public building owners, not for the benefit of

9 private building owners -- can we find a rationale for what the

10 debtors argue?  In fact, Your Honor, I think it turns logic on

11 its head.  The debtors argue that the State of -- the State

12 Legislature intended to bar claims of the State of North Dakota

13 that they could not bring that they did not have.  That turns

14 logic on its face to begin with.

15          But then the second step is they argue that only

16 applies to the State.  So right now if the Sears and Roebuck

17 store in Bismarck, North Dakota had filed a claim in this

18 bankruptcy, there would be no objection on this.  We would have

19 to find, if the debtors are right, that the State Legislature

20 of North Dakota intended to discriminate against the State of

21 North Dakota rather than giving it a common reading that it

22 only barred those persons who may bring claims.  If you didn't

23 have claims, you couldn't bring them, and the statute is not

24 applicable.  I don't think that argument is consistent with the

25 intent of the Legislature. A-270

16

1    THE COURT:  I'm not sure that it's inconsistent.  It
2  seems to me that this statute on its face does several things.
3  It not only revives the statute of limitations for claims that
4  were previously time barred and sets a statute of limitations
5  for claims that were currently known, but it's a statute of
6  repose for other claims against the State.  I think this one
7  statute has all of those aspects to it, and it appears to me to
8  be pretty clear on its face.  But if it isn't, and I go into
9  the legislative history, it seems that the State was well aware
10  of the fact that it had a time limit within which it had to
11  find claims and bring those claims.  So I'm not sure that it
12  isn't a statute of repose.  That's how it reads.

13    MR. SPEIGHTS:  Well, Your Honor, giving it that
14  reading -- and I'm going to the history in a few minutes --
15    THE COURT:  Okay.

16    MR. SPEIGHTS:  -- and deal with that as well, but
17  giving it that reading means that the State Legislature, which
18  was interested in the taxpayers' money, obviously, wanted to
19  provide a statute of repose for public building owners and not
20  for private building owners, and I don't think that was -- and
21  that they wanted to provide a statute of repose for public
22  building owners and prevent them from -- in a situation where
23  they had no case.  They could not bring a case.  They had no
24  case until there was harm.

25    THE COURT:  But that's what statutes of repose do.

A-271

**J&J COURT TRANSCRIBERS, INC.**

1 They give you so much time to figure out whether or not you

2 have a claim and to bring it. And if you don't figure it out

3 within that time, that's too bad. You're out of luck.

4        MR. SPEIGHTS: It has nothing to do, respectfully,

5 Your Honor, with the knowledge of the State of North Dakota.

6 Okay? It has nothing to do with, as Mr. Barr testified -- and

7 I'll get there in a minute -- about what the building owner

8 knew or should've known. That's a separate statute of

9 limitation issue from the question of has a building owner been

10 injured, because under Hebron and Tioga, until you have been

11 injured you have no right to bring a lawsuit, so you're barring

12 a case --

13        THE COURT: That's what statutes of repose do. Even

14 if at the time you had no right to bring a lawsuit, but after

15 that statute expires, all of the factors that made that claim

16 contingent now make it fixed. I'll use the word fixed. You

17 can't bring a claim. That's what statutes of repose do, and

18 this statute looks to me to be, as I said earlier, both a

19 revival and the limitations period and a statute of repose. It

20 has all of those characteristics, and the legislative history

21 seems to support that. I don't know why a North Dakota

22 Legislature would determine to make a statute applicable to

23 public and not private buildings, but that's what legislators

24 do. You know, they have the right to make laws that they

A-272
25 believe are appropriate within that time. The courts haven't

1 | set it aside.   The statute at this point in time is very old.
2 | I think Ms. Hogan pointed out it hasn't been revoked in any
3 | way.   It's still out there.   It seems to me that's kind of the
4 | end of the issue.

5 | MR. SPEIGHTS:   I was almost tempted today to say
6 | there must not be anything to this issue, because Ms. Hogan
7 | could've filed this motion two years ago when we were here, and
8 | she didn't, so that must mean I'm right.   But that's the same
9 | sort of logic, the fact that they haven't gone back and done it
10 | I don't believe provides any assistance.

11 | What I want to go back to is the repose issue though.
12 | The repose -- first of all, there's nothing in the statute of
13 | the legislative history that I'm aware of that uses the word
14 | repose.

15 | THE COURT:   But they rarely do.

16 | MR. SPEIGHTS:   Well, Your Honor, North Dakota does
17 | have a statute of repose, and that was litigated, and that was
18 | decided by <u>Hebron</u> in the Supreme Court of North Dakota, that a
19 | statute of repose -- the statute of repose does not apply.
20 | This statute in no way says we're going to amend the statute of
21 | repose.   It's a statute of limitations and a revival statute.
22 | I understand that.  I just don't believe that we can add that
23 | third card, that it's also a repose, because it applies only in
24 | the language of the statute to those who have claims, and I
25 | don't believe the Legislature was saying -- you would have to

A-273

**J&J COURT TRANSCRIBERS, INC.**

1  say it's a four-prong to give the Legislature some -- I believe
2  to avoid an absurd result.  You'd have to say the Legislature
3  also intended to reverse _Tioga_ and these other cases and say
4  you could bring a case before you've been injured, and I think
5  there's more evidence of that.  So they had no lawsuit under
6  the record that's before you today, and I don't believe the
7  record supports the idea that the Legislature intended to bar
8  lawsuits that did not exist.

9        THE COURT:  When was _Hebron_ decided?

10       MR. SPEIGHTS:  Pardon me?

11       THE COURT:  When was the _Hebron_ case decided?

12       MR. SPEIGHTS:  The _Hebron_ case was decided probably
13  around -- _Tioga_ was '93.  _Hebron_ was probably about '91/'92.
14  It's cited in the brief, and I have a copy here.  I could look
15  it up.

16       THE COURT:  Which is before this statute was enacted.

17       MR. SPEIGHTS:  Oh, absolutely.

18       THE COURT:  So --

19       MR. SPEIGHTS:  All three of the -- all of these cases
20  were decided before the statutes were enacted.

21       THE COURT:  So there is no failure of logic to say
22  that the Legislature determined that a statute of repose could
23  supersede another prior statute of repose with respect to
24  public buildings dealing with asbestos, because to the extent
25  that _Hebron_ said that before this statute was passed, a general

A-274

**J&J COURT TRANSCRIBERS, INC.**

1  statute of repose didn't bar the claims can be overturned by
2  the Legislature by enactment of the statute that, in fact, does
3  set a statute of repose that does bar specific claims.

4          MR. SPEIGHTS:  But it doesn't say statute of repose,
5  Your Honor.  That's my point.

6          THE COURT:  I understand.

7          MR. SPEIGHTS:  If the Legislature wanted to pass a
8  statute of repose, it knows how, because all of the other
9  statutes of repose say statutes of repose.

10         THE COURT:  But this also doesn't say statute of
11 limitations.

12         MR. SPEIGHTS:  I believe, Your Honor -- excuse me a
13 minute.

14                         (Pause)

15         THE COURT:  Well, revival I guess maybe.

16         MR. SPEIGHTS:  It uses the term limitations of
17 actions, which I interpreted as a statute of limitations.

18         THE COURT:  All right.  Then it's not a revival.  It
19 doesn't use the word revival.

20         MR. SPEIGHTS:  Oh, absolutley it uses the word
21 revival, and I've argued in the brief that there was a quid pro
22 quo here.

23         THE COURT:  Oh, yes.

24         MR. SPEIGHTS:  There's a quid pro quo that if you
25 were going to get the benefit of a revival, State of North

A-275

J&J COURT TRANSCRIBERS, INC.

1  Dakota -- benefit of this revival statute, then you must bring
2  it before 1997, and we don't seek the benefit of any revival
3  statute before you.  Our position is there's no evidence we had
4  a claim at all to be revived.  Okay?  We couldn't get revived.
5  We had no claim.  The statute was running.  No claim.  You have
6  indicated a concern that it may have been meant to bar claims
7  that they didn't have, and I don't think -- and at least based
8  on this record there's evidence that the Legislature intended
9  to do that.

10       THE COURT:  All right.  I don't think I went so far
11  as to say that there was no claim.  That's a different issue.
12  I think I was simply trying -- we were talking theoretically
13  about what statutes of repose can do, and I was opining in the
14  theoretical context not related to this case, so I just wanted
15  to correct that.

16       MR. SPEIGHTS:  I appreciate that.  I'm relieved to
17  hear that, because I -- regardless of what you can do with the
18  statute of repose -- and I understand now what Your Honor was
19  saying -- I don't think that the Legislature here intended to
20  bar a case which the public did not already have or would not
21  have before 1997, and I have two reasons for that, and I keep
22  going back to the language itself.  It applies to people who
23  may have a claim, and I don't think there's any evidence they
24  had a claim.  But then we get to the legislative history.

A-276

25       Now, Ms. Hogan made I believe one misstatement

1 concerning the legislative history, and she said it was
2 attached to her objection.  I believe the legislative history
3 was attached to a motion to reply.

4        THE COURT:  Yes.

5        MR. SPEIGHTS:  And I don't know whether that motion
6 has been granted or not, and my concern is not that -- I don't
7 have a problem with them replying, but I do have a problem if
8 they're now supplementing the record with evidentiary material,
9 and I can't respond to it.  And I do believe that now that they
10 have relied on evidentiary material -- it's one of my technical
11 objections -- not appropriate for an omnibus hearing to be
12 arguing evidence about what was intended.

13        Leaving that aside, the technical side though, in the
14 legislative history -- it's always -- I suppose this is why
15 Justice Scalia hates legislative history, because anybody can
16 find anything.  I happen to know Doug Barr.  He happens to be
17 running for the Supreme Court of North Dakota right now, but
18 Mr. Barr dealt with the first issue which is notice, because in
19 the MDU trial -- this is set forth in my brief -- there had
20 been a great deal of testimony devoted to what MDU knew,
21 because the State had informed it of certain things through lab
22 results that they had taken.

23        The whole knowledge issue that Mr. Barr wanted to get
24 rid of in lawsuits involving the State, he did not deal with
25 the injury issue.  But somebody did deal with the injury issue,

A-277

1  and I believe he is an industry spokesperson, and that person's

2  testimony -- at least its comments appear on page 23 of the

3  attachment to the motion to amend our motion to file a reply.

4  And the last paragraph says, "Innocent building owner already

5  protected.  If there is someone around who doesn't know or

6  doesn't have knowledge of facts that would cause them to know

7  of an asbestos problem, the six-year statute will not have

8  begun to run against their claim.  S.B. 2301 --" that's the

9  statute "-- would not affect these claims."

10          There's Mr. Barr.  There's the industry.  The

11  legislative history has a lot in it.  I believe the Legislature

12  -- I believe that was a USG spokesperson -- was saying that we

13  have a discovery statute, etcetera.  I would not even grab

14  those claims.

15          In any event, Your Honor, I'm not sure this is all

16  the legislative history if Ms. Hogan stands up and says I

17  authenticate.  There's no affidavit or anything else.  And if

18  she authenticates that is all the legislative history, I will

19  accept that authentication.  I still would want to respond to

20  the legislative history of this, however, if you allow the

21  motion -- allow the supplementation, because I'm quite

22  confident that we can through discovery get testimony that

23  would support our interpretation by people involved in the

24  Legislature at the time, which raises I guess the last points,

25  Your Honor, that -- the procedural issues.

A-278

**J&J COURT TRANSCRIBERS, INC.**

1    I don't want to spend much time on this, because at
2 the end of the day we're going to be right back here arguing
3 substance.  I do believe that under the roadmap Your Honor set
4 in October my understanding was they would file objections, we
5 would have discovery, and then they would file dispositive
6 motions.  To the extent that's not the roadmap, and Your Honor
7 wants to hear this substantively, I understand that, I'm not
8 going to scream and yell about that procedure.  But we have
9 other objections in other bankruptcies, and I though that was
10 the procedure we would normally do.  I do think it is clear,
11 Your Honor, has said that you're not having evidentiary
12 hearings at omnibus hearings.

13    THE COURT:  Right.  I am not.

14    MR. SPEIGHTS:  And to the extent that we're going any
15 way past the literal language of the statute, then I think we
16 have evidentiary issues involved.  My position is you ought to
17 read the statute in my favor, but if you don't, then I'm
18 entitled to discovery and an evidentiary hearing to show why
19 the legislative intent was consistent with what I am saying to
20 you today, Your Honor.

21    In any event, I think you understand my position.  My
22 position is very simply that the legislation does not require
23 it.  That the result -- and the legislation would, I believe,
24 suggest an absurd result, as interpreted by the debtors, would
25 suggest that the Legislature wanted to discriminate against the

A-279

**J&J COURT TRANSCRIBERS, INC.**

1  public building owners, the very public building owners they
2  wanted to protect, and create this anomalous situation in the
3  law where a private building owner could sue Owens Corning in
4  '95, in '97, in 2050 or whenever, provided they met your bar
5  date order, or did not have some other exception.  But a public
6  building owner could not do so, because it simply was not
7  harmed by this record before 1997.  Thank you, Your Honor.

8          MS. HOGAN:  Mary Beth Hogan for the debtors.  Just a
9  couple of points.  Mr. Speights raised the fact that we didn't
10 make this motion two years ago, and I think the Court is well
11 familiar with the efforts the debtors have made over the last
12 two years to get to this day.

13         THE COURT:  That's a non-starter.  He was making a
14 comment with respect to the fact that time frames are sometimes
15 a fluid point, and it --

16         MS. HOGAN:  Okay.

17         THE COURT:  -- we're where we are.

18         MS. HOGAN:  Okay.  We filed an objection, because at
19 the hearing in October Mr. Speights asked that we file
20 objection, we get to the front of the line rather than the back
21 of the line certain legal issues, so that these claims wouldn't
22 have to be subject to a CMO.  That's exactly what we've done,
23 and that's why we're here today.  So I think the debtors have
24 done what the Court has asked procedurally.

                          A-280
25              The one piece of legislative history -- and Mr.

26

 1 Speights is right.  This was attached to our reply, and we
 2 filed a motion that the reply be accepted, and the reason we
 3 attached the legislative history is because in his response he
 4 said that he'll be able to show through legislative history
 5 that the Legislature never intended the statute to bar actions
 6 after August of 1997, and when -- so we went and pulled the
 7 legislative history, and, in fact, it showed that that's
 8 exactly what was intended by the North Dakota Legislature.

 9        The one piece he pointed to, page 2, page 23, it's
10 interesting.  They're actually two very similar documents that
11 attached to the legislative history.  Both appear to be the
12 testimony of this industry lobbyist whose name is Thomas Kelsh.
13 And if you keep moving back to page 47, he has actually amended
14 his testimony, or it's different testimony.  And the very same
15 section that Mr. Speights points to, it has been changed, and
16 it says, "innocent building owner already protected."  He's
17 arguing against the statute.  He's saying I don't want this
18 statute.

19        Industry actually argued against it for two reasons.
20 They said that these claims are barred.  The State shouldn't
21 get a second chance.  Basically, they sat on their rights to
22 bring claims for many years, and they shouldn't get four more
23 years.  So that was one argument that industry made.  And in
24 order -- and they also said we don't want all these claims to
25 come due in 1997 or 1996.$^{A-281}$We want the ability to space out

**J&J COURT TRANSCRIBERS, INC.**

27

1 this liability over 30 or 40 years, and the Legislature said
2 no, you're going to deal with it all by 1997.  Basically, tough
3 luck, industry, but the payback is we're done in 1997.  You're
4 not going to have to face this litigation going forward.

5          And in arguing against litigation he said you don't
6 need the litigation.  He said if there are public building
7 owners around who do not know or do not have knowledge of the
8 facts that would cause them to know of an asbestos problem, the
9 six-year statute will not have begun to run against their
10 claim, so you don't need the statute, they're saying.  And then
11 he makes the points, "This statute, S.B. 2542, would limit
12 these innocent building owners to only four years."  So he's
13 specifically telling the Legislature you see what you're doing
14 here?  You're limiting them to four years.  They would've had
15 six years if they were an innocent building owner, but you're
16 limiting them to four years, and they passed the legislation
17 over his objections.

18          Mr. Speights made the argument that this -- there was
19 no claim.  There's no claim before 1997, and I have two
20 reactions to that.  One is that if you look in the legislative
21 history, there is specific reference on a number of occasions
22 to the University of North Dakota, which is one of the building
23 owners that -- whose buildings fall under this umbrella of
24 North Dakota claims.  They have pages and pages of buildings
A-282
25 that Mr. Speights represents now in this bankruptcy.  In 1993,

1  when this legislation was being discussed, it said the
2  University of North Dakota already had three million dollars in
3  abatement costs.  How did they not have a claim?  They had
4  three million dollars in abatement costs in 1993, and the
5  argument here today is they didn't have a claim before 1997.

6          THE COURT:  Well, I think what he's saying is that to
7  the extent that the claims were there before, they were surface
8  claims, and these are not surface claims, and that Owens
9  Corning and Fiberboard's action in convincing the Legislature
10 that the type of product that Owens and Fiberboard used was
11 non-friable made a difference and distinction between those
12 products that were friable and for which there was a known
13 claim at the time.  I believe that's his argument, and, you
14 know, facially that seems to have some appeal.  If Owens, in
15 fact, is saying, look, you don't have a claim, because there's
16 not a friable product, how can you then turn around and say but
17 you should've known you had a claim when we're telling you you
18 didn't?

19         MS. HOGAN:  Mr. Speights is confusing the argument.
20 We're not making that argument.  Our argument in this
21 bankruptcy is that there's no product I.D.  There's nothing
22 inconsistent.  We're saying there's no product I.D., therefore,
23 there's no claim on separate grounds -- product I.D. grounds,
24 while at the same time arguing even accepting all the facts in
25 the State of North Dakota's favor, and say there's Fiberboard

A-283

**J&J COURT TRANSCRIBERS, INC.**

1  and asbestos products all over the buildings, it's barred.
2  They're barred by the statute of limitations.  There's nothing
3  inconsistent about arguing no product I.D. and statute of
4  limitations, which is what we're arguing in this case.  He's
5  trying to bring in an argument that Grace made many years ago
6  in another case.  It's not the argument we're making here.

7          The other point I wanted to make is that Mr. Speights
8  said, you know, what could possibly be the rationale for the
9  Legislature acting as it did?  And the rationale I think is
10 quite clear.  At the time that this was passed, there was a
11 very strong argument that the claims from the State of North
12 Dakota were already stale, and this was an effort to give the
13 State a few more years -- four more years to get its act
14 together, to locate the asbestos, to deal with the problem, to
15 protect the public health in the State of North Dakota, and to
16 do that without having to worry about statute of limitations
17 problems that there already present in a litigation.  And they
18 have them four more years.  The statute was never repealed, is
19 still on the books, and there was a deadline, and it's passed.

20         And the idea that there wasn't a claim, that's just
21 one final point I'd like to make.  The statute, when you look
22 at it, the second subsection says, "Notwithstanding any other
23 law to the contrary."  That's how it starts.  So
24 notwithstanding what -- any other law, what the claim is under
                                    A-284
25 North Dakota, what a property damage claim is under North

1  Dakota, it says, "Notwithstanding any other law to the
2  contrary, any action must be brought." Any action that deals
3  with asbestos, and it specifically said, "to recover costs for
4  measures taken to locate, correct, or ameliorate." It doesn't
5  say there has be contamination in order to have a claim. It
6  says a claim exists if you want to recover costs for locating.
7  It's providing a claim to the State of North Dakota. It's
8  providing something extra for public buildings that is not
9  available for private buildings in North Dakota.

10       That's the rationale for this legislation, and it
11  makes perfect sense. They had four more years to deal with the
12  problem. The problem was well known in 1993. The University
13  of North Dakota already had three million in abatement costs at
14  that time, and to argue that it didn't have a claim before 1997
15  is I just believe lacks merit. Thank you.

16       THE COURT: All right. Mr. Speights.

17       MR. SPEIGHTS: I must respond to three statements
18  there. I'm not going back to any other arguments, Your Honor.
19  Number one. This is the objection of the debtors to the State
20  of North Dakota's claim that brings us to Pittsburgh today.
21  Page 8, "There is no evidence of any harm arising from the
22  debtors' product," period.

23       THE COURT: Right.

24       MR. SPEIGHTS: Not a product I.D. issue. Number two.
25  You're absolutely right, Your Honor, that the University of

31

1  North Dakota has spent three million dollars with Grace and
2  USG.  I don't know if the debtors know this.  We sued Grace and
3  USG after this statute and litigated on behalf of the State of
4  North Dakota against the surface manufacturers.  Those were the
5  only surface manufacturers we found in North Dakota and settled
6  those cases as to Grace as we started the trial.

7         Number three, Your Honor, with respect to Ms. Hogan's
8  last statement, I believe what she is suggesting is that in
9  1995 the State of North Dakota could've sued OC and Fiberboard,
10 and they would not have raised -- could not have raised under
11 the defense that the product is not hazardous.  I just don't
12 believe that's realistic for us to assume that.  I mean they in
13 a products liability action would've been screaming that their
14 product is not hazardous, and we could not have proven that
15 under the record here today.  That's the flip of what she's
16 saying.  That if we had to bring the suit then, we wouldn't
17 have had to prove a hazard, because under their testimony
18 today, there was no hazard then or today.  Thank you, Your
19 Honor.

20        THE COURT:  Okay.  It seems to me that a fair reading
21 of this statute indicates on its face, without a reference to
22 the legislative history, that the claim by the public building
23 owners in the State of North Dakota are barred.  That the
24 statute of limitations, in fact, acts as both an extension, as
                            A-286
25 we've talked about, for claims that were previously barred, a

1  limitations period for ongoing claims, a discovery period for

2  claims that are not known, because it does provide for

3  reimbursement of costs for building owners to go and look to

4  determine whether there is an asbestos problem and to bring

5  those claims within four years, and, therefore, it also acts as

6  a statute of repose.  I don't know the theory by which the

7  Legislature would've selected out public buildings versus

8  private buildings, but again that's a legislative prerogative,

9  and that's apparently what they chose to do, and I do not

10 believe that this -- that the public building owners in the

11 State of North Dakota currently have a claim unless it was

12 filed before August 1st, 1997 against the debtors dealing with

13 property damage -- asbestos property damage issues.

14         I do not believe I need to get into the legislative

15 history for that purpose.  I think the statute is clear on its

16 face.  To the extent that I do need to get into the legislative

17 history, Ms. Hogan, Mr. Speights did ask, and I think it's

18 appropriate, to know whether this is the entire legislative

19 history that has been appended to your reply brief.

20         MS. HOGAN:  It's everything we could find.  We made a

21 request to the State of North Dakota, and this is what was

22 provided.  We didn't leave anything out.  This is every single

23 page that we received.

24         THE COURT:  Mr. Speights, is there something you want

25 an opportunity to try to supplement with respect to whether

A-287

J&J COURT TRANSCRIBERS, INC.

1   there is additional legislative history?

2          MR. SPEIGHTS:  I do, Your Honor.  I understand your

3   first ruling, but -- and because I certainly -- for several

4   reasons.  First of all, I do want to present or have the

5   opportunity to present more evidence in terms of legislative

6   history or the intent of the statute.

7          THE COURT:  But the legislative history will be

8   reported or not.  If it's not reported, I don't think we're

9   going to get into testimony about it.  I'm not -- that is

10  definitely a collateral issue.  It appears to me that whatever

11  the state attributes its legislative history to be, that's it.

12  But I'm not going to have people attacking the legislative

13  history.  That is clearly a collateral issue.  So I've

14  indicated I don't think I need to get into the legislative

15  history, but to the extent I do, obviously, I want to consider

16  all of the legislative history not selected portions.  But I'm

17  not to permit a collateral attack on the legislative history.

18  It's either there, or it's not there.  That was up to the

19  Senate or the House in North Dakota to determine what it's

20  legislative history would be not me.

21          MR. SPEIGHTS:  Here's the position I'm in, Your

22  Honor.  I'm not trying to be difficult here.  I understand your

23  reading of the statute is different than my reading of the

24  statute.  But they have filed a motion to amend and have

25  attached a bunch of stuff, and the motion I guess has been

A-288

**J&J COURT TRANSCRIBERS, INC.**

1 | granted today.

2 | THE COURT: I did permit them to respond. They had
3 | filed that motion actually a while back, and somehow or other
4 | it was my error. I just simply missed the fact that it hadn't
5 | been granted. If you need an opportunity to supplement, I'm
6 | happy to give it to you.

7 | MR. SPEIGHTS: I want to do that, Your Honor, and
8 | what I can and can't do, I haven't thought it through, but I
9 | understand Your Honor's concerns about getting away from the
10 | legislative history. But I do want to respond to that, and
11 | especially -- and I only say that -- I say that, because I
12 | think it's fair to my clients to be able to respond to that,
13 | and the last thing in the world we all want is to go up on some
14 | appeal, and it be sent back, let me respond, and go back up
15 | again. I want the record to be clear, so that it can be done
16 | expeditiously.

17 | THE COURT: All right. How much time do you want to
18 | do a surreply and attach any additional legislative history?

19 | MR. SPEIGHTS: Fourteen days, Your Honor.

20 | THE COURT: Okay. Will that be enough time? I don't
21 | know. Apparently, the legislative history had to be gathered
22 | through the State as opposed to a compilation of it

23 | MR. SPEIGHTS: How about -- I think the next omnibus
24 | hearing is like 21 days, so if I could do it before then, so at
25 | least you can be advised that the attached now have been

A-289

J&J COURT TRANSCRIBERS, INC.

1  submitted.  Before the next omnibus hearing I'll submit it?

2          MS. HOGAN:  Yes, I think it took a matter of days to

3  get it from the State.  It wasn't a lengthy --

4          THE COURT:  It wasn't a long process.

5          MS. HOGAN:  No.

6          THE COURT:  Okay, so the next -- what is the next

7  omnibus?  June 27th?

8          MS. HOGAN:  June 27th.

9          THE COURT:  All right, so how about if I give you

10  until June the 17th?  That's a month.

11          MR. SPEIGHTS:  Yes, that would be good, Your Honor.

12          THE COURT:  All right, then why don't you just put

13  this back on the next omnibus, so that if there are any

14  additional points that you feel you need to argue in light of

15  what Mr. Speights suggests, I'll hear that, but I don't want it

16  reargued.  I understand your positions.  This is simply an

17  opportunity for Mr. Speights to comment on the debtors' reply

18  brief, and the debtor, if there is anything additional, to make

19  some additional comments.  So let's put it back on the omnibus

20  for June.

21          MS. HOGAN:  And just to clarify, in terms of

22  supplemental information, it will be -- if there is any

23  additional legislative history from the time not --

24          THE COURT:  Correct.

A-290

25          MS. HOGAN:  -- not anything more recent.

1      THE COURT:  Yes, I'm looking for legislative history
2  to the extent that I need to go outside the face of the
3  statute, but I've already indicated I think the statute's
4  clear, however, to the extent you've already argued legislative
5  history -- and both of you have -- I think it's fair for the
6  State of North Dakota to supplement what it chooses, and I will
7  take a look at it.  Whether I need to refer to it or not at
8  this point, frankly, I'm not convinced I do, but nonetheless,
9  you've given me a lot, so I will take a look.  If Mr. Speights
10  has something else, I'll definitely take a look at that, too,
11  and then we'll discuss it again at the next omnibus hearing.
12  Okay.  Thank you.

13      MS. HOGAN:  Thank you, Your Honor.

14      THE COURT:  Any other matters today?  Mr. Becker.

15      MR. BECKER:  Your Honor, I have -- Your Honor, Gary
16  Becker, Kramer, Levin, Naftalis, and Frankel, for Credit Suisse
17  First Boston.  Your Honor, I have one housekeeping matter.

18      THE COURT:  All right.

19      MR. BECKER:  On April 20th we submitted a certificate
20  of counsel, a stipulation reallocating the fee caps among the
21  financial advisors for the commercial creditors.  That was a
22  stipulation between the debtors, the --

23      THE COURT:  I haven't seen it.

24      MR. BECKER:  Your Honor, I have a copy I can hand up,
25  if you would like.

A-291

**J&J COURT TRANSCRIBERS, INC.**

 1              THE COURT:  Why don't you -- I'm not sure why I'm

 2    missing these things.  Are they being sent to Ms. Bello?  Are

 3    they not related?  Maybe -- are they related to a specific

 4    motion?

 5              MR. COBB:  Your Honor, it's Richard Cobb on behalf of

 6    -- I am co-counsel with Kramer, Levin.  Your Honor, we did send

 7    this by e-mail under your procedure over to Rachel.

 8              THE COURT:  On April -- I'm sorry.  April 20th?

 9              MR. BECKER:  April 20th.  Yes, Your Honor.

10              THE COURT:  Okay.  I have not seen it, so --

11              MR. BECKER:  Your Honor, if I may, I can hand up the

12    order.

13              THE COURT:  Well, I'll take it now, but I don't know

14    whether I'm going to sign it now.  I don't know what it is,

15    so --

16              MR. BECKER:  I could describe it if you'd like, Your

17    Honor.

18              THE COURT:  All right.

19              MR. BECKER:  Your Honor, as you know, under the

20    various procedures that have been adopted in this case, the

21    Commercial Creditors Committee actually has two components.

22    The designated members who are the bondholders and the bank

23    members.  And the Commercial Committee itself, as well as each

24    of those two subgroups, have their own financial advisors.

                              A-292

25    There were a few caps imposed on the financial advisors.  Quite

38

1  some time ago --

2      THE COURT:  Yes, because I only permitted the bank as
3  a subgroup to have its own advisors for a limited purpose, and
4  I'm not so sure that limited purpose didn't expire several
5  years ago, frankly.

6      MR. BECKER:  Your Honor, because of the divisions in
7  the Committee, it made sense to reallocate -- and we've done it
8  once before, in March of 2004 -- to reallocate the fee caps
9  among the three financial advisors to more accurately reflect
10 who was doing the work, and we have, based on the history over
11 the past year, made a determination that it would make sense to
12 reallocate those fee caps again.  No increase, just a
13 reallocation among those three advisors, and that's what the
14 stipulation does.

15     THE COURT:  All right.  Well, I am still -- I think I
16 need back on the next agenda -- I don't know that I'm going to
17 approve this now.  I want to know why it is that I still have
18 more than one advisor for the Committee.  It seems to me that I
19 have a Committee.  The banks I thought had a conflict with
20 bonds as to one specific issue.  As far as I know, that issue
21 is over, unless it's on appeal to the Third Circuit.

22     MR. BECKER:  It's still on appeal to the Third
23 Circuit, Your Honor.

24     THE COURT:  Okay, then there should be very limited
A-293
25 work that the financial advisors for the banks are doing that

**J&J COURT TRANSCRIBERS, INC.**

1 are chargeable against this estate.  This is not a freewheeling
2 opportunity by specific creditors to have their legal fees
3 paid.  It was never intended to be that.  The banks' advisors
4 have been paid well more than I ever anticipated would be paid
5 pursuant to this, and I want to know why it is that the banks'
6 advisors are still necessary.  So I'll take this stipulation.
7 I am not signing it now.  I want this back on the agenda.  I
8 want something that tells me what it is that -- why I need
9 three sets of advisors, and why if I need three sets of
10 advisors, the bonds need a set of advisors.  I mean at some
11 point in time I expect only one counsel for the Committee.
12 This is a Committee.  It's not two committees.  So it's time to
13 end this.  I want one set of advisors.  You folks can pick.  If
14 you have a conflict, that's going to be a bigger issue, but I
15 want it back on the June agenda.  I'll take the stipulation.
16 I'm not entering it until I get some project plan in mind as to
17 who's doing what and why.

18          MR. BECKER:  Would you anticipate, Your Honor, a
19 supplemental brief on this issue?

20          THE COURT:  A brief or, you know, some affidavit as
21 to what you're doing is fine.  I don't really need like
22 citations to legal matters.  I want to know as a practical
23 matter why I still need so many professionals to deal with one
24 single Committee.  I mean the debtor has a plan filed.
25 Admittedly, it's going to have to be modified.  Even assuming

A-294

1  that the Circuit affirms the rulings that have gone on, it will
2  have to be modified but not substantially if this is affirmed.
3  So I'm not sure at this point why all of these separate
4  subgroups need their own advisors to be paid for by this
5  estate.  I think it's time to put an end to it, so I'd like to
6  know why this process should continue.

7          MR. BECKER:  Your Honor, I think as an immediate
8  matter, the plan will be revised substantially to reflect
9  decisions on asbestos numbers as well as substantive
10 consolidation.

11          THE COURT:  Well definitely on the asbestos numbers,
12 yes, I think the debtor now has marching orders.  And as I
13 said, unless there is some reversal, the numbers will have to
14 be revised, and there will be some reallocation.  But at this
15 point, the issue as to which the banks and the bonds had a
16 conflict, i.e., substantive consolidation and who was going to
17 get what divisible share of the proceeds, is done, unless the
18 Circuit revises it.  I don't see any need to have two separate
19 counsel arguing on behalf of this estate and this estate
20 bearing this huge expense any longer.  So I want to know
21 specifically as a project plan what every advisor for the
22 Committee is going to be doing and why, and I want a budget
23 proposed, because I think it's time to put an end to this.
24          MR. BECKER:  Your Honor, I just preliminarily --
25          THE COURT:  Except for the appeal.
A-295

J&J COURT TRANSCRIBERS, INC.

1              MR. BECKER:   The substantive consolidation is not

2   really the only thing that divides the bondholders and the bank

3   creditors.   There is a fraudulent conveyance lawsuit which the

4   debtor bought in 2002, which the bondholders moved to intervene

5   in, which presumably will need to be resolved at some point.

6   There may be other issues in the plan confirmation process

7   which the two sides could be expected to disagree with --

8              THE COURT:   Then, you know, then --

9              MR. BECKER:   -- because the bondholders --

10             THE COURT:   -- if that's the issue, then the bonds

11  may have to go out and get their own counsel and so may the

12  banks, because at this point in time this is a Committee for

13  the benefit of unsecured creditors, and, folks, that's what you

14  all are, and at this point the debtor is gathering its assets,

15  its making a plan to put the funds out there according to the

16  proceeds the way the debtor believes they should be allocated

17  given the distribution of claims.   The Court so far has told

18  you you're unsecured creditors.   There is substantive

19  consolidation.   They defined the asbestos numbers.   At this

20  point a fraudulent conveyance lawsuit is only either going to

21  bring more money in or not bring more money in, and it's going

22  to be divided up the way the plan says it's going to be divided

23  up, and I don't know that there is such a major conflict that

24  this estate should have to bear that expense.

                             A-296
25             MR. BECKER:   Your Honor, the fraudulent conveyance

                    J&J COURT TRANSCRIBERS, INC.

1  lawsuit seeks to avoid the banks' guaranties from the
2  subsidiaries which affects the structure of the plan.

3          THE COURT:  Okay.  Well, yes, it would affect the
4  structure of the plan.  I'm sure.  But how that causes a
5  conflict among all unsecured creditors such that this estate
6  should pay the banks to defend that suit is something I don't
7  understand.  I mean if the banks are subject to that, then it's
8  not a Committee issue.  It's a bank issue as a creditor group.
9  So I don't think that the estate is going to continue to bear
10 this cost very long.

11         MR. BECKER:  Your Honor, the -- for the record, the
12 bank financial advisor fees are paid pursuant to a stipulation
13 by which the banks do not take action against the non-debtor
14 subsidiaries.

15         THE COURT:  Okay.  Well, perhaps that's a reason to
16 continue it, so put it all in something that gives me a
17 proposal for the next omnibus hearing, Mr. Becker.  That's what
18 I say.  I know I'm a day late and a dollar short with respect
19 to some of these issues, and I want to be updated.

20         MR. BECKER:  Thank you, Your Honor.

21         THE COURT:  Okay.  But I'll take the stipulation, but
22 I am not going to sign it now.  I'll ask that it be put on the
23 agenda for June.

24         MR. BECKER:  Yes, Your Honor.  Thank you.
                            A-297
25         THE COURT:  Thank you.

            J&J COURT TRANSCRIBERS, INC.

1          MR. BECKER:  Your Honor, I've handed up the

2    certificate of counsel with a stipulation attached, and I've

3    given your Clerk a separate stipulation alone.

4          THE COURT:  Oh, okay.  Thank you.  Is this not

5    related to something that's already of record if it's a

6    reallocation?  There are no related docket numbers at all.

7          MR. BECKER:  The docket number, Your Honor, is 1-4-9-

8    6-9.

9          THE COURT:  Well shouldn't it be on -- you mean the

10   certification number?

11         MR. BECKER:  Yes, it is, Your Honor.

12         THE COURT:  What is it?  One four --

13         MR. BECKER:  One four nine six nine.

14         THE COURT:  But isn't it related to something else?

15         MR. BECKER:  It's -- I believe it relates back to the

16   order last year, Your Honor.

17         THE COURT:  Well, that's what I mean.  You know,

18   there's no way.  If you don't put the things on here according

19   to the case management order, that I can track what you're

20   doing, so, please, for June give me a copy that has the related

21   docket numbers on it, so I can go back and take a look at the

22   original and then the reallocated stipulations, too?

23         MR. BECKER:  Yes, Your Honor.

24         THE COURT:  All right.  Thank you.

25                        A-298 (Pause)

1          MR. BECKER:  I can have it re-e-mailed, Your Honor.

2          THE COURT:  That would be a good idea.  I think

3   sometimes with the change in servers there have been some

4   problems with getting some of the e-mail communications, Mr.

5   Becker, but Ms. Bellow is very good.  When she gets the things

6   in, we get them almost immediately, and I have not seen this.

7          MR. BECKER:  Okay, Your Honor.  Thank you.

8          THE COURT:  Ms. Stickles.

9          MS. STICKLES:  Your Honor, that concludes everything

10  that was listed for this morning in Owens Corning, unless Your

11  Honor has any questions.

12         THE COURT:  Anybody have any housekeeping matters?

13                   (No verbal response)

14         THE COURT:  Okay.  That's it.  Thank you.  We're

15  adjourned.

16         MS. STICKLES:  Thank you.

17                   *  *  *  *  *

18                   CERTIFICATION

19         I, PATRICIA C. REPKO, court approved transcriber,

20  certify that the foregoing is a correct transcript from the

21  official electronic sound recording of the proceedings in the

22  above-entitled matter to the best of my ability.

23

24  _____      Date:  May 23, 2005
25  PATRICIA C. REPKO          A-299
26  J&J COURT TRANSCRIBERS, INC.

                   J&J COURT TRANSCRIBERS, INC.